IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| T.B., a minor,<br>by and through his next friend and mother,<br>SHERRI JAMES,<br>Kansas City, Missouri,<br><br>                  Plaintiff,<br><br>v.<br><br>OFFICER PETER NEUKIRCH,<br>in his individual capacity,<br>c/o Kansas City, Missouri Police Department<br>South Patrol Division<br>9701 Marion Park Drive<br>Kansas City, Missouri 64137,<br><br>and<br><br>OFFICER JONATHAN MUNYAN,<br>in his individual capacity,<br>c/o Kansas City, Missouri Police Department<br>South Patrol Division<br>9701 Marion Park Drive<br>Kansas City, Missouri 64137,<br><br>and<br><br>DETECTIVE JOHN MATTIVI,<br>in his individual capacity,<br>c/o Kansas City, Missouri Police Department<br>Violent Crimes Administrative Squad<br>Police Headquarters<br>1125 Locust<br>Kansas City, Missouri 64106,<br><br>and<br><br>SERGEANT JOHN DOE I,<br>in his individual and official capacities, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 4:17-cv-695<br>)<br>)  JURY TRIAL DEMANDED |

c/o Kansas City, Missouri Police Department )
South Patrol Division )
9701 Marion Park Drive )
Kansas City, Missouri 64137, )
)
and )
)
CAPTAIN JOHN DOE II, )
in his individual and official capacities, )
c/o Kansas City, Missouri Police Department )
South Patrol Division )
9701 Marion Park Drive )
Kansas City, Missouri 64137, )
)
and )
)
JOHN DOE III, )
in his individual and official capacities, )
c/o Kansas City, Missouri Police Department )
Police Headquarters )
1125 Locust )
Kansas City, Missouri 64106, )
)
and )
)
DARRYL FORTÉ, )
in his former official capacity as Police )
Chief of the Kansas City, Missouri Police )
Department, )
)
and )
)
LELAND SHURIN, )
in his official capacity as President and a )
member of the Board of Police )
Commissioners of Kansas City, Missouri, )
)
and )
)
ANGELA WASSON-HUNT, )
in her official capacity as Treasurer and a )
member of the Board of Police )
Commissioners of Kansas City, Missouri, )

2

```
                                        )
and                                     )
                                        )
MICHAEL RADER,                          )
in his official capacity as a member of the  )
Board of Police Commissioners of Kansas )
City, Missouri,                         )
                                        )
and                                     )
                                        )
NATHAN GARRETT,                         )
in his official capacity as a member of the  )
Board of Police Commissioners of Kansas )
City, Missouri,                         )
                                        )
and                                     )
                                        )
MAYOR SYLVESTER "SLY" JAMES,            )
in his official capacity as a member of the  )
Board of Police Commissioners of Kansas )
City, Missouri,                         )
                                        )
                        Defendants.     )
```

## FIRST AMENDED COMPLAINT

COMES NOW Plaintiff T.B., a minor, by and through his next friend and mother,

Sherri James, and for his causes of action against Defendants Peter Neukirch, Jonathan

Munyan, John Mattivi, Sergeant John Doe I, Captain John Doe II, Sergeant/Captain John

Doe III, Darryl Forté, and Kansas City, Missouri Board of Police Commissioners Leland

Shurin, Angela Wasson-Hunt, Michael Rader, Nathan Garrett[1], and Mayor Sylvester "Sly"

James, and states and alleges as follows:

---

[1]Garrett was appointed to the Board by Governor Eric Greitens on July 27, 2017.  The
appointment is subject to the consent of the Missouri Senate.  MO. REV. STAT. § 84.360.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues raised herein.

**NATURE OF ACTION**

1. On June 8, 2016, fifteen-year-old T.B. was walking home from summer school when he was stopped by a Kansas City, Missouri police officer and, because another KCPD officer wrongfully identified him as a black male who had run from him a few blocks away, he was arrested on a weapons charge. Even though there was immediately available video from the dash cameras of two police vehicles that were on the scene that would have shown conclusively that T.B. was not the fleeing male, none of the officers who responded to the scene looked at the video. And, the detective who was assigned to the case did not look at the video for *three* weeks. All the while, T.B. was held in the Juvenile Detention Center. On June 29, 2016, the detective reviewed the videos, concluded that T.B.'s denial of any involvement was credible based on what he saw in the videos, and presented his findings to the Juvenile Court Prosecutor. The prosecutor dismissed the charges and T.B. was released to his mother. Because T.B. was arrested – wrongfully – no further efforts were undertaken by the police to locate the actual perpetrator who remains unapprehended.

2. Accordingly, Plaintiff T.B. now brings this action against Defendants Neukirch, Munyan, Mattivi, Doe I, Doe II, and Doe III alleging that beginning on June 8, 2016 and continuing to approximately 4:00 p.m. on June 29, 2016, he was wrongfully arrested and detained without probable cause in violation of the Fourth Amendment to the United States Constitution (as applied by the Fourteenth Amendment). T.B. further alleges that his wrongful detention shocks the conscience and deprived him of due process. T.B. also alleges

4

that the violation of his constitutional rights was caused by the negligent and/or inadequate training and/or the negligent and/or inadequate supervision of Defendants Neukirch, Munyan, and Mattivi by Defendants Doe I, Doe II, Doe III, and Forté, and the Defendant Commissioners. Lastly, T.B. alleges Defendants Doe I-III's, Forté's and Defendant Commissioners' policies, practices, procedures, and customs which permitted law enforcement officers, in deliberate indifference to T.B.'s liberty interests, to ignore and/or "sit on" evidence of his innocence – known or knowable before he was arrested and detained – directly caused or contributed to the violations of his constitutional rights.

**PARTIES**

3.   Plaintiff T.B. is currently a seventeen-year-old African-American male who resides with his mother in Kansas City, Jackson County, Missouri. At the time of the events giving rise to this lawsuit, he was fifteen years old and attending Ruskin High School's  summer school session at the Smith-Hale Middle School building. He is now a student at Ruskin High School.

4.   Defendant Officer Peter Neukirch is a police officer employed by the Kansas City, Missouri Police Department (KCPD). On information and belief, he is a resident of the City of Kansas City, Missouri, which lies within the Western Division of the Western District of Missouri. Defendant Neukirch is sued in his individual capacity.

5.   Defendant Officer Jonathan Munyan is a police officer employed by the Kansas City, Missouri Police Department. On information and belief, he is a resident of the City of Kansas City, Missouri, which lies within the Western Division of the Western District of Missouri. Defendant Munyan is sued in his individual capacity.

5

6.  Defendant Detective John Mattivi is a detective employed by the Kansas City, Missouri Police Department.  On information and belief, he is a resident of the City of Kansas City, Missouri, which lies within the Western Division of the Western District of Missouri.  Defendant Mattivi is sued in his individual capacity.

7.  Defendant Sergeant John Doe I is a sergeant employed by the Kansas City, Missouri Police Department.  On information and belief, Doe I is a resident of the City of Kansas City, Missouri, which lies within the Western Division of the Western District of Missouri.  Among Sergeant Doe I's duties and responsibilities are the training and supervision of Defendants Neukirch and Munyan.  Defendant Doe I is sued in his individual and official capacities.

8.  Defendant Captain John Doe II is a captain employed by the Kansas City, Missouri Police Department.  On information and belief, Doe II is a resident of the City of Kansas City, Missouri, which lies within the Western Division of the Western District of Missouri.  Among Captain Doe II's duties and responsibilities are the training and supervision of Defendant Doe I, and, by extension down the chain of command, Defendants Neukirch and Munyan.  Defendant Doe II is sued in his individual and official capacities.

9.  Defendant John Doe III is an officer employed by the Kansas City, Missouri Police Department.  On information and belief, Doe III is a resident of the City of Kansas City, Missouri, which lies within the Western Division of the Western District of Missouri.  Among Doe III's duties and responsibilities are the training and supervision of Defendant Detective Mattivi.  Defendant Doe III is sued in his individual and official capacities.

10.  Defendant Darryl Forté, at the time of the events giving rise to this lawsuit, was

6

the Chief of the Kansas City, Missouri Police Department. He has since retired. On information and belief, Forté is a resident of Kansas City, Missouri. By statute, the Chief of Police for the Kansas City Missouri Police Department is the chief executive officer of the police department. MO. REV. STAT. § 84.500. Defendant Forté was responsible to the Board of Police Commissioners for proper administration of police affairs and the execution of policy pertaining to police affairs a determined by the Board of Police Commissioners. *Id*. The Chief has the power to appoint, subject to the approval of the Board, and has the power to promote, discipline, and suspend all police officers. *Id*. Among Forté's duties and responsibilities through the chain of command, were the training and supervision of Defendants Neukirch, Munyan, Mattivi, and Defendants Doe I-III. Defendant Forté is sued in official capacities.

11. The Board of Police Commissioners of Kansas City, Missouri ("the Board") is a state agency that can be sued by serving and naming the individual members of the Board of Police Commissioners[2]. The Board is an agency created and existing in accordance with the laws of the State of Missouri, specifically, MO. REV. STAT. § 84.350. The Board is charged by statute with several duties and responsibilities. MO. REV. STAT. § 84.420. The Board is statutorily empowered to determine police policy and to that end, is required to, *inter alia*, adopt rules and regulations governing the conduct of the Kansas City, Missouri Police Department and its officers and employees and to appoint a chief of police who is responsible to the Board for proper execution of the policies, duties, and responsibilities established for

---

[2]The members of the Board are collectively referred to herein as "Defendant Commissioners".

7

the administration of the police department. The Board is empowered to provide and contract for liability insurance coverage for officers and employees insuring liabilities incurred during the performance of duty and in the scope of employment for the police department. *Id.* The Board is composed of four members appointed by the Governor of the State of Missouri and the Mayor of the City of Kansas City. MO. REV. STAT. §§ 84.350, 84.360.

12. The Board has exclusive management and control of its policies and practices regarding the method and manner of response to calls for officer assistance and is responsible for assuring that members of the Kansas City, Missouri Police Department conduct themselves in a lawful manner in undertaking their duties.

13. Defendant Leland Shurin is sued in his official capacity as President and member of the Board of Police Commissioners of Kansas City, Missouri. On information and belief, he is a resident of Kansas City, Missouri.

14. Defendant Angela Wasson-Hunt is sued in her official capacity as Treasurer and member of the Board of Police Commissioners of Kansas City, Missouri. On information and belief, she is a resident of Kansas City, Missouri.

15. Defendant Michael Rader is sued in his official capacity as a member of the Board of Police Commissioners of the Kansas City, Missouri Police Department. On information and belief, he is a resident of Kansas City, Missouri.

16. Defendant Nathan Garrett is sued in his official capacity as a member of the Board of Police Commissioners of the Kansas City, Missouri Police Department. On information and belief, he is a resident of Kansas City, Missouri.

17. Defendant Mayor Sylvester "Sly" James is sued in his official capacity as a member of the Board of Police Commissioners of the Kansas City, Missouri Police Department. On information and belief, Mayor James is a resident of Kansas City, Missouri.

## STATE ACTION

18. The acts and omissions of all Defendants herein which give rise to Plaintiff's claims were committed by them while acting under color of state law and the regulations, policies, procedures, practices, customs, and usages of the Kansas City, Missouri Police Department.

## JURISDICTION AND VENUE

19. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343.

20. The Court has jurisdiction over Defendants because the unlawful acts alleged in this Complaint were committed in Kansas City, Jackson County, Missouri, which lies within the Western District of Missouri.

21. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events, acts, or omissions giving rise to Plaintiff's claims occurred in Kansas City, Jackson County, Missouri, which, as provided in 28 U.S.C. § 105(b)(1), lies within the Western Division of the Western District of Missouri.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

22. On June 8, 2016, at about 4:00 p.m., Plaintiff T.B. had taken the bus home after school, but when he got to the front door, he found it locked with no one home to respond. Realizing that he did not have his key, he walked to his aunt's house. Finding no one at home there either, he decided to return home and began walking back along 87th Street.

23. T.B. was dressed in a white tee-shirt, black basketball shorts with white trim on the front and/or sides, short black socks, and black high-top shoes with red trim. He wore his hair in short dreadlocks, lightened at the ends.

24. At about that same time, and completely unbeknownst to T.B., a Kansas Citian observed – and telephoned the Kansas City, Missouri Police Department to report – three African-American male teenagers standing in front of a residence near 91** Marsh Avenue, Kansas City, Missouri, who were talking with teenage females who lived at that residence. One of the males was armed with a weapon. That male was described by the dispatcher as having dreadlocks and as wearing a white shirt and blue shorts. One of the other two males was described as wearing a black tee-shirt. The boys were reportedly showing the gun to the girls.

25. Initially, Defendant Officer Peter Neukirch and Defendant Officer Jonathan Munyan, who were both in the same marked patrol vehicle, responded to the area.

26. Upon their arrival in the area, Neukirch observed three African-American males who matched the listed description standing in the front yard at 91** Marsh Avenue, talking to teenage females.

27. Neukirch later reported that when he and Munyan were observed by the group, all three males turned away from the officers and walked along side the residence and then the backyard fence on East 91st Terrace.

28. When Neukirch turned onto East 91st Terrace and engaged the emergency equipment, all three males began to run.

29. The dash camera in the patrol vehicle manned by Neukirch and Munyan was

10

activated. The dash camera video depicts three black males. One was wearing a white tee-shirt with medium blue shorts. A second male was wearing a black tee-shirt and dark shorts. A third male was wearing a white tee-shirt and dark black or blue or brown shorts.

30. Neukirch and Munyan exited their vehicle and attempted to take all three of the males into custody.

31. Neukirch was able to get two of the males to stop and lie on the ground in a prone position. He placed a knee on top of each of them to keep them from running and took them into custody without any further difficulty.

32. However, as Neukirch and Munyan left their vehicle, Neukirch observed the black male wearing the white tee-shirt and dark shorts turn to look at them. That male then clutched at his shorts and ran.

33. The video also reveals that the fleeing male had long hair in dreadlocks and that he was wearing long grey socks that extended halfway up the calves of his legs.

34. As the black male was running, Neukirch observed him pull a black semi-automatic pistol from beneath his shirt with his right hand.

35. On foot, Munyan pursued the male with the gun. Neukirch saw the black male attempt to turn south onto James A Reed Road and as he did so, Neukirch saw him throw the gun and he heard the gun hit a fence.

36. Munyan continued to give chase while further describing the male and his location, but he was unable to keep the male in view. The dispatch recording and the CAD log reflects that Munyan advised over the radio that the male was approximately 17 or 18 years of age, about five feet, ten inches tall, skinny, and was wearing a white tee-shirt and

11

blue shorts and that he had taken off his shoes. The male was last seen running westbound from East 92nd Terrace and James A. Reed Road. From Munyan's location, the officers concluded that the black male teenager who had thrown the gun had to have run to the north.

37. Sergeant Moran and Officer Adams responded to Neukirch's location and Moran immediately was able to locate the semi-automatic pistol where Neukirch had seen the black male throw it.

38. Meanwhile, Officer Christopher Viesselman heard the radio traffic and started to respond to the area of 91st Terrace and Manchester Road in an attempt to establish a perimeter for the fleeing black male. While en route, Viesselman observed a "younger" black male with "braids" wearing a white shirt and black and white shorts who was walking westbound on 87th Street that he believed matched the description of the fleeing male.

39. Officer Viesselman conducted a pedestrian check of the male who identified himself as T.B..

40. Officer Viesselman contacted Defendant Officer Munyan. When asked if T.B. appeared to have been running, *i.e.*, whether he was sweaty and/or demonstrated breathlessness, Viesselman indicated that T.B. was slightly sweaty, but breathing normally. Viesselman told T.B. he was being detained, explained that T.B. fit the description of someone who had a gun, and arrested him. Viesselman handcuffed T.B..

41. Officer Munyan Munyan went to the location where Viesselman was detaining T.B. and incorrectly identified T.B. as the fleeing male who had thrown the gun.

42. Plaintiff T.B. did not know what he had done to cause the officers to stop him. T.B. was told that two officers and an independent witness had said that he was the person

12

who had tossed the gun and run from the officers. T.B. denied having been with the other males and denied having had a gun.

43. Officer Viesselman then transported T.B. to the location near 91st Street and Marsh where the two other males were now handcuffed and seated by the fence. Viesselman transferred custody of T.B. to Neukirch and Munyan.

44. Officer Viesselman had engaged his dash camera and recorded the interaction with T.B.. He requested that a video hold be placed on the video that had been recorded by his dash camera. That video clearly showed T.B. as described *supra* at ¶23.

45. Although the interaction with T.B. was recorded, none of the officers at the scene looked at the video from Viesselman's dash camera.

46. Officer Neukirch or Officer Munyan ran checks on the two males that Neukirch had apprehended and on T.B.. None of the three had warrants.

47. Officer Neukirch then contacted the reporting witness who confirmed that he had made the call and had seen all three black males at 91** Marsh talking to the teenage girls who lived there. The witness further stated that he had observed two of the males pass the gun back and forth and that the tall one with the dreadlocks was the one who had the gun and was showing it to the girls.

48. The mothers of the two males that Neukirch had apprehended had been notified of the apprehension of their sons and they responded to the scene.

49. Although T.B. had denied that he was the male with the gun who had fled, and even though Neukirch's and Munyan's dash camera video was immediately available to the officers, none of the officers on the scene looked at the video to compare what T.B. was

wearing with what the male who had fled was wearing or to notice the differences in their hair.

50.  Had the officers on the scene reviewed the video they would have discovered key differences that supported T.B.'s denial.  Specifically, they would have seen:

     a.  that although the male who had fled had long dreadlocks that were dark all the way to the tips, T.B. had short, shoulder length dreadlocks that were lightened on the ends;

     b.  that although the fleeing male had solid dark shorts that were either black or dark blue, T.B. was wearing black shorts with white trim;

     c.  that the fleeing male had on dark shoes with long grey socks that extended halfway up his calves, while T.B.'s socks were short and black and his shoes were black high-tops with red trim; and,

     d.  that the fleeing male and T.B. were two different people.

51.  In addition, Munyan had advised over the radio that the fleeing black male had taken off his shoes and when Viesselman saw T.B., T.B. was wearing shoes.

52.  Officer Neukirch then contacted Defendant Detective John Mattivi who was assigned to the Violent Crimes Administrative Unit.  Mattivi directed Neukirch to release the two males to their mothers.

53.  Defendant Detective Mattivi also directed Neukirch to place T.B. on a twenty-four hour investigative hold and to transport him to the Juvenile Detention Center.  Sergeant Ortiz responded to the location where Neukirch and Munyan were holding T.B. and approved the twenty-four hour investigative arrest form without first comparing the two videos that

were immediately available to him.

54. Defendants Neukirch and Munyan transported T.B. to the Jackson County Juvenile Detention Center.

55. By the time Officers Neukirch and Munyan got T.B. to the Juvenile Detention Center, his mother had arrived.

56. T.B. and his mother again denied that T.B. had done anything wrong.

57. One of the officers told T.B.'s mother, "Ma'am, your son just ran from us with a gun."

58. At about 7:00 p.m., T.B. met with Defendant Detective Mattivi to give a recorded statement. T.B.'s mother and aunt were also present.

59. At that time, no charges had been filed. Mattivi advised T.B. that he was on an investigative hold for twenty-four hours for what would be regarded as a felony weapons offense and that within the twenty-four hour period, one of three things could happen. One was that he could be charged with a crime and kept in custody. Second, he could be released pending further investigation and charged later with a crime. Third, no charges would be filed and he would be released.

60. Deputy Juvenile Officer Michael Grimes advised T.B. and his mother of his rights.

61. Mattivi said that he would review the evidence, including the video. Initially, he said it could be that he would view it the next day, or perhaps even that night.

62. T.B. told his truthful story denying his involvement in the reported crime.

63. Mattivi told T.B. that there was a video and that he had spoken with the officers

15

who had reviewed the video by backing it up in the car. Mattivi also told T.B. that the officers had told Mattivi that they could see T.B. in the video, but he had not yet seen the video himself. Mattivi offered to let T.B. tell his story again, emphasizing that it was important for T.B. to tell him the truth.

64. T.B. repeated his story.

65. Mattivi again said that he would view the video and that he might do so by the next day.

66. T.B.'s mother asked if T.B. could be taken to school while the investigation continued.

67. When T.B. asked if he was going to be kept at the Juvenile Detention Center, Mattivi said he did not think so.

68. Continuing his response to T.B.'s question about whether he would be held, Mattivi reiterated that he needed to view the video and read the officers' reports that were then being written. However, this time, he indicated that he was very busy, that he would be going to another case after completing the interview, and that the video had to be gotten from the patrol vehicle and uploaded onto KCPD's computer system, and he was unsure when he could view it. T.B.'s mother emphasized her belief that the video would be exculpatory and urged Mattivi to view it as soon as practicable because she was confident that there would be no reason to keep T.B. in custody.

69. Ultimately, however, the prosecutor objected to T.B. being allowed to go home with his mother because – allegedly – "he had a gun." T.B. was detained at the Juvenile Detention Center.

70. On June 10, 2016, at an appearance in juvenile court, T.B.'s mother asked Detective Mattivi whether he had reviewed the video. Mattivi admitted that he had not done so. T.B. remained in custody at the Juvenile Detention Center.

71. T.B. had another court appearance on June 22, 2016, and on that occasion, T.B.'s mother again asked Detective Mattivi whether he had reviewed the video yet. Mattivi again admitted that he had not yet done so. T.B. remained in custody at the Juvenile Detention Center.

72. Finally, on June 29, 2016, three weeks to the day after T.B. had been arrested and taken to detention, Detective Mattivi finally reviewed the dash camera video from the Neukirch and Munyan vehicle. In the narrative describing his activity, reported at 12:33 p.m., Mattivi wrote:

> Upon reviewing the dash camera video I observed a black male with long braided hair (above shoulder) wearing a white T-shirt, black or dark blue shorts, long grey socks run from the officers. While running, the suspect reaches into his right front short pocket and retrieves a handgun. The suspect then throws the gun over a fence and runs out of view of the camera.

73. After viewing the Neukirch and Munyan video, Mattivi watched video from Officer Viesselman's dash camera. His narrative stated:

> I then reviewed the dash camera video of Officer Viesselman's pedestrian check of T.B. a short time later. I observed T.B. to be dressed very similar to that of the fleeing suspect portrayed in Officer Munyan and Neukirch video. I further observed T.B.'s shorts to appear different [sic] that of the fleeing suspect. T.B.'s shorts appeared to have a white colored pattern on the front/sides of the shorts. T.B.s [sic] socks appeared to be short and black in color. The fleeing suspect was observed to be wearing long grey colored socks that rode half way up his calves.
>
> Based on my observations, I believe the fleeing suspect shown in the initial video and video of T.B.'s arrest appear to be two different people. This information will be provided to the JACO Family Court Prosecutor's Office.

74. After completing his review of the two videos, Mattivi met with the Family Court Prosecutor and showed him the two videos. The prosecutor agreed with Mattivi that T.B. was not the same male who had fled from Neukirch and Munyan. The prosecutor further advised that the case against T.B. would be dismissed and he would be released to his mother. Mattivi closed the investigation of T.B. pending new evidence.

75. Mattivi contacted T.B.'s mother by telephone and told her, "I just looked at the video and I have reason to believe it's not him."

76. About two or three hours later, T.B. was finally released.

77. As a result of the conduct and omissions of Defendants, T.B. was damaged. T.B. had never been in trouble with authorities before. The very experience of being falsely arrested and handcuffed on at a busy intersection in front of a McDonald's restaurant when he knew he had done nothing wrong was bewildering, frightening, humiliating, and embarrassing. Being formally and falsely arrested was similarly bewildering, frightening, humiliating, and embarrassing. T.B. was held in detention for three weeks, thereby losing his liberty. He was humiliated and was apprehensive during his waking hours and was frightened at night. He endured insult at the suggestion that he was not being truthful about what he believed to have happened. He suffered anxiety and emotional pain and suffering. T.B. lost the daily love and companionship of his mother and the companionship of his friends and other family members. He was unable to finish his summer school course as a result of having missed three weeks of classes and did not receive the credits he would have obtained had he not been detained. He was embarrassed among his family, friends, and fellow students when he was finally released. T.B. has experienced a sense of having been

18

betrayed by those he looked to for protection and has suffered a loss of confidence and trust in law enforcement officers.

78. The actions of Defendants Neukirch, Munyan, and Mattivi were driven by an evil motive or intent, or were willful, wanton, reckless, and malicious, and, further, show a complete and deliberate indifference to, and conscious disregard for the constitutional and legal rights of Plaintiff T.B..  Therefore, T.B. is entitled to an award of punitive or exemplary damages in an amount sufficient to punish Defendants or to deter defendants and others from like conduct in the future.

## COUNT I
### UNLAWFUL ARREST AND DETENTION
### 42 U.S.C. § 1983
### Fourth and Fourteenth Amendments to the United States Constitution
### Against Defendants Neukirch, Munyan, and Mattivi

79. Plaintiff hereby incorporates by reference paragraphs 1 through 78 as if fully set forth here.

80. Defendants Neukirch, Munyan, and Mattivi knew or should have known that under the United States Constitution, there is a clearly established prohibition against an arrest and detention without probable cause and that the arrest and extended detention of Plaintiff T.B. without probable cause violated T.B.'s constitutional rights.

81. A reasonable and prudent officer would know or should have known that when contemplating an arrest he or she is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists.

82. A reasonable and prudent officer would know or should have known that he or she may not arrest a suspect if he or she is aware of a videotaped account of the crime that, if

Case 4:17-cv-00695-DGK   Document 5   Filed 08/28/17   Page 19 of 35

reviewed, would have conclusively established the suspect's innocence.

83.  A reasonable and prudent officer would know or should have known that he or she does not have probable cause when a minimal further investigation would have exonerated the suspect and that he or she may not close his or her eyes to facts that would help clarify the circumstances.

84.  A reasonable and prudent officer would know or should have known that he or she has a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as law enforcement would not be unduly hampered if the officers wait to obtain more facts before seeking to arrest.

85.  A reasonable and prudent officer would not believe that T.B. had committed or was committing an offense and would not believe that there was probable cause to arrest T.B..

86.  Defendants Neukirch and Munyan had their dash camera video available at the scene and, in view of, *inter alia*:

      a.  T.B.'s denial of any involvement, his protestation of innocence and his explanation that he was walking home from school;

      b.  the fact that when first encountered by Officer Viesselman, T.B. was not sweating a great deal and was breathing normally – which was inconsistent with having been chased on a summer afternoon;

      c.  the fact that T.B. was dressed differently than the fleeing male who had tossed the gun and that his dreadlocks were shorter than those worn by the fleeing male and were lightened on the ends while the fleeing male's dreadlocks were dark all

the way to their ends;

      d.  the fact that Munyan had seen the fleeing male remove his shoes and T.B. was wearing his shoes; and,

      e.  the fact that Munyan had described the fleeing male as being 17 or 18 and T.B. was only fifteen;

Defendants Neukirch and Munyan should have reviewed the evidence that was immediately at hand before taking T.B. into custody and transporting him to detention because no exigent circumstances prevented them from viewing the videotape.

87.  Mattivi was aware that T.B. denied any involvement and that he and his mother asserted that a review of the Neukirch/Munyan video would exonerate him, but rather than making the effort to view the video promptly, he waited three weeks to view it (and Officer Viesselman's video that showed T.B. to be a different person than the fleeing male) all the while causing T.B. to remain in custody.  Further, Mattivi had told T.B. and his mother that Neukirch and Munyan saw T.B. on the video when they ran it back in their car and, unless Mattivi was lying to T.B. and his mother about that in an attempt to get T.B. to admit that he was the male with the gun, he apparently accepted the word of Neukirch and Munyan that T.B. was the person depicted in their video and made no effort to review the videos before charges were lodged and T.B. was detained overnight (and for a total of three weeks).

88.  The actions or failures to act of Defendants Neukirch, Munyan, and Mattivi were under color of state law.

89.  The acts and omissions of Defendants Neukirch, Munyan, and Mattivi caused T.B. to suffer the damages as fully set forth, *supra* at paragraph 77.

21

90.  As alleged, *supra* at paragraph 78, the actions of Defendants Neukirch, Munyan, and Mattivi were driven by an evil motive or intent, or were willful, wanton, reckless, and malicious, and, further, show a complete and deliberate indifference to, and conscious disregard for the constitutional and legal rights of Plaintiff T.B..  Therefore, T.B. is entitled to an award of punitive or exemplary damages in an amount sufficient to punish Defendants or to deter defendants and others from like conduct in the future.

91.  Plaintiff is entitled to recover from Defendants his reasonable attorneys' fees and expenses, as provided by 42 U.S.C. § 1988.

### COUNT II
### SUBSTANTIVE DUE PROCESS WRONGFUL ARREST AND DETENTION
### 42 U.S.C.  1983
### Fourteenth Amendment to the United States Constitution
### Against Defendants Neukirch, Munyan, and Mattivi

92.  Plaintiff hereby incorporates by reference paragraphs 1 through 91 as if fully set forth here.

93.  The Fourteenth Amendment guarantees substantive due process which prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty and the Fourteenth Amendment prohibits conduct that is so outrageous that it shocks the conscience or otherwise offends judicial notions of fairness or is offensive to human dignity.

94.  The conduct of Defendants Neukirch, Munyan, and Mattivi as described, *supra* ¶¶ 40-46, 49-54, 56-71, not only infringed T.B.'s liberty interest, but the degree of the deprivation was severe and disproportionate to the need presented in that a fifteen-year-old boy, never before in trouble with authorities, was arrested and was detained for three weeks

22

even though the evidence of his innocence was available before he was ever transported to the Juvenile Detention Center.

95. From the moment Officer Viesselman encountered T.B. and continuing for three weeks, Defendants purposefully ignored evidence that was exculpatory as to T.B. even though he denied involvement and even though there were signs that T.B. might not have been the fleeing male which, had they been heeded, would have prompted reasonable and prudent officers under non-exigent circumstances to review the video from both patrol cars before even arresting and transporting T.B. to detention.

96. The conduct of Defendants as described, *supra* ¶¶ ¶¶ 40-46, 49-54, 56-71, that deprived T.B. of his liberty interest was inspired by malice or sadism rather than a merely careless or unwise excess of zeal and it amounted to an inhumane abuse of official power literally shocking to the conscience.

The actions or failures to act of Defendants Neukirch, Munyan, and Mattivi were under color of state law.

97. The acts and omissions of Defendants Neukirch, Munyan, and Mattivi caused T.B. to suffer the damages as fully set forth, *supra* at paragraph 77

98. As alleged, *supra* at paragraph 78, the actions of Defendants Neukirch, Munyan, and Mattivi were driven by an evil motive or intent, or were willful, wanton, reckless, and malicious, and, further, show a complete and deliberate indifference to, and conscious disregard for the constitutional and legal rights of Plaintiff T.B..  Therefore, T.B. is entitled to an award of punitive or exemplary damages in an amount sufficient to punish Defendants or to deter defendants and others from like conduct in the future.

23

99.  Plaintiff is entitled to recover from Defendants his reasonable attorneys' fees and expenses, as provided by 42 U.S.C. § 1988.

**COUNT III**
**NEGLIGENT TRAINING/FAILURE TO TRAIN/INADEQUATE TRAINING**
**42 U.S.C. § 1983**
**Against Defendants Doe I-III, Forté, and Defendant Commissioners**

100.  Plaintiff hereby incorporates by reference paragraphs 1 through 99 as if fully set forth here.

101.  Defendants Doe I-III, Defendant Forté, and Defendants Shurin, Wasson-Hunt, Garrett, Rader, and James, as the Board, had the authority to train, supervise, discipline, and otherwise control the officers of the Kansas City, Missouri Police Department, including Defendants Neukirch, Munyan, Mattivi, and Defendant Does I-III.

102.  Defendants Doe I-III, Defendant Forté, and Defendants Shurin, Wasson-Hunt, Garrett, Rader, and James, had a duty to train police under their supervision, including Defendants Neukirch, Munyan, Mattivi, and Defendant Does I-III.

103.  Defendants Doe I-III, Defendant Forté, and the Defendant Commissioners had a duty to provide reasonable training to prevent the police officers under their supervision from:

      a.  unlawfully arresting citizens, including T.B., without probable cause and committing them to detention;

      b.  disregarding and/or ignoring plainly exculpatory evidence;

      c.  arresting citizens and detaining citizens, including T.B., when aware of a videotaped account of the crime that conclusively establishes the suspect's innocence;

      d.  failing to recognize that he or she does not have probable cause for arrest

Case 4:17-cv-00695-DGK   Document 5   Filed 08/28/17   Page 24 of 35

(and subsequent detention) when a minimal further investigation would have exonerated a suspect, including T.B., and closing his or her eyes to facts that would help clarify the circumstances;

e.  failing to conduct a reasonably thorough investigation prior to arresting a suspect, including T.B., at least in the absence of exigent circumstances and so long as law enforcement would not be unduly hampered if the officers wait to obtain more facts before seeking to arrest; and,

f.  failing to review for three weeks exculpatory evidence known to exist and readily available even before the arrest while a fifteen-year-old boy who denied his involvement and who had never before been in trouble with authorities remained in juvenile detention.

104.  Defendants Doe I-III, Defendant Forté, and the Defendant Commissioners failed to train the police officers under their supervision in a manner that reasonable police commanders, chiefs, and police commissioners would have under the circumstances.

105.  The failure of Defendants Doe I-III, Defendant Forté, and the Defendant Commissioners to provide reasonable and adequate training to prevent the police officers under their supervision from unlawfully:

a.  arresting and committing citizens, including T.B., to detention without probable cause;

b.  disregarding and/or ignoring plainly exculpatory evidence;

c.  arresting citizens and detaining citizens, including T.B., when aware of a videotaped account of the crime that conclusively establishes the suspect's innocence;

25

d.  failing to recognize that he or she does not have probable cause for arrest (and subsequent detention) when a minimal further investigation would have exonerated a suspect, including T.B., and closing his or her eyes to facts that would help clarify the circumstances;

e.  failing to conduct a reasonably thorough investigation prior to arresting a suspect, including T.B., at least in the absence of exigent circumstances and so long as law enforcement would not be unduly hampered if the officers wait to obtain more facts before seeking to arrest; and,

f.  failing to review for three weeks exculpatory evidence known to exist and readily available even before the arrest while a fifteen-year-old boy who denied his involvement and who had never before been in trouble with authorities remained in juvenile detention

amounts to a custom and demonstrated deliberate indifference to or tacit authorization of the acts and omissions of Defendants Neukirch, Munyan, and Mattivi.

106.  The failure of Defendants Doe I-III, Defendant Forté, and the Defendant Commissioners to adequately train KCPD officers and particularly Defendants Neukirch, Munyan, and Mattivi proximately caused injury to T.B..

107.  Plaintiff T.B. has been damaged as a direct and proximate result of the defendants' actions and failures to act.  In particular, he has suffered injuries as set forth, *supra* at paragraph 77.

108.  Defendants' failure to exercise reasonable care in training the police officers under their supervision was willful, wanton, reckless, and malicious, and further, shows a

complete and deliberate indifference to and conscious disregard for the constitutional and legal rights of T.B.. Therefore, T.B. is entitled to an award of punitive or exemplary damages in an amount sufficient to punish Defendants or to deter Defendants and others from like conduct in the future.

109.  Plaintiff is entitled to recover from Defendants his reasonable attorneys' fees and expenses, as provided by 42 U.S.C. § 1988.

**COUNT IV**
**NEGLIGENT SUPERVISION/FAILURE TO SUPERVISE/INADEQUATE SUPERVISION**
**42 U.S.C. § 1983**
**Against Defendants Doe I-III,  Forté, and Defendant Commissioners**

110.  Plaintiff hereby incorporates by reference paragraphs 1 through 109 as if fully set forth here.

111.  Defendants Doe I-III, Forté, and Defendant Commissioners had the authority to train, supervise, discipline, and otherwise control the officers of the Kansas City, Missouri Police Department including Defendants Neukirch, Munyan, Mattivi, and Does I-III..

112.  Defendants Doe I-III, Forté, and Defendant Commissioners had a duty to control, direct, and supervise the conduct of Defendants Neukirch, Munyan, Mattivi, and Does I-III.

113.  Defendants Doe I-III, Forté, and Defendant Commissioners had a duty to exercise reasonable care to prevent the officers under the supervision from:

    a.  unlawfully arresting citizens, including T.B., without probable cause and committing them to detention;

    b.  disregarding and/or ignoring plainly exculpatory evidence;

    c.  arresting citizens and detaining citizens, including T.B., when aware of a

27

videotaped account of the crime that conclusively establishes the suspect's innocence;

      d.  failing to recognize that he or she does not have probable cause for arrest (and subsequent detention) when a minimal further investigation would have exonerated a suspect, including T.B., and closing his or her eyes to facts that would help clarify the circumstances;

      e.  failing to conduct a reasonably thorough investigation prior to arresting a suspect, including T.B., at least in the absence of exigent circumstances and so long as law enforcement would not be unduly hampered if the officers wait to obtain more facts before seeking to arrest; and,

      f.  failing to review for three weeks exculpatory evidence known to exist and readily available even before the arrest while a fifteen-year-old boy who denied his involvement and who had never before been in trouble with authorities remained in juvenile detention.

114.  Defendants Doe I-III, Forté, and Defendant Commissioners failed to exercise the proper degree of control and supervision of the officers under their supervision that reasonable governmental entities, police departments, police chiefs, and governmental officials would have exercised under the circumstances.

115.  The failure of Defendants Doe I-III, Forté, and Defendant Commissioners to provide reasonable and adequate supervision to prevent the police officers under their supervision from:

      a.  unlawfully arresting citizens, including T.B., without probable cause and committing them to detention;

b.  disregarding and/or ignoring plainly exculpatory evidence;

c.  arresting citizens and detaining citizens, including T.B., when aware of a videotaped account of the crime that conclusively establishes the suspect's innocence;

d.  failing to recognize that he or she does not have probable cause for arrest (and subsequent detention) when a minimal further investigation would have exonerated a suspect, including T.B., and closing his or her eyes to facts that would help clarify the circumstances;

e.  failing to conduct a reasonably thorough investigation prior to arresting a suspect, including T.B., at least in the absence of exigent circumstances and so long as law enforcement would not be unduly hampered if the officers wait to obtain more facts before seeking to arrest; and,

f.  failing to review for three weeks exculpatory evidence known to exist and readily available even before the arrest while a fifteen-year-old boy who denied his involvement and who had never before been in trouble with authorities remained in juvenile detention

amounts to a custom and demonstrated deliberate indifference to or tacit authorization of the acts and omissions of Defendants Neukirch, Munyan, Mattivi, and Does I-III.

116.  The failure of Defendants Doe I-III, Forté, and Defendant Commissioners to provide reasonable supervision of Defendants Neukirch, Munyan, and Mattivi proximately caused injury to Plaintiff T.B..  In particular, he has suffered injuries as set forth, *supra* at paragraph 77.

117.  Defendants' failure to exercise reasonable care in supervising the police officers

Case 4:17-cv-00695-DGK   Document 5   Filed 08/28/17   Page 29 of 35

under their supervision, including Defendants Neukirch, Munyan, Mattivi, an Does I-III was willful, wanton, reckless, and malicious, and further, shows a complete and deliberate indifference to, and conscious disregard for, rights of Plaintiff T.B..  Therefore, Plaintiff T.B. is entitled to an award of punitive or exemplary damages against Defendants in an amount sufficient to punish Defendants or to deter Defendants and others from like conduct in the future.

118.  Plaintiff is entitled to recover from Defendants his reasonable attorneys' fees and expenses, as provided by 42 U.S.C. § 1988.

## COUNT V
### DEPRIVATIONS OF CONSTITUTIONAL RIGHTS DIRECTLY CAUSED OR CONTRIBUTED TO BY OFFICIAL POLICIES, PROCEDURES, PRACTICES, CUSTOMS, AND USAGES
### 42 U.S.C. § 1983
### Against Defendants Doe I-III,  Forté, and Defendant Commissioners

119.  Plaintiff hereby incorporates by reference paragraphs 1 through 118 as if fully set forth here.

120.  Defendants Neukirch, Munyan, and Mattivi violated Plaintiff T.B.'s rights under federal law when, without reviewing exculpatory evidence that was readily at hand and without probable cause, they arrested him and detained him for three weeks in violation of his Fourth Amendment and Due Process rights.

121.  Defendants Neukirch's, Munyan's, and Mattivi's unconstitutional conduct resulted from certain improper policies, procedures, practices, customs, and usages of the Kansas City, Missouri Police Department that directly caused or contributed to the constitutional deprivations suffered by Plaintiff T.B..

122.  There exist within the Kansas City, Missouri Police Department certain policies,

30

procedures, practices, customs, and usages relating to the failure of officers and detectives to:

a. unlawfully arrest citizens, including T.B., without probable cause and commit them to detention;

b. disregard and/or ignore plainly exculpatory evidence;

c. arrest and detain citizens, including T.B., when aware of a videotaped account of the crime that conclusively establishes the suspect's innocence;

d. fail to recognize that he or she does not have probable cause for arrest (and subsequent detention) when a minimal further investigation would have exonerated a suspect, including T.B., and close his or her eyes to facts that would help clarify the circumstances;

e. fail to conduct a reasonably thorough investigation prior to arresting a suspect, including T.B., at least in the absence of exigent circumstances and so long as law enforcement would not be unduly hampered if the officers wait to obtain more facts before seeking to arrest; and,

f. fail to review for three weeks exculpatory evidence known to exist and readily available even before the arrest while a fifteen-year-old boy who denied his involvement and who had never before been in trouble with authorities remained in juvenile detention

that are so pervasive that the constitute the policy of the Board and the KCPD and they were the moving force behind and thereby caused the constitutional deprivations suffered by Plaintiff as herein alleged.

123. Alternatively, there has been a failure to adopt training and supervision, and

policies, procedures, practices, customs, and usages which caused and which would have prevented the constitutional deprivations suffered by Plaintiff as herein alleged.

124. Defendants Doe I-III, Forté, and Defendant Commissioners are vested with the authority to establish policies, procedures, practices, and usages of and for the KCPD as are required for the lawful and effective administration of the KCPD and the protection of citizens and fellow officers. Defendant Forté was vested with the authority to recommend to the Board such policies, procedures, practices, and usages for the KCPD as are required for the lawful and effective administration of the Department and the protection of citizens which would prevent KCPD officers from violating the constitutional rights of citizens as described in paragraph 122. Defendants Doe I-III, Forté, and Defendant Commissioners have failed to establish and administer training and supervision and policies, procedures, practices, and usages in a manner calculated to assure that KCPD officers do not present a risk or unnecessarily increase the risk of deprivations of the constitutional rights of citizens.

125. Defendants Doe I-III, Forté, and Defendant Commissioners were aware of the training and supervision and of the policies, procedures, practices, customs, and usages of the KCPD and knew or should have known that the training and supervision and the policies, procedures, practices, customs, and usages of the KCPD, or the absence of same, presented a risk and/or unnecessarily increased the risk of violations of the constitutional rights of citizens.

126. Defendants Doe I-III, Forté, and Defendant Commissioners have the power and responsibility to prevent the existence of policies, procedures, practices, customs, and usages which result in violations of the constitutional rights of citizens such as that suffered by

Plaintiff T.B..

127.  Defendants Doe I-III, Forté, are in a position to establish informal policies, procedures, practices, customs, and usages and to recommend to the Defendant Commissioners formal policies, procedures, practices, and usages which prevent violations to constitutional rights such as that suffered by Plaintiff T.B..

128.  Defendant Commissioners are the official policy makes for the Kansas City, Missouri Police Department and the failure of Defendants Doe I-III, Forté, and Defendant Commissioners to affirmatively act in the face of policies, procedures, practices, customs, and usages which resulted in conduct that violated constitutional rights establishes a policy to condone and otherwise tolerate unconstitutional conduct in general, and specifically, the unconstitutional conduct alleged herein.  Had Defendants Doe I-III, Forté, and Defendant Commissioners affirmatively acted to recommend and establish training and supervision and policies, procedures, practices, and usages which were reasonably calculated to assure that officers were properly trained and supervised, the constitutional deprivation suffered by Plaintiff T.B. would not have occurred.

129.  In their failures as described, Defendants Doe I-III, Forté, and Defendant Commissioners intentionally disregarded known facts or, alternatively, were deliberately indifferent to a risk of constitutional violation of which they knew or should have known and their culpability caused the deprivation of constitutional rights suffered by Plaintiff T.B..

130.  As a direct and proximate result of the fact that the conduct of Defendants Neukirch, Munyan, and Mattivi was caused by the acts or omissions of Defendants Doe I-III, Forté, and Defendant Commissioners in adopting or administering and/or failing to adopt or

33

administer policies, procedures, practices, and usages and/or in acquiescing to and failing to halt unconstitutional conduct by KCPD officers, Plaintiff suffered damages as set forth in paragraph 77.

131.  Because the acts and omissions of Defendants Doe I-III, Forté, and Defendant Commissioners in adopting or administering and/or failing to adopt or administer policies, procedures, practices, and usages and/or in acquiescing to and failing to halt unconstitutional conduct by KCPD officers, were willful, wanton, reckless, and malicious, and demonstrated a complete and deliberate indifference to, and conscious disregard for, the rights of Plaintiff T.B., Plaintiff T.B. is entitled to an award of punitive or exemplary damages against Defendants in an amount sufficient to punish Defendants or to deter Defendants and others from like conduct in the future.

132.  Plaintiff is entitled to recover from Defendants his reasonable attorneys' fees and expenses, as provided by 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court, after a trial by jury of his claims, enter judgment against Defendants for his actual damages, nominal damages, and punitive or exemplary damages as are proven at trial, for his attorney fees and expenses pursuant to 42 U.S.C. § 1988, for his costs herein, and for any such further legal and equitable relief as the Court deems appropriate.

Respectfully submitted,

ARTHUR BENSON & ASSOCIATES

By  s/ Arthur A. Benson II

34

By  s/ Jamie Kathryn Lansford
Arthur A. Benson II #21107
Jamie Kathryn Lansford #31133
4006 Central Avenue
Kansas City, Missouri 64111
(816) 531-6565
(816) 531-6688 (telefacsimile)
abenson@bensonlaw.com
jlansford@bensonlaw.com

Attorneys for Plaintiff T.B.