# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

TYREE BELL,             )
                                   )
       Plaintiff,         )
                                   )
v.                               )     Case No. 17-CV-00695-DGK
                                   )
PETER NEUKIRCH, *et al.*,    )
                                   )
       Defendants.    )

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND SUGGESTIONS IN SUPPORT

Defendants Kansas City, Missouri Board of Police Commissioners, through its members, Leland Shurin, Don Wagner, Mark Tolbert, Nathan Garrett, and Sylvester "Sly" James, (hereinafter "the Board"), Chief Richard Smith, Officers Peter Neukirch and Jonathan Munyan, Detective John Mattivi, and Sergeant Luis Ortiz, of the Kansas City, Missouri Police Department, pursuant to Fed.R.Civ.P. 56 and L.R. 56.1, move this Court to enter summary judgment as a matter of law in their favor.

## I.    Introduction.

Plaintiff Tyree Bell alleges he was falsely arrested and wrongfully detained for three weeks based on misidentification. He brings the following counts against Defendants: Count I alleges a 42 U.S.C. § 1983 Unlawful Arrest and Detention claim under the Fourth and Fourteenth Amendments against Officers Neukirch and Munyan, Detective Mattivi, and Sergeant Ortiz; Count II alleges a 42 U.S.C. § 1983 Substantive Due Process Wrongful Arrest and Detention claim under the Fourteenth Amendment against Officers Neukirch and Munyan, Detective Mattivi, and Sergeant

Case 4:17-cv-00695-DGK   Document 56   Filed 09/26/18   Page 1 of 33

Ortiz; Count III alleges a 42 U.S.C. § 1983 Negligent Training/Failure to Train/Inadequate Training the Board, the Chief, and Sergeant Ortiz; Count IV alleges a Negligent Supervision/Failure to Supervise/Inadequate Supervision against the Board, the Chief and Sergeant Ortiz; Count V alleges a 42 U.S.C. § 1983 Deprivations of Constitutional Rights Directly Caused by Official Policies, Procedures, Practices, Customs, and Usages against the Board, the Chief, and Sergeant Ortiz.

As detailed below, Defendants are entitled to qualified immunity, because there was probable cause to arrest him and a timely judicial determination of probable cause.

## II. Undisputed material facts.

### A. The 911 call.

1. On June 8, 2016, around 4:07 p.m., the Kansas City, Missouri Police Department received a 911 call from a resident at 9112 Marsh Avenue who reported that two Black males had guns at the corner of James A. Reed and 91st Terrace.[1]

2. The caller described one as wearing a white t-shirt and jeans with dreads; he described the other as wearing a black t-shirt.[2]

### B. Officers respond.

3. At about 4:10 p.m., Officers Jon Munyan and Peter Neukirch were dispatched

---

[1] Exhibit A, audio recording of the 911 call with a 3-page detailed history log identifying the location, date, and time of the 911 call; Exhibit B, sworn transcript of the 911 call in the Affidavit of Denise Wymore, pg. 2.
[2] Exhibit A; Exhibit B, pg. 2.

to 9112 Marsh with the following information from the dispatcher: "A report of a suspicious party armed with a gun. 9112 Marsh. It's gonna be a Black male, dreads, white shirt, blue jeans, armed with a gun. Black male, black shirt, also armed with a gun. Two unknown females standing next to them, possibly teenagers."[3]

4.  On the way to the call, Officer Munyan called the calling party to get more information.[4]

5.  The calling party reported there were three Black males inside or at the house located at 9108 Marsh on the corner of Marsh and 91st Terrace.[5]

6.  At about 4:17 p.m., as Officers Munyan and Neukirch drove their patrol car up to the corner of Marsh and 91st Terrace, Officer Neukirch saw three Black male teenagers in the front yard of 9108 Marsh talking to some teenaged girls.[6]

7.  As Officer Neukirch drove his patrol car closer, he saw the three males turn away from his patrol car, quickly start walking, then running away.[7]

8.  At 4:18 p.m., Officers Munyan and Neukirch stopped their patrol car next to the males who by this time had stopped running.[8]

9.  The male wearing a white t-shirt and black shorts turned to face the patrol

[3] Exhibit C, audio recording of the June 8, 2016 KCPD dispatch communications for the Tyree Bell arrest; Exhibit D, sworn transcript of the June 8, 2016 KCPD dispatch communications for the Tyree Bell arrest in the affidavit of Officer Peter Neukirch, pg. 1; Exhibit S, Affidavit of Officer Peter Neukirch, ¶ 3; Exhibit BB, Affidavit of Officer Jonathan Munyan, ¶ 3.
[4] Exhibit R, Affidavit of Trorant Miller, the calling party; ¶ 5; Exhibit BB, ¶ 4.
[5] Exhibit R, ¶ 5; Exhibit S, ¶ 5; Exhibit BB, ¶ 5.
[6] Exhibit S, ¶ 7.
[7] Exhibit S, ¶¶ 7-8
[8] Exhibit S, ¶ 8; Exhibit T, Officer Neukirch and Munyan's patrol car video, at time-stamp 4:18:00; Exhibit BB, ¶¶ 6-7.

3

car, while grabbing his waist, then began to run, pulled a gun from his shorts, and tossed it over a fence.[9]

10. Officer Munyan yelled, "Come here! Drop the gun! Drop it! Drop it!" while chasing after him.[10]

11. Officer Neukirch took custody of the two remaining males.[11]

### C. The foot chase.

12. Officer Munyan gave updated descriptions and locations on dispatch radio as he chased the fleeing suspect through backyards.[12]

13. At 4:19 p.m., Officer Munyan reported on dispatch radio that he had lost sight of the fleeing suspect.[13]

14. A few seconds later, Officer Munyan reported a description of the fleeing suspect, whom he last saw around 92nd Terrace and James A. Reed, as "Juvenile, Black male, 17-18, about 5'10", skinny, blue shorts, white t-shirt, shoulder-length dreads. He was taking his shoes off. I'm not sure what kind of shoes he had on."[14]

15. After he lost sight of him, Officer Munyan continued looking for him.[15]

16. Believing the fleeing suspect ran northbound, Officer Munyan reported to dispatch, "My best guess is he cut north. But I'm not sure."[16]

---

[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] Exhibit S, ¶ 9; Exhibit BB, ¶ 8.
[13] Exhibit S, ¶ 10; Exhibit T at time-stamp 4:19:07; Exhibit BB, ¶ 11.
[14] Exhibit S, ¶ 11; Exhibit T at time-stamp 4:19:35; Exhibit BB, ¶¶ 11-13; Exhibit CC, a map indicating where Officer Munyan last saw the fleeing suspect.
[15] Exhibit BB, ¶ 14.
[16] Exhibit BB, ¶ 14; Exhibit D, pg. 4; Exhibit C.

4

17. At 4:21 p.m., Officer Munyan set up a perimeter at certain locations surrounding the area where he lost sight of the fleeing suspect.[17]

18. Several officers reported responding to these locations.[18]

19. Officers Jonathan Janes and Andrew Lawrence and Sgts. Chase Moraczewski and Jason Moran responded to the area and never saw anyone fitting the description of the fleeing suspect.[19]

20. At 4:22 p.m., a canine officer agreed to meet Officer Munyan to help locate the fleeing suspect.[20]

**D. The Terry stop and arrest.**

21. At approximately 4:26 p.m., Officer Chris Viesselman, who responded to area to help search for the fleeing suspect, saw a male, later identified as Tyree Bell, who fit the description of the fleeing suspect, walking in the vicinity that he could have easily reached in 7 minutes from where Officer Munyan last saw him.[21]

22. At 4:26 p.m., Officer Viesselman reported locating a "younger Black male

---

[17] Exhibit S, ¶ 13; Exhibit T at time-stamp 4:21:14; Exhibit BB, ¶ 16.

[18] Exhibit S, ¶ 13; Exhibit T at time-stamp 4:21:14; Exhibit BB, ¶ 17.

[19] Exhibit G, Affidavit of Sgt. Moraczewski, Exhibit H, Sgt. Moraczewski's patrol car video; Exhibit I, map of Sgt. Moraczewski's route; Exhibit J, Affidavit of Officer Janes; Exhibit K, Officer Janes' patrol car video; Exhibit L, Affidavit of Officer Lawrence; Exhibit M, Officer Lawrence's patrol car video; Exhibit N, map of Officer Lawrence's location while he was in the area; Exhibit X, Affidavit of Sgt. Moran; Exhibit W, Sgt. Moran's patrol car video.

[20] Exhibit S, ¶¶ 14-15; Exhibit T at time-stamp 4:22:48 and 4:22:57; Exhibit BB, ¶ 17.

[21] Exhibit Y, Affidavit of Officer Viesselman, ¶¶6-8; Exhibit Z, Officer Viesselman's patrol car video at time-stamp 4:25:55; Exhibit AA, map of location where Officer Viesselman saw Tyree Bell and where Officer Viesselman believed the fleeing suspect was last seen; Exhibit S, ¶ 10; Exhibit T at time-stamp 4:19:07; Exhibit BB, ¶ 11.

Case 4:17-cv-00695-DGK   Document 56   Filed 09/26/18   Page 5 of 33

with braids, or dreads…[wearing a] white t-shirt with black and white shorts."[22]

23. Officer Viesselman asked Officer Munyan if he was sure the fleeing suspect had taken his shoes off.[23]

24. Officer Munyan responded, "He was taking them off as I was running. But I didn't see him toss them and I can't find any shoes, so he might have held them and put them back on. I don't know. Ped check him. See if he runs."[24]

25. Officer Viesselman conducted a pedestrian check or Terry stop of Tyree Bell, because he believed he had reasonable suspicion to believe he was the party he fled from Officer Munyan.[25]

26. At 4:29 p.m., the dispatcher reported that the canine was out in the area.[26]

27. At 4:30 p.m., Officer Viesselman reported that the suspect's breathing was "normal" but he was a "little sweaty."[27]

28. At 4:30 p.m., Officer Munyan reported to Officer Viesselman that he was with canine officers, who he was briefing about the search, but would respond to Officer Viesselman's location to identify the detained suspect.[28]

29. At 4:39 p.m., the police helicopter was in the area.[29]

30. Sgt. Moran located the gun that was tossed by the fleeing suspect.[30]

---

[22] Exhibit S, ¶ 17; Exhibit T at time-stamp 4:26:44.
[23] Exhibit S, ¶ 17; Exhibit T at time-stamp 4:26:44.
[24] Exhibit S, ¶ 17; Exhibit T at time-stamp 4:26:44
[25] Exhibit Y, ¶ 10.
[26] Exhibit S, ¶ 18; Exhibit T at time-stamp 4:29:40; Exhibit BB, ¶ 19.
[27] Exhibit S, ¶ 19; Exhibit T at time-stamp 4:30:09
[28] Exhibit BB, ¶¶ 20-21.
[29] Exhibit S, ¶ 21; Exhibit T at time-stamp 4:39:20
[30] Exhibit X, ¶ 5.

31. After Sgt. Moran asked the dispatcher to run the serial number of this gun, the dispatcher found no records linked to it.[31]

32. At 4:41 p.m., Officer Munyan drove to Officer Viesselman's location and identified the detained suspect (Tyree Bell) as the fleeing suspect.[32]

33. As he drove up 87th Street, Officer Munyan clearly saw Tyree Bell, who was facing him, from head to toe.[33]

34. Officer Munyan told Officer Viesselman that he "noticed the red on his shoes when he was running."[34]

35. At 4:46 p.m., Officer Viesselman returned to original scene at Marsh and 91st Terrace with Tyree Bell where Officer Neukirch was with the two other juveniles.[35]

36. Officer Neukirch saw Tyree Bell as he sat in Officer Viesselman's patrol car.[36]

37. Starting at 4:48 p.m., Officers Munyan and Neukirch, along with Sgt. Ortiz, reviewed patrol car video of the fleeing suspect to confirm it was Tyree Bell.[37]

38. At 4:48 p.m., the log file for Officer Neukirch's patrol car video shows that the video stopped recording; and at 4:50 p.m., the video was played back two times.[38]

39. From 4:50 p.m. to 5:32 p.m., Officer Neukirch performed various tasks related

---

[31] Exhibit X, ¶ 6; Exhibit C; Exhibit D, pg. 9.
[32] Exhibit S, ¶ 22; Exhibit T at time-stamp 4:41:11; Exhibit BB, ¶¶ 24-25; Exhibit Z, Officer Chris Viesselman's patrol car video, at time-stamp 4:41:00.
[33] Exhibit BB, ¶ 24; Exhibit Z, at time-stamp 4:41:00.
[34] Exhibit BB, ¶ 24; Exhibit Z, at time-stamp 4:42:44.
[35] Exhibit S, ¶ 25; Exhibit Z at time-stamp 4:46:20
[36] Exhibit S, ¶ 25.
[37] Exhibit S, ¶ 30; Exhibit U, Officer Corby Adams' patrol car video, starting at time-stamp 4:48:15; Exhibit BB, ¶¶ 26-28.
[38] Exhibit E, Affidavit of Officer Michael Feagans; Exhibit F, log file for Officer Neukirch's June 8, 2016 patrol car video.

7

to Tyree Bell's arrest such as: discuss the case with Detective John Mattivi; talk to the calling party; take photos of Tyree Bell and the other two juveniles; talk to Tyree Bell's mother and the mothers of the two other juveniles.[39]

40. From 4:54 p.m. to 4:56 p.m., Officer Munyan talked to the other two juveniles.[40]

41. He asked the two other juveniles for information about the fleeing suspect's name and address.[41]

42. After his conversation with the two other juveniles, Officer Munyan reported to Sgt. Ortiz that they said the suspect's street name was "Jay."[42]

43. He also reported to Sgt. Ortiz that when he asked the two other juveniles, "You know we got him, right? (referring to Tyree Bell), one of them responded, "Yah, I seen you when you pulled up."[43]

44. To Officer Munyan, this juvenile implied that Tyree Bell was the fleeing suspect.[44]

45. At 5:00 p.m., Sgt. Ortiz left the scene and did not return.[45]

46. Sgt. Ortiz did not return to the scene and did not go the Juvenile Justice Center.[46]

47. At 5:22 p.m., Officer Munyan reviewed his patrol car video again to further

---

[39] Exhibit S, ¶¶ 31-37; Exhibit U at time-stamp 4:50:42 to 5:27:16.
[40] Exhibit BB, ¶ 30; Exhibit Z at time-stamp 4:54:00 to 4:56:15.
[41] Exhibit BB, ¶ 29; Exhibit U starting at time-stamp 4:55:41.
[42] Exhibit BB, ¶ 30; Exhibit Z at time-stamp 4:56:29.
[43] Exhibit BB, ¶ 30; Exhibit Z at time-stamp 4:56:29.
[44] Exhibit BB, ¶ 30.
[45] Exhibit BB, ¶ 31; Exhibit U at time-stamp 5:00:45.
[46] Exhibit BB, ¶ 31.

confirm whether Tyree Bell fit the description of the fleeing suspect.[47]

48. At 5:22 p.m., the log file for Officer Neukirch's patrol car video shows that the the video was played back two times.[48]

49. At 5:32 p.m., Officers Neukirch and Munyan, with Tyree Bell, left the original scene at Marsh and 91st Terrace and went to the Juvenile Justice Center.[49]

50. Tyree Bell's calm demeanor during the 20-minute drive to the Juvenile Justice Center indicated to Officer Neukirch that he had committed the offense at issue.[50]

51. At some point, Officer Neukirch learned that Tyree Bell knew one of the two other juveniles.[51]

52. At 5:52 p.m., after arriving to the Juvenile Justice Center, Officer Neukirch reviewed his patrol car video again.[52]

53. From 5:52 p.m. to 5:53 p.m., the log file for Officer Neukirch's patrol car video shows that the video was played back four times.[53]

54. Officers Munyan and Neukirch believed Tyree Bell was the fleeing suspect, because they looked the same height, weight, body build, hair color, hair style, and hair length, and both wore unstained white t-shirts and black and red shoes.[54]

55. In addition to their similar physical characteristics, Officers Munyan and

---

[47] Exhibit BB, ¶ 32; Exhibit U at time-stamp 5:22:21 to 5:23:20.
[48] Exhibit E; Exhibit F.
[49] Exhibit S, ¶ 38; Exhibit U at time-stamp 5:32:30
[50] Exhibit S, ¶¶ 40-41; Exhibit V, Officer Peter Neukirch's inward-facing patrol car video.
[51] Exhibit S, ¶ 42.
[52] Exhibit S, ¶ 39; Exhibit V at time stamp 5:52.
[53] Exhibit E; Exhibit F.
[54] Exhibit S, ¶ 42; Exhibit BB, ¶ 35.

9

Neukirch further believed that Tyree Bell was the fleeing suspect, because several officers reported to the location, including canine officers and the police helicopter, and no other officer reported seeing a suspect in the area who fit the description of fleeing suspect, other than Tyree Bell.[55]

56. Tyree Bell was found about 7 minutes after Officer Munyan lost sight of him.[56]

57. Tyree Bell was found about 5-6 blocks from where Officer Munyan last saw him, if running through backyards as Officer Munyan saw him do.[57]

58. Tyree Bell was found north of the location where Officer Munyan last saw him.[58]

59. After observing how fast the fleeing suspect ran from Officer Munyan when they first pulled up to him in their patrol car, Officer Neukirch believed the fleeing suspect could have easily run 5 to 6 blocks in 7 minutes.[59]

60. Officer Munyan, who is able to run a 6 ½-minute mile without his gear on, was unable to keep up with the fleeing suspect.[60]

61. Given how fast Officer Munyan saw the fleeing suspect ran, he expected him to be in the area where Officer Viesselman found him in 7 minutes.[61]

62. Officer Munyan did not observe whether there was a white stripe on the fleeing

---

[55] Exhibit S, ¶ 43; Exhibit BB, ¶ 38.
[56] Exhibit S, ¶ 44; Exhibit BB, ¶ 39.
[57] Exhibit S, ¶ 44; Exhibit BB, ¶¶ 11-12, 23; Exhibit CC.
[58] Exhibit S, ¶ 44; Exhibit CC.
[59] Exhibit S, ¶ 44.
[60] Exhibit BB, ¶ 39.
[61] Exhibit BB, ¶ 39.

suspect's shorts, because he was initially focused on the gun in the fleeing suspect's hand.[62]

63. When Officer Munyan reviewed the patrol car video, he could not definitively determine if there were white stripes on the fleeing suspect's shorts.[63]

64. Even if Tyree Bell's shorts and socks appeared different from the fleeing suspect's, Officers Munyan and Neukirch would not have been persuaded that Tyree Bell was not the suspect, because based on their law enforcement experience, fleeing suspects frequently wear more than one pair of shorts, pants, or socks, and will shed clothing during a foot pursuit with police to change their appearance to law enforcement.[64]

65. After writing the arrest report that night, Officers Neukirch and Munyan had nothing more to do with Tyree Bell's arrest.[65]

66. Tyree Bell was arrested for a weapons violation, because Officer Munyan saw him pull a firearm from his waistline and toss it over a fence.[66]

**E. The 3-week detention.**

67. While at the scene, Officer Neukirch reported to Detective John Mattivi that he and Officer Munyan saw a juvenile suspect flee from them with a gun, Officer Munyan chased him on foot, lost sight of him, minutes later another officer found Tyree Bell who fit the description, and Officer Munyan identified the

---

[62] Exhibit BB, ¶ 40.
[63] Exhibit BB, ¶ 40.
[64] Exhibit S, ¶ 45; Exhibit BB, ¶ 41.
[65] Exhibit S, ¶ 48; Exhibit BB, ¶ 42.
[66] Exhibit BB, ¶ 34.

Tyree Bell as the fleeing suspect.[67]

68. He further reported to Detective Mattivi that he and Officer Munyan personally identified Tyree Bell as the fleeing suspect, and after reviewing the patrol car video confirmed that Tyree Bell was the fleeing suspect seen on patrol car video.[68]

69. Based on information he received from Officer Neukirch, Detective Mattivi told Officer Neukirch to place Tyree Bell on a 24-hour investigative hold at the Juvenile Justice Center.[69]

70. At the Juvenile Justice Center, Officers Munyan and Neukirch assured Detective Mattivi again that they reviewed the patrol car video and identified Tyree Bell from their review of it.[70]

71. On June 8, 2016, around 7:00 p.m., he was interviewed by Detective John Mattivi, while his mother was present and after he was Mirandized.[71]

72. That Tyree Bell denied any involvement in the crime was not surprising to Detective Mattivi, because suspects lie about their involvement in crime all the time.[72]

73. That Tyree Bell's mother supported his claims of innocence also was not surprising to Detective Mattivi, because parents frequently do so.[73]

---

[67] Exhibit S, ¶31.
[68] Exhibit O, Affidavit of Detective John Mattivi, ¶14.
[69] Exhibit O, ¶¶1, 3; Doc. No. 35, Second Amended Complaint, ¶1.
[70] Exhibit O, ¶ 15.
[71] Exhibit O, ¶¶4-7; Exhibit P, executed Notification and Waiver of Rights form.
[72] Exhibit O, ¶10.
[73] Exhibit O, ¶12.

74. Because the arresting officers insisted Plaintiff was the suspect and Plaintiff insisted he was not, Detective Mattivi believed that issues surrounding Plaintiff's guilt or innocence would be determined by DNA testing of the gun, not the patrol car video.[74]

75. On June 9, 2016, at 1:15 p.m., the Juvenile Officer of Jackson County, Missouri filed a petition with the Family Court Division, arising out of Tyree Bell's June 8, 2016 arrest, that alleged he carried a firearm in violation of Section 571.030 RSMo. and fled from officers in violation of Section 575.150 RSMo.[75]

76. On June 10, 2016, Tyree Bell had a probable cause hearing before a judge pursuant to Rule 127.08.[76]

77. Tyree Bell was represented by counsel at that hearing.[77]

78. As a result of that hearing, the judge ordered Tyree Bell be detained.[78]

79. On June 22, 2016, Tyree Bell had a second hearing.[79]

80. Tyree Bell was represented by counsel at the second hearing.[80]

---

[74] Exhibit O, ¶16.

[75] Exhibit DD, June 9, 2016 Petition filed in *In the Matter of Tyree Bell*, Case Number: 1616-JU000792, Jackson County, Missouri Circuit Court, Family Court Division.

[76] Exhibit EE, Sherri James' deposition,16:19-17:1, 17:11-14, 19:16-19, 19:25-20:7; Exhibit FF, June 10, 2016 Order of Detention, *In the Matter of Tyree Bell*, Case Number: 1616-JU000792, Circuit Court of Jackson County, Missouri, Family Court Division.

[77] Exhibit EE, 19:16-17, 27:18-20; Exhibit FF.

[78] Exhibit D.

[79] Exhibit EE, 28:9-13; Exhibit GG, June 22, 2016 Order on Arraignment, *In the Matter of Tyree Bell*, Case Number: 1616-JU000792, Circuit Court of Jackson County, Missouri, Family Court Division.

[80] Exhibit GG.

13

81. As a result of the second hearing, the judge ordered Tyree Bell's continued detention and set a trial date for August 4, 2016.[81]

82. On June 29, 2016, Detective Mattivi watched the patrol car videos from Tyree Bell's June 8, 2016 arrest for the first time.[82]

83. After watching these videos, Detective Mattivi believed that Tyree Bell and the fleeing suspect appeared to be two different people, because they had on different shorts and different socks.[83]

84. Detective Mattivi got a second and third opinion (from his sergeant and the prosecutor respectively) on the identity of the fleeing suspect on the patrol car video.[84]

85. Detective Mattivi immediately contacted Tyree Bell's mother and told her Tyree Bell would be released from detention.[85]

## III. Argument.

### A. Qualified immunity bars claims against Officers Munyan and Neukirch and Sgt. Ortiz, because they did not violate the Fourth Amendment.

"[Q]ualified-immunity analysis involves the following two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of

---

[81] Exhibit GG.
[82] Exhibit O, ¶ 20.
[83] Exhibit O, ¶¶ 21-22.
[84] Exhibit O, ¶¶ 23-24.
[85] Exhibit O, ¶29.

Case 4:17-cv-00695-DGK   Document 56   Filed 09/26/18   Page 14 of 33

the defendant's alleged misconduct." *Smith v. City of Minneapolis*, 754 F.3d 541, 545 (8th Cir. 2014)(quotation marks omitted).

The second step of the inquiry requires the court to determine whether the rights at issue were "clearly established." *Id.* "A right is clearly established if its contours are sufficiently clear that a reasonable official would understand that *what he is doing* violates that right." *Id.* at 546 (emphasis added). For an officer to have violated a "clearly established right," the illegality of his conduct must be "beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (U.S. 2011).

### (1) The Fourth, not Fourteenth Amendment, applies to Section 1983 unlawful or wrongful arrest claims.

Unlawful arrest claims brought under the Fourteenth Amendment are analyzed identically to those brought under the Fourth Amendment. *See Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005); *Gilmore v. City of Minneapolis*, 837 F.3d 827, 843 n. 7 (8th Cir. 2016); *Smithson v. Aldrich*, 235 F.3d 1058, 1064 (8th Cir. 2000). As such, Plaintiff's unlawful and wrongful arrest claims under the Fourteenth Amendment should be dismissed; analysis of these claims should be under the Fourth Amendment standard only.

### (2) Officers do not violate the Fourth Amendment when they make a warrantless arrest based on probable cause.

"If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); *Virginia v. Moore*, 553 U.S. 164, 171 (2008); Section 84.710.2 RSMo.

15

(officers in the State of Missouri authorized "to arrest, on view, any person they see violating…any law of the state or ordinance of the city.").

"An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *United States v. Torres-Lona*, 491 F.3d 750, 755 (8th Cir. 2007). "To determine the existence of probable cause, we look at the totality of the circumstances as set forth in the information available to the officers at the time of the arrest." *United States v. Kelly*, 329 F.3d 624, 628 (8th Cir. 2003). "The determination of whether probable cause exists must not rest on isolated facts; rather it depends on the cumulative effect of the facts in the totality of the circumstances." *Tokar v. Bowersox*, 198 F.3d 1039, 1046-47 (8th Cir. 1999)(internal quotations omitted).

Whether the police had probable cause at the time of arrest is a question of law for a court to decide. *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995). "As probable cause is determined at the moment the arrest was made, any later developed facts are irrelevant to the probable cause analysis for an arrest." *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008) (internal quotations and citation omitted).

Here, there is no question that Officers Munyan and Neukirch observed the suspect run from Officer Munyan, pull a firearm from his pocket or waistband and toss it over a fence as he fled, and therefore had probable cause to arrest the fleeing suspect for a weapons violations under Sections 571.030 RSMo. (2016).

16

Plaintiff does not dispute there was probable cause to arrest the fleeing suspect. (Second Amended Complaint, Doc. No. 35, ¶¶32-33). Instead, he alleges Officers Munyan and Neukirch arrested him on the mistaken belief that he was the fleeing suspect. However, the Fourth Amendment is not violated by an arrest based on probable cause, even if the wrong person is arrested, as long as the arresting officer had a reasonable belief that he was in fact arresting the correct person. *Hill v. California,* 401 U.S. 797, (1971). The qualified immunity doctrine "allows officers to make reasonable errors," *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996), and allows considerable room for "mistaken judgments." *Borgman v. Kedley*, 646 F.3d 518, 522 (8th Cir. 2011). Law enforcement officers are entitled to qualified immunity even if they arrest a suspect under the mistaken belief they have probable cause to do so—provided the mistake is objectively reasonable. *Smithson*, 235 F.3d at 1061.

*Hill v. California*, 401 U.S. 797 (1971), although a criminal case, is instructive. In *Hill*, officers had probable cause to arrest Hill, but did not have an arrest warrant. *Id.* at 799-801. The officers arrived at Hill's residence where they were confronted by a man who fit the description of Hill but who identified himself as Miller and produced identification in that name. *Id.* at 799. The officers, believing that Miller was Hill, searched the residence; Hill was ultimately found guilty of robbery based on the fruits of that search. *Id.* at 801. The Court upheld the search, concluding that the officers had probable cause to arrest Hill and a reasonable, good faith belief that Miller was Hill. *Id.* at 802-04. Therefore, the arrest of Miller was valid (even though Miller was not Hill). *Id.*

17

Here, Officers Munyan and Neukirch had more evidence supporting probable cause to arrest than the officers in *Hill*. Rather than relying on witness descriptions like the officers in *Hill*, Officers Munyan and Neukirch personally observed the fleeing suspect and Plaintiff, then later reviewed their patrol car video (at least eight times) to confirm that Plaintiff was the fleeing suspect. The fleeing suspect and Plaintiff were similar in age, had similar height, weight, body build, hair color, hair style, and hair length, and both wore unstained white t-shirts and black and red shoes. In addition to those similar physical characteristics, Plaintiff was found 5-6 blocks from where Officer Munyan last saw the fleeing suspect—a distance he could have easily covered, running through backyards, within the 7-minute time gap from when Officer Munyan lost sight of him. More poignantly, Plaintiff was located north of the area where Officer Munyan last saw the fleeing suspect; and Officer Munyan believed the fleeing suspect was headed in a northern direction after he lost sight of him. Moreover, even though multiple officers responded to the area to help search for the fleeing suspect, including canine officers and the police helicopter, no other person was found that matched the description of the suspect, other than the Plaintiff.

Furthermore, Plaintiff knew one of the other juveniles who was originally detained by Officer Neukirch. And one of the other juveniles implied that Plaintiff was the fleeing suspect when Officer Munyan asked, "You know we got him, right? (referring to Plaintiff), and the juvenile responded, "Yah, I seen you when you pulled up." At the very least, neither of the two other juveniles objected to Plaintiff's arrest when they certainly had the opportunity to do so. Finally, Plaintiff's calm demeanor

after his arrest indicated to Officer Neukirch, based on his law enforcement experience, that Plaintiff was the fleeing suspect.

In a recent St. Louis case, qualified immunity barred a Section 1983 claim based on mistaken arrest against two officers when there was probable cause to arrest Plaintiff based on: (1) how his physical appearance and clothing matched the description given by an eyewitness; (2) that he was arrested in an area near the scene of the offense; and (3) he "took some steps back" when he saw police officers approaching. *See Wright v. St. Louis Bd. of Police Com'rs*, No. 4:12CV00107 AGF, 2014 WL 4187797 (E.D. Mo. Aug. 22, 2014). In that case, a store clerk gave a description of the suspect as a Black male, in his late 30s to early 40s, wearing a white t-shirt and blue jeans and carrying 18-pack of beer. *Id*. at *1. The district court held that this description sufficiently matched Plaintiff. *Id*. at *14.

Here, Officers Munyan and Neukirch had more facts before them than the officers in *Wright*. They personally observed the fleeing suspect and gave a more detailed description of him, which Plaintiff matched. Additionally, unlike the officers in *Wright*, other officers were looking for the fleeing suspect, but only found Plaintiff who fit the fleeing suspect's description. These cases, *Hill v. California*, 401 U.S. 797 (1971) and *Wright v. St. Louis Bd. of Police Com'rs,* 2014 WL 4187797, demonstrate that under the facts within Officers Munyan and Neukirch's knowledge, viewed objectively, probable cause existed to arrest Plaintiff. Other cases also support a finding of probable cause under these facts. See, e.g., *U.S. v. Oakley*, 153 F.3d 696, 697 (8th Cir. 1998)(probable cause where race, height, weight, pants and hat matched

19

description and was found within 12 blocks and less than an hour from the crime); *U.S. v. Slipka*, 735 F.2d 1064, 1065-66 (8th Cir. 1984)(probable cause where suspect matched detailed clothing description and fled upon eye contact with officers); *U.S. v. Jones*, 535 F.3d 886, 890 (8th Cir. 2008)(probable cause where height, race, body build and clothing details matched and was carrying a backpack and soft drink bottle).

Because probable cause existed to arrest Plaintiff, there is no Fourth Amendment violation, and the first prong of the qualified immunity doctrine is sufficiently satisfied to bar Plaintiff's unlawful arrest claim.

### (3) Assuming Officers Munyan and Neukirch and Sgt. Ortiz violated the Fourth Amendment, they are still entitled to qualified immunity.

Even if this court determines there was no probable cause to arrest Plaintiff and therefore, his Fourth Amendment right was violated, that right was not clearly established within the context of this case, given the Eighth Circuit case law, *U.S. v. Oakley*, 153 F.3d 696 (8th Cir. 1998); *U.S. v. Slipka*, 735 F.2d 1064 (8th Cir. 1984); *U.S. v. Jones*, 535 F.3d 886. Accordingly, they are still entitled to qualified immunity.

### B. Officers Munyan and Neukirch conducted a reasonably thorough investigation prior to arresting Plaintiff.

Law enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect. *Kuehl v. Burris*, 173 F.3d 646, 650 (8th Cir. 1999). Although an officer need not conduct a "mini-trial" before making an arrest, probable cause will not exist when minimal further investigation would have exonerated the suspect. *Id*.

Here, Officers Munyan and Neukirch conducted a more than reasonable investigation even though they already had probable cause to arrest. They reviewed the patrol car video at least 8 times to confirm Plaintiff matched the description of the fleeing suspect. In spite of the clothing differences, namely the socks and the shorts, given the remaining similar physical characteristics and clothing, Officers Munyan and Neukirch still had probable cause to arrest. Both officers believed Plaintiff could have easily shed a pair of shorts and socks in the 7-minute time gap where no officer was behind him. Based on their law enforcement experience, fleeing suspects often shed clothes to change their appearance to pursuing law enforcement officers. Officers Munyan and Neukirch are entitled to consider the circumstances presented to them in light of their experiences. *See Hannah v. City of Overland, Missouri*, 795 F.2d 1385, 1390 (8th Cir. 1986).

In addition, Officer Munyan asked the two other juveniles questions about fleeing suspect's name and address. They reported the fleeing suspect's street name as "Jay." When Officer Munyan indicated Plaintiff was the fleeing suspect ("You know we got him, right?"), one of the juveniles tacitly agreed ("Yah, I seen you when you pulled up.") Officer Neukirch talked to the calling party and conducted other various tasks related to the arrest.

Neither Officer Munyan or Neukirch asked the calling party or the two other juveniles to identify Plaintiff as the fleeing suspect. There was no reason to believe the two juveniles, one of whom tacitly agreed Plaintiff was the fleeing suspect, would have exonerated Plaintiff; even if they had, Officers Munyan and Neukirch, who

themselves personally identified the fleeing suspect as the Plaintiff, were under no constitutional obligation to believe the two juveniles over their own personal observations. In addition, the calling party was not present when Officers Munyan and Neukirch saw the fleeing suspect toss a gun and run from Officer Munyan. As such, Officers Munyan and Neukirch had no reason to believe that he would be able to offer a more reliable identification than their own personal observations.

**C. Qualified immunity bars Plaintiff's unlawful arrest claim against Detective Mattivi.**

Detective Mattivi's only involvement in Plaintiff's arrest was his direction to Officer Neukirch to place Plaintiff on a 24-hour investigative hold at the Juvenile Justice Center. He did so in reliance on the information Officer Neukirch gave him.

Detective Mattivi is entitled to rely on information from "official channels, like fellow officers…provided that the source of information was itself based on probable cause." *Miller v. Denney*, No. 4:12CV0378BCW, 2012 WL 3548200 *8 (W.D. Mo. Aug. 16, 2012) citing *State v. Johnson*, 316 S.W.3d 390, 397 (Mo.App.W.D. 2010); *see also Borgman v. Kedley*, 646 F.3d 518, 523 (8th Cir. 2011).

Because the information provided to Detective Mattivi from Officer Neukirch was itself based on probable cause, qualified immunity bars Plaintiff's unlawful arrest claim against Detective Mattivi for all the same reasons it bars the unlawful arrest claim against Officers Neukirch and Munyan.

22

**D. Plaintiff has no viable Fourteenth Amendment wrongful detention claim against Officers Neukirch and Munyan and Sgt. Ortiz.**

Plaintiff alleges a Fourteenth Amendment wrongful detention claim against Officers Neukirch and Munyan and Sergeant Ortiz. These Defendants placed Plaintiff on a 24-hour investigative hold for which probable cause existed. Other than that, they were not personally involved in Plaintiff's 3-week detention. Because these Defendants were not personally involved in Plaintiff's continued detention beyond the first 24 hours, the Fourteenth Amendment wrongful detention claim against them fails. *See Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985)(Individual liability under Section 1983 requires personal involvement). Even if there was such a viable claim against them, that claim would be barred by qualified immunity, because Plaintiff's 24-hour investigative hold was based on probable cause, and as such, does not shock the conscience. *See Amrine v. Brooks*, 522 F.3d 823, 834 (8th Cir. 2008)(Due process violations require conduct that shocks the conscience.).

**E. Qualified immunity bars Plaintiff's Fourteenth Amendment wrongful detention claim against Detective Mattivi.**

Plaintiff's alleged due process violation against Detective Mattivi is predicated on his 3-week detention. Plaintiff alleges his Fourteenth Amendment right was violated by Detective Mattivi's failure to investigate exculpatory evidence for 3 weeks. Plaintiff alleges the patrol car videos would have exonerated him and "conclusively established [his] innocence." *See* Second Amended Complaint, Doc. No. 35, ¶¶83-84.

23

To establish an alleged due process violation, Plaintiff must show that Detective Mattivi "intentionally or recklessly failed to investigate, thereby shocking the conscience." *Akins v. Epperly*, 588 F.3d 1178, 1184 (8th Cir. 2009)(quotations omitted). "An officer's negligent failure to investigate inconsistencies or other leads is insufficient to establish conscience-shocking misconduct." *Id*. Rather, "the following circumstances indicate reckless or intentional failure to investigate that shocks the conscience: (1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence." *Id*.

First, and perhaps most importantly, the patrol car videos from Plaintiff's arrest do not conclusively establish his innocence as he claims. After watching these videos, Detective Mattivi believed that Plaintiff and the fleeing suspect appeared to be two different people, because they had on different shorts and different socks. However, Officers Neukirch and Munyan disagreed. They did not believe that different shorts and socks extinguished probable cause in this case, because in their experience, fleeing suspects frequently shed clothes when running from police for the purpose of changing their identity to escape detection. A suspect's change of clothes to avoid detection is not a novel concept among law enforcement. *See United States v. Carpenter*, 342 F.3d 812, 814 (7th Cir. 2003)(noting that "it is generally assumed that robbers will *change* their clothes after the crime to avoid being recognized."). Even Detective Mattivi, who thought the patrol car video indicated two different people,

got a second and third opinion (from his sergeant and the prosecutor respectively) on the matter before he confirmed with Plaintiff's mother that Plaintiff would be released from detention.

Secondly, Detective Mattivi did not act with the requisite deliberate indifference. He relied on multiple assurances from Officers Neukirch and Munyan, that they reviewed the patrol car video and confirmed that Plaintiff was the fleeing suspect seen it. As previously noted, Detective Mattivi is permitted to rely on fellow officers. *Miller*, 2012 WL 3548200 *8 citing *State v. Johnson*, 316 S.W.3d at 397; *see also Borgman*, 646 F.3d at 523.

That Detective Mattivi allegedly ignored Plaintiff's and his mother's protests of innocence also does not rise to the level of deliberate indifference. "An officer is not required to believe the statements of a suspect." *U.S. v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997). Certainly, based on Detective Mattivi's experience, suspects lie all the time, and parents frequently support their child's claim of innocence regardless of the claim's veracity.

Finally, because the arresting officers insisted Plaintiff was the suspect and Plaintiff insisted he was not, Detective Mattivi believed that issues surrounding Plaintiff's guilt or innocence would be determined by DNA testing of the gun, not the patrol car video. He did not therefore ignore evidence (the patrol car video) suggesting Plaintiff's innocence, because he did not believe it would.

Accordingly, Detective Mattivi's conduct does not rise to the level of conscience-shocking, therefore, he is entitled to qualified immunity on Plaintiff's Fourteenth Amendment wrongful detention claim.

**D. Qualified immunity bars Plaintiff's unlawful detention claims under the Fourth Amendment against Officers Neukich and Munyan, Detective Mattivi, and Sergeant Ortiz.**

"[T]he Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). In that vein, the reasonableness of a suspect's pretrial detention hinges on whether there is probable cause to hold the suspect over for trial. *Manuel v. City of Joliet, Ill.*, 137 S.Ct. 911, 918 (2017). In Missouri, a plaintiff can succeed on a false arrest and false imprisonment claim only if he was confined *without any legal justification* (emphasis added). *Zike v. Advance America, Cash Advance Centers of Missouri, Inc.*, 646 F.3d 504, 512 (8th Cir. 2011). Thus, arrests and detentions supported by probable cause are "justified *per se* under Missouri law and therefore cannot form the basis of a false-arrest claim." *Id.* Accordingly, a judicial determination of probable cause to bind a suspect over for trial provides a complete defense to Section 1983 unlawful detention claims when the arrest was based on probable cause. So long as the suspect appears before a judicial officer within forty-eight hours for a determination of probable cause, warrantless arrests are constitutional. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 352 (2001).

26

Here, as explained earlier, Plaintiff's arrest was based on probable cause. On June 9, 2016, the Juvenile Officer of Jackson County, Missouri filed a petition with the Family Court Division, arising out of Tyree Bell's June 8, 2016 arrest, that alleged he carried a firearm in violation of Section 571.030 RSMo. and fled from officers in violation of Section 575.150 RSMo. Rule 127.07 provides that "an order of detention [for a juvenile] shall be entered only upon: (1) the filing of a petition…and, (2) a determination by the court that probable cause exists to believe that the juvenile's acts alleged in the petition…bring the juvenile within the jurisdiction of the court." Missouri Supreme Court Rule 127.07. On June 10, 2016, Plaintiff had a probable cause hearing before a judge pursuant to Rule 127.08, which states in pertinent part, "[t]he court shall receive evidence relevant to the necessity for detention of the juvenile," and "[i]f the court orders the juvenile detained, the court shall review the order of detention every 30 days." Missouri Supreme Court Rule 127.08. Plaintiff was represented by counsel at that hearing. The judge ordered Plaintiff be detained. In his order, the judge stated "the court, receiving evidence relevant to the necessity for detention of the juvenile…and considering the information and evidence presented at the hearing, finds detention [is necessary]." Exhibit FF.

On June 22, 2016, Plaintiff had another judicial hearing with his attorney present. The judge decided to continue to detain Plaintiff and scheduled Plaintiff's case for trial on August 4, 2016. On June 29, 2016, Plaintiff was released from custody after Detective Mattivi reviewed the patrol car videos from his arrest and concluded that there was reason to believe Plaintiff was not the fleeing suspect.

Qualified immunity bars Plaintiff's unlawful detention claims based on the Fourth Amendment against all Defendants, because Plaintiff's clearly established rights were not violated. There was probable cause to arrest him and there was probable cause to bind him over for trial as determined by a judge within 48 hours of his arrest.

**E. Qualified immunity bars Plaintiff's Fourth Amendment unlawful detention claim against Detective Mattivi, because he did not detain Plaintiff for an unreasonable amount of time in light of protests of innocence.**

State actors are liable for wrongful imprisonment over protests of innocence under Section 1983 only after the passage of an unreasonable amount of time. *See Baker v. McCollan*, 443 U.S. 137, 145 (1979). The *Baker* Court held plaintiff's constitutional rights were not violated even though he was "confined for a period of days [because] it was pursuant to a warrant conforming to the requirements of the Fourth Amendment." *Id.* at 44. In *Rivera v. County of Los Angeles*, 745 F.3d 384, 391 (9th Cir. 2014), a two-week detention was not unreasonable when it was pursuant to a court order after the court determined there was probable cause to proceed with prosecution. However, in *Russo v. City of Bridgeport*, 479 F.3d 196 (2nd Cir. 2007), a 7-month detention violated the Fourth Amendment when it took officers that long to view an exculpatory video which was readily available. The video was exculpatory, because the suspect depicted in it did not share Plaintiff's distinct tattoos. *Id.* at 206.

More importantly, officers concealed from Plaintiff the exculpatory nature of the video. *Id.*

In this case, Plaintiff was not detained for a prolonged amount of time given the totality of the circumstances surrounding his investigation. As previously discussed, the patrol car videos in this case are not necessarily exculpatory, unlike the video in *Russo*. Detective Mattivi relied on the repeated assurances of fellow officers who watched the patrol car videos and claimed they were not exculpatory. Furthermore, Plaintiff was bound over for trial after a judicial finding of probable cause, so theoretically he could have been lawfully detained all the way until his trial. Thus, Plaintiff's clearly established rights were not violated by Detective Mattivi, because Plaintiff's pretrial detention was lawful, according to a judicial finding of probable cause, and not unreasonably long.

F. **Supervisory liability is barred because there are no underlying constitutional claims.**

For supervisory liability to attach, individual liability first must be found on an underlying substantive claim. *Moore v. City of Desloge, Mo.*, 647 F.3d 841, 849 (8th Cir. 2011). Thus, because summary judgment is proper for the individual officers, the federal claims against the supervisory defendants, the Kansas City, Missouri Board of Police Commissioners, Chief Smith, and Sgt. Ortiz also fail.

G. **Claims against the Board, Chief Smith, and Sgt. Ortiz in their official capacities under 42 U.S.C. § 1983 fail.**

When analyzing the Board's potential §1983 supervisory liability, the Board

is treated as a municipality, rather than an arm of the state. *See Gorman v. Easley,* 257 F.3d 738, 743 (8th Cir. 2001). With respect to municipalities, "[s]ection 1983 liability for a constitutional violation may attach… if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Independence, MO*, 829 F.3d 695, 699 (8th Cir. 2016). It is not enough for a plaintiff to simply allege that such a policy, custom, or deliberate indifferent training or supervision exists; a plaintiff must be able to prove that the constitutional violation occurred because of an official policy, an unofficial custom, or deliberate indifferent supervision or training by the decisionmakers. *See Green v. Nocciero*, 676 F.3d 748, 752 (8th Cir. 2012).

With respect to Chief Smith and Sgt. Ortiz, their potential liability is analyzed in the same manner as the Board's potential liability, because they are being sued in their official capacities. "A suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent." *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006)(citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)).

Plaintiff's allegations are insufficient to establish liability against these defendants. Plaintiff must "allege facts that would support the existence of an unconstitutional policy orcustom." *Doe v. Sch. Dist. Of City of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003). Plaintiff'scomplaint alleges, in a conclusory manner, that policies and customs violate constitutional rights but failed to elicit a policy or pattern of incidents that support this assertion. *Id.* (An isolated incident of alleged misconduct,

30

cannot, as a matter of law, establish a municipal policy or custom creating liability under Section1983).

To the extent Plaintiff asserts liability on the basis of failure to train and supervise, Plaintiff pleads insufficient facts to establish liability under Section 1983. The complaint lacks factual allegations demonstrating that employee trainings and supervision were inadequate, that these Defendants were deliberately indifferent to the rights of others in adopting these training and supervision practices, and these Defendants' failure to train and supervise were a result of deliberate and conscious choices made, and alleged training and supervision deficiencies caused his constitutional rights to be violated. *Ulrichv. Pope County*, 715 F.3d 1054, 1061 (8th Cir. 2013). Thus, claims against these Defendants must be dismissed.

### H. Sgt. Ortiz is not liable in his individual capacity.

Plaintiff alleges that Sergeant Ortiz is liable in his individual supervisory capacity for failure to train and supervise Officers Munyan and Neukirch. "Because vicarious liability is inapplicable to…§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S.662, 676 (2009). "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* at 677. A supervising officer can be liable for an inferior officer's constitutional violation only if "he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation." *Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997).

31

Plaintiff alleges that Sergeant Ortiz did not review the patrol car video and did not question Officer Munyan about his positive identification of Plaintiff. However, these bare allegations are not sufficient to establish a direct constitutional violation or failure to train or supervise, and Plaintiff's claim against Sergeant Ortiz fails.

WHEREFORE, for the reasons set forth in this motion, Defendants respectfully request that this Court sustain their motion for summary judgment and enter judgment as a matter of law in their favor.

Respectfully submitted,

**JOSHUA D. HAWLEY**
Attorney General of Missouri

*/s/ Diane Peters*
Assistant Attorney General
Missouri Bar Number: 54784
Attorneys for Defendants
Missouri Attorney General's Office
615 E. 13th Street, Suite 401
Kansas City, Missouri 64106
Telephone: (816)889-5000
Fax: (816)889-5006
diane.peters@ago.mo.gov
Attorneys for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 26, 2018, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following:

Arthur Benson
Arthur Benson and Associates
4006 Central Street
Kansas City, MO 64111
Telephone: 816-531-6565

32

Fax: 816-531-6688
Attorney for Plaintiff

/s/ Diane Peters
Diane Peters
Missouri Bar Number: 54784
Attorney for Defendants
Missouri Attorney General's Office
Kansas City, Missouri 64106
Phone: (816)889-5000