**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| TYREE BELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-CV-00695-DGK |
| | ) | |
| PETER NEUKIRCH, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' REPLY SUGGESTIONS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants Kansas City, Missouri Board of Police Commissioners, through its members, Leland Shurin, Don Wagner, Mark Tolbert, Nathan Garrett, and Sylvester "Sly" James, (hereinafter "the Board"), Chief Richard Smith, Officers Peter Neukirch and Jonathan Munyan, Detective John Mattivi, and Sergeant Luis Ortiz, of the Kansas City, Missouri Police Department, pursuant to Fed.R.Civ.P. 56 and L.R. 56.1, respectfully submit the following reply suggestions in support of their motion for summary judgment:

## Statement of Uncontroverted Material Facts[1]

1.     On June 8, 2016, around 4:07 p.m., the Kansas City, Missouri Police Department received a 911 call from a resident at 9112 Marsh Avenue who reported that two Black males had guns at the corner of James A. Reed and 91st Terrace.

**Plaintiff's Answer: Uncontroverted that on the audio recording of the 911 call the caller indicated there were "a couple of kids" on the corner of James A. Reed Road and 91st Terrace who had guns and were letting some teenage girls play with the guns.** ***But see,***

---

[1] Defendants will reply only to the facts that Plaintiff disputes.

**Defendants' Exhibit R, Miller Declaration at ¶¶ 2, indicating that there were three African-American males and that one of them had a gun;** *and see***, DSF 5.**

2.      The caller described one as wearing a white t-shirt and jeans with dreads; he described the other as wearing a black t-shirt.

**Plaintiff's Answer: Uncontroverted that on the audio recording, the caller said that one male wearing a white t-shirt and jeans had a gun; the caller further volunteered that a second male was wearing a black t-shirt.**

3.      At about 4:10 p.m., Officers Jon Munyan and Peter Neukirch were dispatched to 9112 Marsh with the following information from the dispatcher: "A report of a suspicious party armed with a gun. 9112 Marsh. It's gonna be a Black male, dreads, white shirt, blue jeans, armed with a gun. Black male, black shirt, also armed with a gun. Two unknown females standing next to them, possibly teenagers."

**Plaintiff's Answer: Uncontroverted that the dispatcher on Defendants' Exhibit C Dispatch Radio recording so stated. Uncontroverted that Munyan and Neukirch were dispatched to 9112 Marsh at about 4:10 p.m. Disputed that Exhibit D, purporting to contain a true and accurate transcript of that audio is, in fact, true and accurate throughout as there are minor errors.**

*Reply: Please see Exhibit D, notarized affidavit of Peter Neukirch, attesting that the Dispatch Audio Transcript is a true and accurate copy of a transcript of those communications.*

4.      On the way to the call, Officer Munyan called the calling party to get more information.

**Plaintiff's Answer: Uncontroverted.**

5.      The calling party reported there were three Black males inside or at the house located at 9108 Marsh on the corner of Marsh and 91st Terrace.

**Plaintiff's Answer: Uncontroverted.**

6.    At about 4:17 p.m., as Officers Munyan and Neukirch drove their patrol car up to the corner of Marsh and 91st Terrace, Officer Neukirch saw three Black male teenagers in the front yard of 9108 Marsh talking to some teenaged girls.

**Plaintiff's Answer: Uncontroverted.**

7.    As Officer Neukirch drove his patrol car closer, he saw the three males turn away from his patrol car, quickly start walking, then running away.

**Plaintiff's Answer: Uncontroverted that the males may have quickly started walking. Controverted that all three males were running away. Only one of the males began to run. Defendants' Exhibit T, First Neukirch Video at 4:18:00-4:18:03.**

*Reply: Plaintiff failed to create a factual dispute, because the portion of the patrol car video cited by Plaintiff is consistent with the fact contained in ¶7 in that Officer Neukirch's testimony in his affidavit is that the juveniles cannot be seen running on the video as he had not completely turned the corner at that time. So Plaintiff's citation to the portion of the video where the juveniles are visible, after he had turned the corner, does not properly controvert the evidence in Officer Neukirch's affidavit. Thus, the statement of fact should be considered undisputed. Rule 56(e)(2).*

8.    At 4:18 p.m., Officers Munyan and Neukirch stopped their patrol car next to the males who by this time had stopped running.

**Plaintiff's Answer: Uncontroverted that by 4:18:03, Officers Munyan and Neukirch had stopped their patrol car next to the males. Uncontroverted that two of the males had stopped running. Controverted that all three males stopped. A third male did not stop. Defendants' Exhibit T at 4:18:04-4:18:05.**

*Reply: The cited portion of the patrol car video is consistent with the evidence cited by Defendants in support of this fact. Defendants have shown, by appropriate citation to the evidence, that all three males had stopped running by 4:18:00, as the three males can be seen walking at that point. The portion of the video cited by Plaintiff, which simply shows that one of them began running again at 4:18:04-4:18:05, does not properly controvert the evidence cited by Defendants. Thus, the fact should be considered undisputed. Rule 56(e)(2).*

9.      The male wearing a white t-shirt and black shorts turned to face the patrol car, while grabbing his waist, then began to run, pulled a gun from his shorts, and tossed it over a fence.

        **Plaintiff's Answer: Uncontroverted.**

10.     Officer Munyan yelled, "Come here!  Drop the gun!  Drop it!  Drop it!" while chasing after him.

        **Plaintiff's Answer: Uncontroverted.**

11.     Officer Neukirch took custody of the two remaining males.

        **Plaintiff's Answer: Uncontroverted.**

12.     Officer Munyan gave updated descriptions and locations on dispatch radio as he chased the fleeing suspect through backyards.

        **Plaintiff's Answer: Uncontroverted.**

13.     At 4:19 p.m., Officer Munyan reported on dispatch radio that he had lost sight of the fleeing suspect.

        **Plaintiff's Answer: Uncontroverted.**

14.     A few seconds later, Officer Munyan reported a description of the fleeing suspect, whom he last saw around 92nd Terrace and James A. Reed, as "Juvenile, Black male, 17-18, about 5'10", skinny, blue shorts, white t-shirt, shoulder-length dreads.  He was taking his shoes off.  I'm not

sure what kind of shoes he had on."

**Plaintiff's Answer: Uncontroverted that Munyan so reported. However, there is no intersection at James A. Reed Road and 92nd Terrace. Plaintiff's Exhibit 10, Google Map showing 9112 Marsh and that 92nd Terrace does not intersect with James A. Reed Road.**

*Reply: The point is immaterial. There is an intersection at James A. Reed Road and 92nd Terrace. Although 92nd Terrace does not continue immediately west of Marsh, it continues again beginning westbound from James A. Reed. See Plaintiff's Exhibit 10. The intersection of 92nd Terrace and James A. Reed is due south of the intersection of 91st Terrace and James A. Reed. This is consistent with the fact that the fleeing suspect turned southbound around a fence at the corner of James A. Reed and 91st Terrace. Defendant's Exhibit T, at 4:18:09-4:18:11. It is also consistent with the fact that Officer Munyan reported chasing the suspect southbound along James A. Reed before he turned westbound at 92nd Terrace. Defendant's Exhibit T, at 4:18:14–4:18:17 and 4:18:34–4:18:58; Defendant's Exhibit D, at 2.*

15.     After he lost sight of him, Officer Munyan continued looking for him.

**Plaintiff's Answer: Uncontroverted.**

16.     Believing the fleeing suspect ran northbound, Officer Munyan reported to dispatch, "My best guess is he cut north. But I'm not sure."

**Plaintiff's Answer: Uncontroverted that after first saying that he did not know whether the fleeing party went north or south and suggesting the boundaries of a perimeter, Munyan later stated that his best guess was that the fleeing suspect cut north.**

17.     At 4:21 p.m., Officer Munyan set up a perimeter at certain locations surrounding the area where he lost sight of the fleeing suspect.

**Plaintiff's Answer: Uncontroverted.**

18.     Several officers reported responding to these locations.

        **Plaintiff's Answer: Uncontroverted**.

19.     Officers Jonathan Janes and Andrew Lawrence and Sgts. Chase Moraczewski and Jason

Moran responded to the area and never saw anyone fitting the description of the fleeing suspect.

        **Plaintiff's Answer: Uncontroverted.**

20.     At 4:22 p.m., a canine officer agreed to meet Officer Munyan to help locate the

fleeing suspect.

        **Plaintiff's Answer: Uncontroverted.**

21.     At approximately 4:26 p.m., Officer Chris Viesselman, who responded to area to help

search for the fleeing suspect, saw a male, later identified as Tyree Bell, who fit the description of

the fleeing suspect, walking in the vicinity that he could have easily reached in 7 minutes from

where Officer Munyan last saw him.

        **Plaintiff's Answer: Controverted.  Viesselman saw Bell approximately 7 minutes and**

**55 seconds after Neukirch and Munyan exited their vehicle to engage with the three black**

**males.  Defendants' speculation that Bell could have easily gotten from 9112 Marsh Avenue**

**to just east of the intersection of 87th Street and Manchester where Viesselman first saw Bell**

*walking* **westbound in 7 minutes presumes that the fleeing male was running the entire time**

**– which if Munyan's report that he took off his shoes is credited – would not have been the**

**case.  He would have had to pause at least long enough to remove them.   And, Bell was**

*walking* **when Viesselman encountered him.  Per Google Maps, it would take about 19 to 20**

**minutes to** *walk* **from 9112 Marsh to the intersection of Blue Ridge Boulevard and 87th Street**

**whether via Manchester, James A. Reed Road or Blue Ridge Boulevard.  Plaintiff's Exhibit**

**5, Google Map with directions and distance between 9112 Marsh and 7805 E. 87th Street**

**(just east of 87th Street and Manchester). Bell was only a "little sweaty" and was "breathing normal" when Viesselman encountered him, inconsistent with having run about a mile in 86-87 degree heat. *See*, *infra*, at PSF ¶ 33 and n. 5.**

Reply: The fact in ¶21 should be considered undisputed. Rule 56(e)(2). At the summary judgment stage, the non-moving party may not rest on mere denials, but rather must meet proof with proof. Conseco Life Ins. Co. v. Williams, 620 F.3d 902, 909–10 (8th Cir. 2010).

Here, Defendants have established, by appropriate citation to the evidence, that based on Officer Viesselman's testimony, he saw a male, later identified as Tyree Bell, who fit the description of the fleeing suspect, and based on Officer Viesselman's testimony, was walking in the vicinity that the suspect could have easily reached in 7 minutes from where Officer Munyan last saw him.

Plaintiff asserts that the suspect would have had to run without stopping to reach Bell's location by the time Officer Viesselman saw Bell. The problem with this argument is three-fold. First, it is based on proffered evidence that lacks foundation (the Google Map with no accompanying testimony). Second, the proffered evidence is based on speculation about the estimated time it would take the average person to walk to Bell's location from 9112 Marsh by main roads - 19 to 20 minutes. Finally, Officer Viesselman only needed reasonable suspicion to conduct an investigatory stop of Bell. See Brown v. Texas, 443 U.S. 47, 51 (1979). The evidence that Officer Viesselman reported Bell as "a little sweaty" and "breathing normal" is from Officer Viesselman's later observations at 4:30 p.m. after stopping Bell. Exhibit Z, at 4:30:06–4:30:15. That evidence from later in the encounter cannot properly controvert the fact that Bell sufficiently matched the description of the suspect and was sufficiently in the location where the suspect may be, when Officer Viesselman first saw him at 4:26 p.m. The point should be considered undisputed.

*Rule 56(e)(2).*

22.     At 4:26 p.m., Officer Viesselman reported locating a "younger Black male with braids, or dreads…[wearing a] white t-shirt with black and white shorts."

**Plaintiff's Answer: Uncontroverted that after Viesselman asked Munyan if he was sure the fleeing suspect had taken his shoes off, he said, "I gotta younger black male with uh braids or dreads, ah 8-7 approaching Blue Ridge, white shirt, with *black and white shorts.*" *See also*, *infra*, at PSF ¶ 26.**

23.     Officer Viesselman asked Officer Munyan if he was sure the fleeing suspect had taken his shoes off.

**Plaintiff's Answer: Uncontroverted.  *See also*, *supra*, at RDSF ¶ 22, *infra*, at PSF ¶ 26.**

24.     Officer Munyan responded, "He was taking them off as I was running.  But I didn't see him toss them and I can't find any shoes, so he might have held them and put them back on.  I don't know.  Ped check him.  See if he runs."

**Plaintiff's Answer: Uncontroverted that the quoted passage is part of what Munyan said.  *See*, *infra*, at PSF ¶ 26.**

25.     Officer Viesselman conducted a pedestrian check or *Terry* stop of Tyree Bell, because he believed he had reasonable suspicion to believe he was the party he fled from Officer Munyan.

**Plaintiff's Answer: Uncontroverted that Viesselman conducted a pedestrian check or *Terry* stop of Tyree Bell; uncontroverted that at the moment of the stop, Viesselman may have believed Bell was the fleeing party.  Disputed, however, that he continued to so believe as he started comparing Bell with the description of the fleeing party.  *See*, *infra*, at PSF ¶ 24 (Bell has visible white stripes on his shorts); at PSF ¶ 26 (Bell is wearing his shoes and black**

*and white* shorts); at PSF ¶ 30 (Bell does not run and cooperates); PSF ¶ 32 (tells Bell, "So long as I can verify that it's not you with him, then I'm gonna cut you loose and you're gonna be gone. Okay? You'll be gone here in just a second."); at PSF ¶ 33 (Bell is just a "little sweaty" but "breathing normal"); at PSF ¶ 36 (Bell conveys that his shoes are "on there pretty good"); at PSF ¶ 38 (Bell is 6'3", 155 pounds with an athletic build versus the "5'10, skinny" fleeing suspect); at PSF ¶ 40 (Viesselman tells Bell he doesn't imagine they will need to contact his mother and says, "You don't seem like you're really out of breath after a foot chase or anything so I don't imagine it's you but you match what he's wearing so that's why I gotta stop you until we check, OK?"); at PSF ¶ 44 (Viesselman tells Bell, "It sounds like they're on their way here, so we should be done here pretty quick.").

Reply: *Plaintiff's citation to Officer Viesselman's statement on the patrol car video is misleading, because it is taken out of context. Officer Viesselman's statement, placed in proper context is as follows:*

*"**Right now you are being detained because you match the description of a party that was in foot chase with our officers that was carrying a gun**. So long as I can verify that it's not you with him, then I'm gonna cut you loose and you're gonna be gone. Okay? You'll be gone here in just a second." See Exhibit Z beginning at time-stamped 4:29:09 (emphasis added to omitted portion).*

*"Just in case we have to get a hold of her. I don't imagine we will. You don't seem like you're really out of breath after a foot chase or anything so I don't imagine it's you  but you match what he's wearing so that's why I gotta stop you until we check, OK?  **And you're the right age too. He's a juvenile**." See Exhibit Z at time-stamped 4:34:20 (emphasis added to omitted portion).*

*Plaintiff is only entitled to <u>reasonable</u> inferences that can be drawn from the evidence, not unreasonable inferences or speculation. "Although a district court must rule on a motion for summary judgment after viewing the facts in the light most favorable to the non-moving party, it is not required to accept unreasonable inferences or sheer speculation as fact." Reed v. City of St. Charles, Mo., 561 F.3d 788, 791 (8th Cir. 2009). Placed in context, Plaintiff is not entitled to an inference that Officer Viesselman stopped believing that he had grounds to stop Bell for an investigatory stop. Defendants' fact contained in ¶25 is undisputed.*

26.     At 4:29 p.m., the dispatcher reported that the canine was out in the area.

   **Plaintiff's** Answer: Uncontroverted.

27.     At 4:30 p.m., Officer Viesselman reported that the suspect's breathing was "normal" but he was a "little sweaty."

   **Plaintiff's Answer: Uncontroverted.  *See also*, *infra*, at PSF ¶ 33 and n. 5.**

28.     At 4:30 p.m., Officer Munyan reported to Officer Viesselman that he was with canine officers, who he was briefing about the search, but would respond to Officer Viesselman's location to identify the detained suspect.

   **Plaintiff's Answer: Uncontroverted.  *See also*, *infra*, at PSF ¶ 33.**

29.     At 4:39 p.m., the police helicopter was in the area.

   **Plaintiff's Answer: Uncontroverted**.

30.     Sgt. Moran located the gun that was tossed by the fleeing suspect.

   **Plaintiff's Answer: Uncontroverted.  *See also*, *infra*, at PSF ¶ 29.**

31.     After Sgt. Moran asked the dispatcher to run the serial number of this gun, the dispatcher found no records linked to it.

   **Plaintiff's Answer: Uncontroverted.  *See also*, *infra*, at PSF ¶ 41.**

32.     At 4:41 p.m., Officer Munyan drove to Officer Viesselman's location and identified the detained suspect (Tyree Bell) as the fleeing suspect.

**Plaintiff's Answer: Controverted. He misidentified Tyree Bell as the fleeing suspect.**

*Reply: With no citation to the record, Plaintiff attempts to controvert the fact in ¶32 through argument. The fact in ¶32 should be considered undisputed. Rule 56(e)(2). At the summary judgment stage, the non-moving party may not rest on mere denials, but rather must meet proof with proof. Conseco Life Ins. Co. v. Williams, 620 F.3d 902, 909–10 (8th Cir. 2010). Here, Defendants have established, by appropriate citation to the evidence, that Officer Munyan identified Tyree Bell as the fleeing suspect. To rebut the point, Plaintiff must cite to evidence contradicting Defendant's evidence, which he has not done. Thus, the point should be considered undisputed. Rule 56(e)(2).*

33.     As he drove up 87th Street, Officer Munyan clearly saw Tyree Bell, who was facing him, from head to toe.

**Plaintiff's Answer: Controverted that Munyan clearly saw Bell as he was driving. Uncontroverted that Bell was facing the vehicle Munyan was driving when Munyan arrived.**

*Reply: With no citation to the record, Plaintiff attempts to controvert the fact in ¶33 through argument. The fact in ¶33 should be considered undisputed. Rule 56(e)(2). At the summary judgment stage, the non-moving party may not rest on mere denials, but rather must meet proof with proof, which Plaintiff has failed to do. Conseco Life Ins. Co., 620 F.3d at 909–10. Thus, the point should be considered undisputed. Rule 56(e)(2).*

34.     Officer Munyan told Officer Viesselman that he "noticed the red on his shoes when he was running."

**Plaintiff's Answer: Uncontroverted that Munyan told Viesselman that he noticed red**

on the fleeing suspect's shoes. **Controverted, in light of his earlier statement that he was "***not sure what kind of shoes [the fleeing suspect] had***", that his view of the fleeing suspect was from behind, and the distances between Munyan and the fleeing male, that Munyan actually noticed red on the fleeing suspect's shoes or whether he was saying that to buttress his identification of Bell as the fleeing suspect after seeing Bell. This is the first time Munyan mentions noticing red on the fleeing male's shoes, *i.e.*, it is not until he sees Bell's shoes that he utters the word "red" in connection with the fleeing suspect. The red on the back of Bell's shoes is so small that it is debatable whether Munyan could have seen it, especially as far behind the fleeing suspect as he was, running through yards with grass, and given that he was "not sure what kind of shoes" the fleeing suspect was wearing (or removed). *See*, *infra*, at PSF ¶ 9 (five seconds and perhaps 40-45 yards behind the fleeing male); *see also*, Plaintiff's Exhibit 17, Photograph of Bell's shoe.**

Reply: *The evidence cited by Plaintiff does not controvert Defendants' evidence. Officer Munyan (1) did not know what kind of shoes the fleeing suspect wore; <u>and</u> (2) saw the color red on his shoes as he ran. Both of these statements are true and not mutually exclusively or contradictory, and Plaintiff has failed to demonstrate otherwise. Therefore, the fact in ¶34 remains undisputed.*

35.    At 4:46 p.m., Officer Viesselman returned to original scene at Marsh and 91st Terrace with Tyree Bell where Officer Neukirch was with the two other juveniles.

**Plaintiff's Answer: Uncontroverted**.

36.    Officer Neukirch saw Tyree Bell as he sat in Officer Viesselman's patrol car.

**Plaintiff's Answer: Uncontroverted that Neukirch so attested and that from a distance he likely could have seen Bell's figure in Viesselman's vehicle. However, it should**

be noted that Neukirch was in the same location near the two other juveniles, several yards away from Viesselman's vehicle from 4:46:00 until he and Munyan walk toward their vehicle at about 4:48:08 and so no inference that he actually saw Bell's face or what he was wearing at this time can be drawn. In addition, Neukirch testified in his deposition that as of 4:48:17, he did not know if Bell was at that location by that time. **Plaintiff's Exhibit 14, Neukirch Deposition at 63:9-64:2.**

*Reply: Here, Defendants have established, by appropriate citation to the evidence, that Officer Neukirch saw Bell as he sat in Officer Viesselman's vehicle. To rebut the point, Plaintiff must cite to evidence contradicting Defendant's evidence, which he has not done. The portion of the video cited by Plaintiff merely gives additional information about Officer Neukirch's location when he saw Bell, and does not contradict the fact that Officer Neukirch saw Bell. The cited portion of Officer Neukirch's deposition does not establish what Plaintiff claims it does. Rather, the question to which he answered "I don't know" was whether "the plaintiff [was] in the car here at this location by this time." See Exhibit 14, Neukirch Deposition at 63:25–64:2 (emphasis added). Even if the question were referring to Officer Viesselman's car, which is far from clear, the fact that Officer Neukirch did not know if Bell was in the car at 4:48:17 does not controvert the fact that he saw Bell in Officer Viesselman's vehicle before that point. Thus, the point should be considered undisputed. Rule 56(e)(2).*

37.      Starting at 4:48 p.m., Officers Munyan and Neukirch, along with Sgt. Ortiz, reviewed patrol car video of the fleeing suspect to confirm it was Tyree Bell.

**Plaintiff's Answer: Controverted in so far as the log file shows that the video was not played back the first time until 4:50 p.m. Defendants' Exhibit F, page 2. Uncontroverted that Munyan, Neukirch, and Ortiz were in the Munyan/Neukirch vehicle at that time.**

**Uncontroverted that Munyan, Neukirch, and Ortiz claim to have reviewed the video, but no inference can be drawn as to how closely they reviewed the video.**

*Reply:     Plaintiffs attempt to create a factual dispute by quibbling with exact timing. Paragraph 37 states Officers Munyan and Neukirch and Sgt. Ortiz **started** to review the video at 4:48 p.m. The officers can be seen on Officer Adams' video (Exhibit U) getting into the car at 4:48 and reaching up to the COBAN, in support of Defendants' statement that they started to review the video at 4:48 p.m. The fact that the first playback of the video occurred at 4:50 p.m. is consistent with the fact that the officers started reviewing the video at 4:48 p.m. Thus, instead of controverting ¶ 37, Plaintiff's response is consistent with it.*

38.     At 4:48 p.m., the log file for Officer Neukirch's patrol car video shows that the video stopped recording; and at 4:50 p.m., the video was played back two times.

**Plaintiff's Answer: Uncontroverted.  However, the log file does not indicate how long the video was reviewed.  Plaintiff's Exhibit 13, Feagans Deposition at 10:10-17; 11:22-12:6. There is no way to determine from the log files how much of a video was viewed in each playback.  *Id*. at 12:7-11.  There is no indication of how long any particular playback lasted. If there are five minutes between playbacks, the log file does not indicate whether the playback lasted 4 minutes and 58 seconds or 15 seconds.  *Id*. at 16:12-24.**

39.     From 4:50 p.m. to 5:32 p.m., Officer Neukirch performed various tasks related to Tyree Bell's arrest such as: discuss the case with Detective John Mattivi; talk to the calling party; take photos of Tyree Bell and the other two juveniles; talk to Tyree Bell's mother and the mothers of the two other juveniles.

**Plaintiff's Answer: Uncontroverted.**

40.     From 4:54 p.m. to 4:56 p.m., Officer Munyan talked to the other two juveniles.

**Plaintiff's Answer: Uncontroverted.  *See also*, *infra*, at PSF ¶ 86.**

41.     He asked the two other juveniles for information about the fleeing suspect's name and address.

**Plaintiff's Answer: Uncontroverted.  *See also*, *infra*, at PSF ¶ 86.**

42.     After his conversation with the two other juveniles, Officer Munyan reported to Sgt. Ortiz that they said the suspect's street name was "Jay."

**Plaintiff's Answer: Uncontroverted.**

43.     He also reported to Sgt. Ortiz that when he asked the two other juveniles, "You know we got him, right?" (referring to Tyree Bell), one of them responded, "Yah, I seen you when you pulled up."

**Plaintiff's Answer: Uncontroverted that Munyan may have reported that to Ortiz irrespective of whether it was true.  Controverted that one of the juveniles responded, "Yah, I seen you when you pulled up."  That is not heard on either Defendants' Exhibit U or Defendants' Exhibit Z.  *Munyan* may have been referring to Tyree Bell, but it is not clear whether, if, "Yah I see you when you pulled up" was indeed said, either juvenile was actually referring specifically to Bell.  Further, at the times cited in Defendants' Exhibit BB, Bell had not yet been taken out of Viesselman's vehicle to be photographed which would have been the first time either of the juveniles would have had a clear view of Bell.  Also, because Viesselman's vehicle is a few yards to the west of where the two juveniles are sitting up against the fence (and a light pole seems to obstruct the view of at least one of the juveniles), the juveniles did not have a clear view into Viesselman's vehicle.  Neither juvenile was asked directly if Bell was their companion.  Plaintiff's Exhibit 16, Adams Declaration at ¶ 6.  It was unreasonable for Munyan to infer that whichever juvenile Munyan claims responded as**

Munyan he claims he did was affirming – in response to "You know we got him, right?" – that Bell was their companion. It is equally reasonable to infer that although they were acknowledging that the police had captured *someone*, until Bell got out of the car, they thought their companion was the person apprehended.

*Reply: Here, Defendants have established, by appropriate citation to the patrol car video (Exhibit Z at time-stamp 4:56:29) and Officer Munyan's testimony (Exhibit BB), that Officer Munyan reported to Sgt. Ortiz that when he asked the two other juveniles, "You know we got him, right?" one of them responded, "Yah, I seen you when you pulled up." To rebut the point, Plaintiff must cite to evidence contradicting Defendants' evidence, which Plaintiff has not done. The fact in ¶43 remains undisputed.*

44.     To Officer Munyan, this juvenile implied that Tyree Bell was the fleeing suspect.

**Plaintiff's Answer: Uncontroverted that Munyan so claims after the fact, but it was unreasonable for Munyan to so conclude. If, in fact, the juvenile was implying that Bell was the fleeing suspect, the juvenile could have been lying in an attempt to protect the fleeing suspect by saying it was Bell who had fled.**

*Reply: Plaintiff seeks to dispute the reasonableness of Officer Munyan's actions through uncited argument. The reasonableness of officers' actions is not a question of fact, but a question of law. Scott v. Harris, 550 U.S. 372, 381 n.8 (2007); Pace v. City of Des Moines, 201 F.3d 1050, 1056 (8th Cir. 2000).*

45.     At 5:00 p.m., Sgt. Ortiz left the scene and did not return.

**Plaintiff's Answer: Uncontroverted.**

46.     Sgt. Ortiz did not return to the scene and did not go the Juvenile Justice Center.

**Plaintiff's Answer: Uncontroverted.**

47.    At 5:22 p.m., Officer Munyan reviewed his patrol car video again to further confirm whether Tyree Bell fit the description of the fleeing suspect.

**Plaintiff's Answer: Uncontroverted that the video log file shows that someone reviewed the patrol car video twice at 5:22. However, the log file does not indicate how long the video was reviewed. Plaintiff's Exhibit 13, Feagans Deposition at 10:10-17; 11:22-12:6. There is no way to determine from the log files how much of a video was viewed in each playback.** ***Id.*** **at 12:7-11. There is no indication of how long any particular playback lasted. If there are five minutes between playbacks, the log file does not indicate whether the playback lasted 4 minutes and 58 seconds or 15 seconds.** ***Id.*** **at 16:12-24. At least one of these playbacks lasted less than a minute because the second playback started in the same minute as the first. Denied that Munyan carefully reviewed the video with Bell side by side for direct comparison.** ***See also, supra*** **at RDSF ¶ 38.**

*Reply: Here, Defendants have established, by appropriate citation to the evidence, that Officer Munyan reviewed his patrol car video again at 5:22 p.m. in order to further confirm whether Bell fit the description of the fleeing suspect. To rebut the point, Plaintiff must cite to evidence contradicting Defendants' evidence, which Plaintiff has not done. The cited portions of the log file and the portions of Officer Feagan's testimony, which explain what information is reported in a log file, are consistent with the fact that Officer Munyan reviewed the video again at 5:22 p.m., and do not properly controvert Defendants' evidence. Thus, the point should be considered undisputed. Rule 56(e)(2).*

48.    At 5:22 p.m., the log file for Officer Neukirch's patrol car video shows that the video was played back two times.

**Plaintiff's Answer: Uncontroverted,** ***but see, supra*****, RDSF ¶¶ 38, 47.**

49.     At 5:32 p.m., Officers Neukirch and Munyan, with Tyree Bell, left the original scene at Marsh and 91st Terrace and went to the Juvenile Justice Center.

**Plaintiff's Answer: Uncontroverted.  *See also*, *infra*, at PSF ¶ 104.**

50.     Tyree Bell's calm demeanor during the 20-minute drive to the Juvenile Justice Center indicated to Officer Neukirch that he had committed the offense at issue.

**Plaintiff's Answer: Uncontroverted that Neukirch so attests after the fact; immaterial, however, as the arrest had already been made.**

51.     At some point, Officer Neukirch learned that Tyree Bell knew one of the two other juveniles.

**Plaintiff's Answer: Uncontroverted that Bell told Neukirch that he knew one of them from attending the same school.  Uncontroverted also that Adams has attested that he knew Bell from school but that they were not friends.  *See*, *infra*, at PSF ¶ 103 (citing Plaintiff's Exhibit 16 ¶ 4.)**

52.     At 5:52 p.m., after arriving to the Juvenile Justice Center, Officer Neukirch reviewed his patrol car video again.

**Plaintiff's Answer: Uncontroverted that someone reviewed the patrol car video. Controverted that Neukirch reviewed it in a meaningful way or that he viewed the video with Bell side-by-side to make a direct comparison with the fleeing male.**

*Reply: Here, Defendants have established, by appropriate citation to the evidence, that Officer Neukirch reviewed his patrol car video again at 5:52 p.m. To rebut the point, Plaintiff must cite to evidence contradicting Defendant's evidence, which he has not done. Thus, Defendants' fact should be considered undisputed. Rule 56(e)(2).*

53.     From 5:52 p.m. to 5:53 p.m., the log file for Officer Neukirch's patrol car video shows

that the video was played back four times.

**Plaintiff's Answer: Uncontroverted.  However, the log file does not indicate how long the video was reviewed.  Plaintiff's Exhibit 13, Feagans Deposition at 10:10-17; 11:22-12:6. There is no way to determine from the log files how much of a video was viewed in each playback.  *Id*. at 12:7-11.  There is no indication of how long any particular playback lasted. If there are five minutes between playbacks, the log file does not indicate whether the playback lasted 4 minutes and 58 seconds or 15 seconds.  *Id*. at 16:12-24.   It is likely that at least two of these playbacks lasted less than a minute because at both 17:52 and 17:53, the a second playback started in the same minute as the first.  Denied that Neukirch carefully reviewed the video with Bell side-by-side for direct comparison.  *See also, supra* at RDSF ¶ 38.**

*Reply: Here, Defendants have established, by appropriate citation to the evidence, that Officer Neukirch reviewed his patrol car video again at 5:52 p.m. To rebut the point, Plaintiff must cite to evidence contradicting Defendant's evidence, which he has not done. Thus, Defendants' fact should be considered undisputed. Rule 56(e)(2).*

54.    Officers Munyan and Neukirch believed Tyree Bell was the fleeing suspect, because they looked the same height, weight, body build, hair color, hair style, and hair length, and both wore unstained white t-shirts and black and red shoes.

**Plaintiff's Answer: Uncontroverted that Officers Munyan and Neukirch so state. However, disputed that they looked the same height (5'10" versus 6'3"), weight and body build (no weight given and "skinny" versus 155 pounds and athletic build); hair length (fleeing suspect had shoulder-length dreads while Bell's were collar-length); and, disputed that Munyan ever saw that the fleeing male had black and red shoes.  *See*, *infra*, PSF ¶¶ 18,**

**64.**

*Reply: Defendants have established, by appropriate citation to the evidence, that Officers Munyan and Neukirch believed Tyree Bell was the fleeing suspect, because they looked the same height, weight, body build, hair color, hair style, and hair length, and because both wore unstained white t-shirts and black and red shoes. To rebut the point, Plaintiff must cite to evidence contradicting Defendant's evidence, which he has not done.*

*The difference of mere inches between the estimate of the suspect's described height—which Officer Munyan estimated during the heat of a footchase—and Bell's self-reported height of 6'3", does not contradict the fact that Bell appeared to Officers Munyan and Neukirch to be the same height as the fleeing suspect. Bell's weight and build are also consistent with the description of the fleeing suspect as "skinny" and thus do not contradict the fact that Officers Munyan and Neukirch thought he looked the same weight and build. Plaintiff does not cite any evidence to contradict the fact that Bell appeared to have the same hair color, hair style, and hair length. There is likewise nothing inconsistent between Officer Munyan's earlier statement during the chase that he was not sure what kind of shoes the fleeing suspect had and his later statement that he nevertheless noticed the color red on those shoes. And the fact that Officer Munyan failed to mention the red on the shoes while giving a description in the heat of the chase does not contradict his statement made later under calmer circumstances that he noticed the red on the shoes during the chase.*

*Since none of Plaintiff's cited evidence contradicts Defendants' evidence, Defendants' fact should be considered undisputed. Rule 56(e)(2).*

55.     In addition to their similar physical characteristics, Officers Munyan and Neukirch further believed that Tyree Bell was the fleeing suspect, because several officers reported to the location,

including canine officers and the police helicopter, and no other officer reported seeing a suspect in the area who fit the description of fleeing suspect, other than Tyree Bell.

**Plaintiff's Answer: Uncontroverted that they now attest that they so believed; disputed that Bell fit the description had they carefully reviewed the video or paid attention to the differences instead of the similarities they wanted to find; disputed that it was reasonable to reach such a belief given that Bell did *not* match the description. Further, it was not reasonable to believe that just because Bell was the only person seen, he was the fleeing male. The neighborhood and its surrounding area had both residences and businesses. Officers were only looking for the suspect from their vehicles. A reasonable officer would have considered that the fleeing suspect could have entered a residence or hidden in the bushes of someone's backyard and escaped detection.**

*Reply: Defendants have established, by appropriate citation to the evidence, that Officers Munyan and Neukirch believed that Tyree Bell was the fleeing suspect because several officers reported to the location, including canine and a police helicopter, and no other officer reported seeing a suspect in the area who fit the description of fleeing suspect, other than Tyree Bell. To rebut the point, Plaintiff must cite to evidence contradicting Defendant's evidence, which he has not done. Thus, the point should be considered undisputed. Rule 56(e)(2).*

*Furthermore, to the extent Plaintiff seeks to dispute the reasonableness of the officers' actions, that is not a question of fact, but a question of law. Scott v. Harris, 550 U.S. 372, 381 n.8 (2007); Pace v. City of Des Moines, 201 F.3d 1050, 1056 (8th Cir. 2000).*

56.    Tyree Bell was found about 7 minutes after Officer Munyan lost sight of him.

**Plaintiff's Answer: Controverted. Munyan did not lose sight of Tyree Bell. He lost sight of the fleeing suspect who was *NOT* Tyree Bell. Controverted that Bell was "found".**

**Admitted only that Viesselman first saw Bell about 7 minutes and 55 seconds after Neukirch and Munyan left their vehicles attempting to stop the three juveniles.**

*Reply: Immaterial whether the fleeing suspect was actually Tyree Bell; officers had probable cause to believe that the fleeing suspect was Bell. Additionally, Plaintiff's fact that Officer Viesselman first saw Bell 7 minutes and 55 seconds after Officers Neukirch and Munyon left their vehicles does not dispute, but rather is consistent with, the fact that Bell was found about 7 minutes after Officer Munyan lost sight of him. Defendants' fact in ¶ 56 remains undisputed.*

57. Tyree Bell was found about 5-6 blocks from where Officer Munyan last saw him, if running through backyards as Officer Munyan saw him do.

**Plaintiff's Answer: Controverted. Munyan claims he last saw the fleeing suspect at 92nd Terrace and James A. Reed Road (which do not intersect). That location is more than 5-6 blocks from where Viesselman first saw Bell. Plaintiff's Exhibit 5; Plaintiff's Exhibit 10; *see also*, *infra*, at PSF ¶ 16 (citing Defendants' Exhibit T beginning at approximately 4:19:07).**

*Reply: Defendants have established, by appropriate citation to the evidence, that Bell was first seen about 5-6 blocks from where Officer Munyan last saw the fleeing suspect. To rebut the point, Plaintiff must cite to evidence contradicting Defendant's evidence.*

*Plaintiff asserts that the intersection of James A. Reed and 92nd Terrace does not exist. However, Plaintiff's Exhibit 10 demonstrates that that statement is not accurate. As reflected in Exhibit 10, the two roads meet at a point southwest of 9112 Marsh, and 92nd Terrace proceeds west from that intersection. See Plaintiff's Exhibit 10. Plaintiff has not cited to any evidence that contradicts Defendants' evidence. Thus, Defendants' fact in ¶57 should be considered undisputed.*

*Rule 56(e)(2).*

58.     Tyree Bell was found north of the location where Officer Munyan last saw him.

**Plaintiff's Answer: Controverted in that Bell was not "found." Controverted in that Munyan was not sure where the fleeing suspect went and misreported his own location as being at East 92nd Terrace and James A. Reed Road which do not intersect. However, admitted that Bell was seen by Viesselman walking along East 87th Street, just east of Manchester, which is north of where Neukirch and Munyan encountered the three juveniles, including the fleeing male.**

*Reply: Defendants have established, by appropriate citation to the evidence, that Bell was found north of the location where Officer Munyan lost sight of the fleeing suspect. Furthermore, there is ample evidence that James A. Reed and 92nd Terrace do intersect at a point southwest of 9112 Marsh, as is clearly visible from Plaintiff's Exhibit 10. To rebut the point, Plaintiff must cite to evidence contradicting Defendant's evidence, which he has not done. Thus, Defendants' fact in ¶58 should be considered undisputed. Rule 56(e)(2).*

59.     After observing how fast the fleeing suspect ran from Officer Munyan when they first pulled up to him in their patrol car, Officer Neukirch believed the fleeing suspect could have easily run 5 to 6 blocks in 7 minutes.

**Plaintiff's Answer: Uncontroverted that Officer Neukirch may have so thought, but no one knows the route the fleeing suspect ultimately took or whether he was running the entire time because Munyan never caught up with him. And, where Viesselman encountered Bell is more than 5 or 6 blocks. Plaintiff's Exhibit 5. In addition, Munyan has testified that the fleeing suspect did not run in a direct line. Plaintiff's Exhibit 3, Munyan Deposition at 9:11-20.**

*Reply: Defendants have established, by appropriate citation to the evidence, that Officer Neukirch believed the suspect could have easily run 5 to 6 blocks in 7 minutes. To rebut the point, Plaintiff must cite to evidence contradicting Defendant's evidence, which he has not done. Neither the map nor Officer Munyan's deposition testimony contradict this fact. Thus, Defendants' fact in ¶59 should be considered undisputed. Rule 56(e)(2).*

60.     Officer Munyan, who is able to run a 6½-minute mile without his gear on, was unable to keep up with the fleeing suspect.

**Plaintiff's Answer: Uncontroverted that Munyan was unable to keep up with the fleeing suspect; uncontroverted that Munyan has attested that he is able to run a 6½-minute mile without wearing his gear.  Uncontroverted, however, that Munyan was wearing about 40 pounds of gear.  Plaintiff's Exhibit 3, Munyan Deposition at 56:19-22.  In addition, Munyan testified that he only chased the fleeing suspect for four or five city blocks, back and forth and up and down, *i.e.*, not in a direct line, for about a minute.  *Id*. at 56:16-18.**

*Reply: The cited evidence is consistent with the testimony in Officer Munyan's affidavit, and the former does not properly controvert the latter. Thus, the fact should be considered undisputed. Rule 56(e)(2).*

61.     Given how fast Officer Munyan saw the fleeing suspect ran, he expected him to be in the area where Officer Viesselman found him in 7 minutes.

**Plaintiff's Answer: Uncontroverted that Officer Munyan has attested that such was his expectation, but no one knows the route the fleeing suspect ultimately took or whether he was running the entire time because Munyan never caught up with and lost him.  And, where Viesselman encountered Bell is more than 5 or 6 blocks from where Munyan said he last saw the fleeing suspect, *i.e.*, at the non-existent intersection of 92nd Terrace and James A. Reed**

Road.  **Plaintiff's Exhibit 5; Plaintiff's Exhibit 10.  In addition, Munyan has testified that the fleeing suspect did not run in a direct line.  Plaintiff's Exhibit 3, Munyan Deposition at 9:11-20.**

*Reply: The evidence cited by Plaintiff—the maps of the area and Officer Munyan's deposition testimony that the suspect was not running straight while he pursued him, are consistent with Officer Munyan's affidavit testimony that he expected the fleeing suspect to be in the area where Officer Viesselman found Bell, and the former does not properly controvert the latter. Plaintiff's assertion that James A. Reed and 92nd Terrace do not intersect is contradicted by his own evidence. See Plaintiff's Exhibit 5. Thus, Defendants' fact in ¶61 should be considered undisputed. Rule 56(e)(2).*

62.     Officer Munyan did not observe whether there was a white stripe on the fleeing suspect's shorts, because he was initially focused on the gun in the fleeing suspect's hand.

**Plaintiff's Answer: Uncontroverted that Munyan may not have initially observed whether there was a white stripe on the fleeing suspect's shorts.  Uncontroverted, however, that the fleeing subject's shorts did not have a white stripe on them.  Plaintiff's Exhibit 18, Screenshot from Defendants' Exhibit T showing all three juveniles, none of whom have stripes on their shorts; Defendants' Exhibit T at 4:18:00-4:18:08 (the officers had a side view of all three when they first turned the corner and pointed the dash cam toward the juveniles). Also, given that Munyan chased the fleeing suspect for four or five city blocks, back and forth and up and down, *i.e.*, not in a direct line, for about a minute (*see*, *supra* at RDSF ¶ 60), it is difficult to believe that if a stripe as large as the stripe on Bell's shorts had been on the fleeing suspect's shorts, Munyan would not have seen it, especially since he claims to have seen small areas of red on the fleeing suspect's shoes, the kind of which he could not identify**

**when chasing the fleeing suspect.** *See*, *infra*, **at PSF ¶ 18.**

*Reply: Defendants have established, by appropriate citation to the evidence, that Officer Munyan did not observe whether there was a white stripe on the fleeing suspect's shorts, because he was initially focused on the gun in the fleeing suspect's hand. To rebut the point, Plaintiff must cite to evidence contradicting Defendant's evidence, which he has not done. The cited portions of the patrol car video establish only what can arguably be seen on the shorts from the patrol car. This does not contradict the fact that Officer Munyan simply did not notice whether there was white on the shorts. The fact that Officer Munyan chased the suspect in various directions does not contradict this fact either—even if the stripe became visible during the foot pursuit, that does not mean Officer Munyan's attention was drawn to it. Officer Munyan's observation of the red on the suspect's shoes is not inconsistent with this fact either, because unlike the white on the front of Bell's shorts, shoes similar to Bell's would have had red visible on the back of the shoes, which is more easily visible during a chase, and the suspect's act of removing his shoes drew Officer Munyan's attention to them. Thus, Defendants' fact in ¶62 should be considered undisputed. Rule 56(e)(2).*

63.     When Officer Munyan reviewed the patrol car video, he could not definitively determine if there were white stripes on the fleeing suspect's shorts.

**Plaintiff's Answer: Uncontroverted that he so attests. However, had he looked more carefully at the video to err on the side of caution rather than to "verify" his hasty "identification" of Bell, he could have seen that there was no large white stripe on the fleeing suspect's shorts that resembled the large white stripe on Bell's shorts.** *See*, *supra*, **at RDSF ¶ 62;** *infra*, **at PSF ¶¶ 66, 76. Notably, Detective Mattivi was able to see that there was no white stripe on the fleeing suspect's shorts.    Plaintiff's Exhibit 19, Mattivi Report,**

**Supplement 3, at 1 (suspect wore black or dark blue shorts; Bell's shorts appear different and to have a white colored pattern on the front/sides of the shorts). Mattivi also noted that Bell was wearing short black socks whereas the fleeing suspect "was observed to be wearing long grey colored socks that rode half way up his calves."** *Id.*

*Reply: Immaterial that Detective Mattivi concluded that the fleeing suspect seemingly wore different socks and shorts than Bell when comparing the patrol car videos, but Officer Munyan did not come to that same conclusion. The Fourth Amendment only requires that Officer Munyan's actions be objectively reasonable. See Copeland v. Locke, 613 F.3d 875, 880 (8th Cir. 2010)("In the wrongful arrest context, officers are entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so, provided that the mistake is objectively reasonable."). And given all the other similarities between Bell and the fleeing suspect, that their shorts and socks may have been different, did not make Officer Munyan's arrest of Bell unreasonable, particularly in light of the fact that, in Officer Munyan's experience, suspects sometimes change their clothing to avoid detection during a chase (See Defendants' SOF 64).*

64.     Even if Tyree Bell's shorts and socks appeared different from the fleeing suspect's, Officers Munyan and Neukirch would not have been persuaded that Tyree Bell was not the suspect, because based on their law enforcement experience, fleeing suspects frequently wear more than one pair of shorts, pants, or socks, and will shed clothing during a foot pursuit with police to change their appearance to law enforcement.

**Plaintiff's Answer: Uncontroverted that Munyan and Neukirch so claim after the fact. Uncontroverted that this may have been their experience on occasion. However, disputed that it was reasonable under the circumstances to believe that the fleeing suspect had done so on this occasion, *i.e.*, that one of three juvenile males who were showing off for**

neighborhood girls would have gone to the trouble to wear two shirts, two pairs of shorts, and two sets of socks on a summer day when temperatures were in the mid-to-upper 80s. While a criminal set on committing a crime might go to the trouble to be ready to change his/her appearance it is hard to believe that much effort would have gone into just out being a fool on a summer day.  Plaintiff's Exhibit 6; *see also*, *infra*, at n. 5.  Additionally, based on his review of the two videos that were commenced within approximately eight minutes of each other, Mattivi concluded that Bell and the fleeing suspect were different people because Bell's black shorts had white on the front and sides while the fleeing suspect's shorts were solid black or blue (as earlier described by Munyan) and Bell's socks were black and short while the fleeing suspect's were grey and extended halfway up his calves, irrespective of whether, on other occasions, suspects had shed clothing during a foot pursuit.

*Reply: Plaintiff attempts to create a factual dispute by making legal arguments about the officers' reasonableness. Whether the officer's conclusions were reasonable under the circumstances is not a question of fact, but a question of law. Scott v. Harris, 550 U.S. 372, 381 n.8 (2007); Pace v. City of Des Moines, 201 F.3d 1050, 1056 (8th Cir. 2000).  Defendants have established the fact by appropriate citation to the evidence. To rebut the point, Plaintiff must cite to evidence contradicting Defendant's evidence, which he has not done. Thus, Defendants' fact in ¶64 should be considered undisputed. Rule 56(e)(2).*

65.     After writing the arrest report that night, Officers Neukirch and Munyan had nothing more to do with Tyree Bell's arrest.

**Plaintiff's Answer: Uncontroverted.**

66.     Tyree Bell was arrested for a weapons violation, because Officer Munyan saw him pull a firearm from his waistline and toss it over a fence.

**Plaintiff's Answer: Controverted.** Munyan did not see *Tyree Bell* pull a firearm from his waistline and toss it over a fence. Uncontroverted that he saw *someone else* pull a firearm from his waistline and toss it over a fence. Plaintiff's Exhibit 19, Mattivi Report; and, *e.g.,* compare Plaintiff's Exhibit 18 (fleeing male has no stripes on shorts) with Plaintiff's Exhibit 15 (Bell has white stripes on shorts). Uncontroverted that no one asked or remembers asking or whether anyone asked the other two juveniles who it was that pulled the firearm from his waistline and tossed it over the fence or if they asked either of them if Bell was the person who had done so. Plaintiff's Exhibit 3, Munyan Deposition at 88:10-15 ("that would be a job for a detective"; "we wouldn't do that without Mirandizing people in the field"); Plaintiff's Exhibit 14, Neukirch Deposition at 78:10-13 (does not remember if, when holding the other two juveniles, he asked them if they could identify the plaintiff as being the one who ran with the gun); at 79:7-9 (does not remember if he ever asked either of the two juveniles if they knew the plaintiff); Defendants' Exhibit HH, Ortiz Deposition at 50:20-24 (does not remember any officer asking either of the two juveniles or their mothers whether or not they knew the plaintiff); at 51:6-10 (does not know whether either of them could identify whether Bell had been the one who had fled and thrown the gun); at 51:14-52:2 (does not believe anyone looked into whether either had been questioned and said, "I go to school with that kid, he's not the one that ran and threw the gun"); at 52:3-12 (does not know whether either of the mothers or either of the two juveniles were asked if they knew the subject seated in Viesselman's car or could identify or name the person who had been with them, fled, and thrown the gun).

*Reply:* Immaterial whether Officer Munyan saw Bell; the validity of the arrest turns not on whether Bell was actually the one who fled and tossed the firearm, but whether there was

*probable cause to believe he was the one. Defendants' fact in ¶66 remains undisputed.*

67.     While at the scene, Officer Neukirch reported to Detective John Mattivi that he and Officer Munyan saw a juvenile suspect flee from them with a gun, Officer Munyan chased him on foot, lost sight of him, minutes later another officer found Tyree Bell who fit the description, and Officer Munyan identified the [sic] Tyree Bell as the fleeing suspect.

**Plaintiff's Answer: Uncontroverted that Neukirch provided that information to Mattivi, but controverted that Bell was correctly identified as the fleeing suspect. *See*, *e.g.*, *inter alia*, Plaintiff's Exhibit 19, Mattivi Report; Plaintiff's Exhibit 16, Adams Declaration; Defendants' Exhibit R, Miller Declaration.**

*Reply: The point is immaterial, since the validity of the arrest turns not on whether Bell was correctly identified as the one who fled and tossed the firearm, but whether there was probable cause to believe he was the one. Defendants' fact in ¶67 remains undisputed.*

68.     He further reported to Detective Mattivi that he and Officer Munyan personally identified Tyree Bell as the fleeing suspect, and after reviewing the patrol car video confirmed that Tyree Bell was the fleeing suspect seen on patrol car video.

**Plaintiff's Answer: Uncontroverted that Neukirch provided that information to Mattivi, but controverted that the video confirmed that Bell was the fleeing suspect. *See*, *e.g.*, *inter alia*, Plaintiff's Exhibit 19, Mattivi Report; Plaintiff's Exhibit 16, Adams Declaration; Defendants' Exhibit R, Miller Declaration.**

*Reply: Defendants have established the fact by appropriate citation to the evidence. The fact is not that the video confirmed so, but that Officers Munyan and Neukirch confirmed so* after reviewing *the patrol car video. To rebut the point, Plaintiff must cite to evidence contradicting Defendant's evidence, which he has not done. Plaintiff's cited evidence establishes that* others

*did not confirm that Bell was the fleeing suspect, but this does not contradict the fact that*

*Officers Munyan and Neukirch confirmed that he was after they watched the video. Thus,*

*Defendants' fact in ¶68 should be considered undisputed. Rule 56(e)(2).*

69.     Based on information he received from Officer Neukirch, Detective Mattivi told Officer

Neukirch to place Tyree Bell on a 24-hour investigative hold at the Juvenile Justice Center.

**Plaintiff's Answer: Uncontroverted.**

70.     At the Juvenile Justice Center, Officers Munyan and Neukirch assured Detective Mattivi

again that they reviewed the patrol car video and identified Tyree Bell from their review of it.

**Plaintiff's Answer: Uncontroverted that Mattivi has attested that Munyan and**

**Neukirch assured him again that they had reviewed the patrol car video.  Uncontroverted**

**also that Mattivi did not ask Munyan or Neukirch anything further about their supposed**

**identification of Bell after interviewing Bell.  Plaintiff's Exhibit 20, Mattivi Deposition at**

**41:14-42:7.**

71.     On June 8, 2016, around 7:00 p.m., he [Bell] was interviewed by Detective John Mattivi,

while his mother was present and after he was Mirandized.

**Plaintiff's Answer: Uncontroverted**.

72.     That Tyree Bell denied any involvement in the crime was not surprising to Detective

Mattivi, because suspects lie about their involvement in crime all the time.

**Plaintiff's Answer: Uncontroverted that Mattivi has so stated.**

73.     That Tyree Bell's mother supported his claims of innocence also was not surprising to

Detective Mattivi, because parents frequently do so.

**Plaintiff's Answer: Uncontroverted that Mattivi has so stated.**

74.     Because the arresting officers insisted Plaintiff was the suspect and Plaintiff insisted he

was not, Detective Mattivi believed that issues surrounding Plaintiff's guilt or innocence would be determined by DNA testing of the gun, not the patrol car video.

**Plaintiff's Answer: Uncontroverted that Mattivi has so stated. However, when asked if the DNA results ever came back, Mattivi testified in deposition that they "never got to the point to get the DNA back because in that time frame, I had viewed the video." He further testified that at the time of Bell's arrest, from the time of submission of the DNA samples until the time a report is provided could be anywhere between six months and a year. Had Mattivi actually waited until the DNA results came back, there is a possibility that Bell – being held on what, if he were an adult, would have been a felony firearms charge – could have been held for six months to a year, especially since Mattivi further testified that he "was not aware that [Bell] was still incarcerated until the day [he] viewed the video well." Plaintiff's Exhibit 20, Mattivi Deposition at 27:16-28:22; *see*, *infra*, at PSF ¶ 123.**

75. On June 9, 2016, at 1:15 p.m., the Juvenile Officer of Jackson County, Missouri filed a petition with the Family Court Division, arising out of Tyree Bell's June 8, 2016 arrest, that alleged he carried a firearm in violation of Section 571.030 RSMo. and fled from officers in violation of Section 575.150 RSMo.

       **Plaintiff's Answer: Uncontroverted**.

76. On June 10, 2016, Tyree Bell had a probable cause hearing before a judge pursuant to Rule 127.08.

       **Plaintiff's Answer: Uncontroverted**.

77. Tyree Bell was represented by counsel at that hearing.

       **Plaintiff's Answer: Uncontroverted**.

78. As a result of that hearing, the judge ordered Tyree Bell be detained.

**Plaintiff's Answer: Uncontroverted (although Defendants' Exhibit D does not support the statement).**

79.     On June 22, 2016, Tyree Bell had a second hearing.

    **Plaintiff's Answer: Uncontroverted**.

80.     Tyree Bell was represented by counsel at the second hearing.

    **Plaintiff's Answer: Uncontroverted**.

81.     As a result of the second hearing, the judge ordered Tyree Bell's continued detention and set a trial date for August 4, 2016.

    **Plaintiff's Answer: Uncontroverted**.

82.     On June 29, 2016, Detective Mattivi watched the patrol car videos from Tyree Bell's June 8, 2016 arrest for the first time.

    **Plaintiff's Answer: Uncontroverted**.

83.     After watching these videos, Detective Mattivi believed that Tyree Bell and the fleeing suspect appeared to be two different people, because they had on different shorts and different socks.

    **Plaintiff's Answer: Uncontroverted**.

84.     Detective Mattivi got a second and third opinion (from his sergeant and the prosecutor respectively) on the identity of the fleeing suspect on the patrol car video.

    **Plaintiff's Answer: Uncontroverted that Mattivi showed the video to the prosecutor and it is not disputed that he also showed the video to his sergeant.**

85.     Detective Mattivi immediately contacted Tyree Bell's mother and told her Tyree Bell would be released from detention.

    **Plaintiff's Answer: Uncontroverted**.

## Response to Plaintiff's Statement of Additional Facts

Plaintiff indulges in 218 numbered sprawling paragraphs, most containing multiple alleged facts. Of the hundreds of alleged facts Plaintiff submitted, however, he failed to dispute a single fact material to qualified immunity, not does it demonstrate that, in the light of clearly established law at the time, it would have been clear to a reasonable officer that his conduct was unlawful in the situation confronted.

1.　　On June 8, 2016, Tyree Bell was misidentified as a fleeing suspect who was a juvenile illegally in possession of a firearm, arrested without probable (sic), and taken to juvenile detention where he remained for twenty-one days. Defendant Officers Munyan and Neukirch and Sergeant Ortiz failed to carefully examine and directly compare readily available video to Bell and his clothing even though the video was feet away from Bell. *See*, *infra*, at PSF ¶ 212. Officers, supervising sergeants, and a detective also ignored obvious exculpatory evidence that was at hand which would have negated probable cause to arrest and detain him. As this table summarizes, there were fourteen obvious evidentiary reasons immediately evident at the scene that should have negated probable cause for any prudent officer:

| Claimed or Suspicious | Actual |
|---|---|
| The fleeing suspect was said to be wearing blue shorts. *See*, *infra*, at PSF ¶ 12<br><br>**RESPONSE: He was also said to be wearing all black at one point during the chase. See Exhibit D, at 2. Officer Neukirch also remembered the fleeing suspect as wearing black shorts. Exhibit S, ¶ 8 (c) and (e).** | Bell's shorts were mostly black, not blue. *See*, Plaintiff's Exhibit 15<br><br>**RESPONSE: Admitted**. |

| Claimed or Suspicious | Actual |
|---|---|
| Munyan did not describe the fleeing suspect's shorts as having stripes. *See*, *infra*, at PSF ¶ 18.<br><br>**RESPONSE: Admitted.** | Bell's black shorts had prominent white stripes down the sides and at the bottom of the pant legs in front; when repeating Viesselman's description, the dispatcher's inflection and makes "white stripes" a question, Viesselman affirms his description. When Bell removed from Viesselman's car to be photographed, and again when removed to be ushered to the Neukirch/Munyan patrol car, the white stripes on his shorts are plainly visible. *See*, Plaintiff's Exhibit 15; *see also*, *infra*, at PSF ¶¶ 28, 102.<br><br>**RESPONSE: That Bell's shorts had a "prominent white stripes" is a characterization of the evidence. Plaintiff's Exhibit 15 speaks for itself.** |
| Munyan claims not to be able to discern that fleeing suspect's shorts do not have white stripes on them. *See*, *supra*, at DSF ¶ 63.<br><br>**RESPONSE: Admitted.** | Difficult to believe that if a stripe as large as the stripe on Bell's shorts had been on the fleeing suspect's shorts, Munyan would not have seen it, especially since he claims to have seen small areas of red on the fleeing suspect's shoes, the kind of which he could not identify when chasing the fleeing suspect. *See*, *supra*, RDSF ¶¶ 62, 63.<br><br>**RESPONSE: This is an argument about facts, not a fact.** |
| The fleeing suspect was described by Munyan as being 5'10". *See*, *infra*, at PSF ¶ 18.<br><br>**RESPONSE: Admitted.** | Bell is – and told Officer Viesselman that he was – 6'3". *See*, *infra* at PSF ¶ 38.<br><br>**RESPONSE: Admitted that Bell claimed he was 6'3" when Officer Viesselman asked him. Denied that any of the officers knew for a fact that Bell was 6'3". None of the evidence cited in PSF ¶ 38 is competent to establish that Bell is or was in fact 6'3", but only that Bell reported this as his height. Neukirch's report (relied on by Plaintiff for the description of Bell's hair length) said he was 6 feet tall. Exhibit 8 at 2** |

| Claimed or Suspicious | Actual |
|---|---|
| The fleeing suspect was described by Munyan as having shoulder-length dreadlocks ("dreads"). *See, infra*, at PSF ¶ 18.<br><br>**RESPONSE: Admitted.** | Bell's dreads do not reach his shoulders. *See*, Plaintiff's Exhibit 15; *see also*, Plaintiff's Exhibit 8 at 2 ("short hair/collar length/dreadlocks").<br><br>**RESPONSE: Exhibit 15 speaks for itself as to the length of Plaintiff's hair.** |
| The fleeing suspect was described by Munyan as "skinny". *See, infra*, at PSF ¶ 18.<br><br>**RESPONSE: Admitted** | Bell weighed 155 and has more of an athletic build; he does not appear to be "skinny". *See, infra*, at PSF ¶ 38.<br><br>**RESPONSE: This is Plaintiff's characterization of the facts, not a fact. None of the evidence cited in PSF ¶ 38 establishes this as a fact. Exhibit 15 speaks for itself.** |
| The fleeing suspect would again run (as he had initially) if he saw a police vehicle. *See, infra*, at PSF ¶ 7 (citing Defendants' Exhibit T at 4:18:00-4:18:06). Also suggested by Munyan's suggestion that a pedestrian check might prompt Bell to run. *See, infra*, at PSF ¶ 26.<br><br>**RESPONSE: The evidence does not establish that the fleeing suspect would again run if he saw a police vehicle. The evidence cited by Plaintiff establishes only that the suspect ran at the first encounter with Munyan and Neukirch, not that he would run again. Munyan's suggestion to ped check Bell does not mean the fleeing suspect would necessarily run again—it meant only that running would be a clear indication of guilt, not that a decision not to run would tend to indicate innocence.** | When he saw Viesselman's patrol vehicle, Bell "walked right past me and never looked back." *See, infra*, at PSF ¶ 93. *See also*, *infra* at PSF ¶ 84 (". . . he was just walking down the street; so he didn't try to hide.").<br><br>**RESPONSE: Admitted.** |
| Munyan suggests that Viesselman perform a pedestrian check to see if Bell would run. *See, infra*, at PSF ¶ 26.<br><br>**RESPONSE: Admitted.** | Viesselman does a pedestrian check and Bell does not run and is compliant. *See, infra*, at PSF ¶ 30.<br><br>**RESPONSE: Admitted.** |

| Claimed or Suspicious | Actual |
|---|---|
| Munyan reported that the fleeing suspect removed his shoes when Munyan was chasing him. *See*, *infra*, at PSF ¶ 18.<br><br>**RESPONSE: Admitted. Munyan also said he did not see him toss them and he didn't find any shoes, so the suspect "might have held on to them and put them back on." Exhibit Z at 4:27:00–07.** | Bell had on shoes; they were on "pretty good." *See*, *infra*, at PSF ¶ 36.<br><br>**RESPONSE: The evidence cited does not establish that his shoes *were* on pretty good. Rather, it establishes only that Bell *claimed* they were on pretty good in response to Officer Viesselman's observation that they looked "really loose." Officer Viesselman asked, "How do you not lose your shoes? Those look really loose." Then Bell murmurs something and Viesselman responds, "They on pretty good?" Bell nods briefly and then Viesselman nods in response. Exhibit Z, at 4:31:40.** |
| Fleeing suspect last seen running after Munyan had chased the fleeing suspect for four or five city blocks, back and forth and up and down, *i.e.*, not in a direct line, for about a minute and to get to East 87th and Manchester in seven minutes, as Munyan and Neukirch believed he could, he would have had to have run the distance. *See*, *supra*, at RDSF ¶ 60.<br><br>**RESPONSE: Plaintiff's claim that the suspect would have had to run the entire distance to reach East 87th and Manchester in 7 minutes is denied, since it is not supported by any of the evidence cited in RDSF ¶ 60. The only evidence cited in RDSF ¶ 60 is Munyan's deposition testimony that he chased the fleeing suspect for about a minute before losing him and that he was running as fast as he could wearing 40 pounds of equipment. The fleeing suspect could have easily reached Bell's location in the time since Munyan lost sight of him. See Exhibit AA; Exhibit Y, ¶ 8.** | When Viesselman sees Bell about a mile away from the start of the foot chase, Bell is calmly walking on East 87th Street, talking on his cell phone. *See*, *infra*, at PSF ¶ 24<br><br>**RESPONSE: Admitted that Bell can be seen walking on this portion of the video. Plaintiff's characterization that he was walking "calmly" is not a fact, but a characterization of the video evidence.** |

| Claimed or Suspicious | Actual |
|---|---|
| Moran asked about Bell's breathing, expecting that after a run of about a mile in mid-eighty degree heat, the fleeing suspect would be breathing hard. *See*, *infra*, at PSF ¶ 33; n. 5; Plaintiff's Exhibit 6.<br><br>**RESPONSE: Admitted that someone asked about Bell's breathing and that the temperature at the time was in the mid eighties. The remainder of this statement is not established by evidence in the record. Plaintiff cites to no evidence that is competent to testify as to Moran's mental processes. Moran never said that he expected the suspect to be breathing hard. Exhibit Z at 4:29:49** | Viesselman initially reports Bell was "breathing normal", but while he later seems to soften this in support of Munyan's misidentification, he still admits Bell does not look out of breath: "When you're like how's he breathing and I was – well, when I first walked up there, pulled up to him and he walked past me I was like he was sweating pretty good and he looked like he was breathing *but it wasn't like I'd look after a foot chase.*" *See*, *infra*, at PSF ¶ 33; n. 5; PSF ¶ 84.<br><br>**RESPONSE: To the extent the statement contains Plaintiff's characterization of the facts, those characterizations are denied. Admitted that Bell said the quote cited here, except as to the emphasis Plaintiff has added. Exhibit Z, beginning at 4:50:00.** |
| Moran asked about Bell's sweating, expecting that after a run of about a mile in mid-eighty degree heat, the fleeing suspect would be sweating. *See*, *infra*, at PSF ¶ 33; n. 5; Plaintiff's Exhibit 6<br>**RESPONSE: Admitted that someone asked about Bell's sweating and that the temperature at the time was in the mid eighties. The remainder of this statement is not established by evidence in the record. Plaintiff cites to no evidence that is competent to testify as to Moran's mental processes. Moran never said that he expected the suspect to be sweating. Exhibit Z at 4:29:49** | Viesselman initially reports that Bell was a "little sweaty" but while he later seems to soften this in support of Munyan's misidentification, but still admits Bell does not look as sweaty as he would after a run saying, "When you're like how's he breathing and I was – well, when I first walked up there, pulled up to him and he walked past me I was like *he was sweating pretty good and he looked like he was breathing but it wasn't like I'd look after a foot chase.*" *See*, *infra*, at PSF ¶ 33; n. 5; PSF ¶ 84.<br><br>**RESPONSE: To the extent the statement contains Plaintiff's characterization of the facts, those characterizations are denied. Admitted that Bell said the quote cited here, except as to the emphasis Plaintiff has added. Exhibit Z, beginning at 4:50:00.** |

| Claimed or Suspicious | Actual |
|---|---|
| Munyan claims to have seen red on fleeing suspect's shoes but not until after seeing Bell's shoes. *See*, *infra*, at PSF ¶ 64.<br>**RESPONSE: Admitted.** | Unlikely that red was seen on shoes of fleeing suspect given how small it was and Munyan's earlier radio transmission that he could not see what kind of shoes they were. *See*, *infra*, at PSF ¶ 18; PSF ¶ 64.<br>**RESPONSE: This is an argument about facts, not a fact.** |
| The fleeing suspect had a street name of "Jay". *See*, *infra*, at PSF ¶ 86.<br>**RESPONSE: Admitted.** | A street name of "Jay" is not consistent with Bell's given name, Tyree Dibrell. *See*, Plaintiff's Exhibit 24, Bell Deposition at 3:5-12.<br>**RESPONSE: This is an argument about facts, not a fact.** |

**RESPONSE: Objection. Each of the approximately 28 statements contained in Paragraph 1 is not set forth in separately numbered paragraphs as required by Local Rule 56.1(a). Without waiving the objection, Defendants admit all of the foregoing portions that are factual; and object to all portions that are argument.**

2.      In addition, Defendant Officers Munyan and Neukirch, Sergeant Ortiz, and Detective Mattivi failed to investigate leads and did not conduct a thorough investigation, and, as supervisor (Ortiz) and lead investigating detective (Mattivi), did not question or raise issues with Munyan and Neukirch in that:

a.   Munyan took only seconds to make the eye witness show-up identification of Bell, but Sgt. Ortiz does not question him about it, nor does Mattivi. *See*, *infra*, at PSF ¶¶ 47-49, 116, 214.

b.   Munyan's video review was to "verify" an identification he had already made and it could not have been careful or thorough since he did not compare the white stripes on Bell (that he had both seen himself and been radioed about by Viesselman. *See*, *infra*, at PSF ¶¶ 66, 76, 147.

c.   Munyan, Neukirch, and Ortiz had not been trained about or were even aware of how

eye witness issues could have adversely affected the false identification of Bell. *See*, *infra*, at PSF ¶¶ 152, 177, 186, 187, 194, 198-202, 213, 214.

d. Mattivi was aware, but he still did not take that training into account. *See*, *infra*, at PSF ¶ 215.

e. The two other minor males were present when Bell was brought to 91st Terrace and Marsh by Viesselman but were not questioned about the identification, even though they were questioned about scores of other matters. *See*, *supra*, at RDSF ¶ 43; *infra*, at PSF ¶¶ 86, 104, 126, 134; Plaintiff's Exhibit 16.

f. Likewise, even the mothers of the two other minor males came to where the minors were being detained and officers could have asked them for permission to inquire of the two minors about whether Bell was their companion with the gun who fled, they did not do so nor did they ask the mothers themselves if they knew whether Bell had been with their sons. *See*, *infra*, at PSF ¶¶ 155, 156.

g. Calling Party Miller was three houses away but was not brought to the scene, nor was Bell taken to his house, to confirm whether Bell was the person he saw with the gun. *See*, *infra*, at PSF ¶ 104, 134, 138; Defendants' Exhibit R.

h. Sgt. Ortiz does not question Munyan and Neukirch about the identification or raise issues about the other factual anomalies. *See*, *infra*, at PSF ¶ 147.

i. Even though the Neukirch/Munyan vehicle was there before Mattivi interviewed Bell and he could have looked at it on the evening of Bell's arrest, as Bell and his mother implored him to do, Mattivi did not review the Neukirch/Munyan dash cam video until June 29, 21 days after Bell was taken into custody. No one looked at Viesselman's dash cam video until Mattivi looked at it on June 29. *See*, *infra*, at PSF ¶ 115, 120, 122, 124, 215.

**RESPONSE: Objection. Each of the approximately nine statements contained in Paragraph 2 is not set forth in separately numbered paragraphs as required by Local Rule 56.1(a). Without waiving the objection, Defendants respond as follows: Admit to the factual averments; object to Plaintiff's legal arguments.**

3.      Sixty-year-old Trorant Miller was outside his home at 9112 Marsh Avenue in Kansas City, Missouri, on June 8, 2016 when he saw three young African-American males on the porch two houses to the north talking to some young women.  One of the males had a gun. Defendants' Exhibit R, Miller Declaration at ¶¶ 1, 2.

**RESPONSE: Immaterial that Mr. Miller saw three young males on the porch talking to young women before officers arrived; that's not what Officers Munyan and Neukirch observed when they arrived.**

4.      At about 4:10 p.m., Officers Jon Munyan and Peter Neukirch respond.[4] *See*, RDSF ¶ 3.

**RESPONSE: Admit.**

5.       At about 4:13:10, Munyan calls the Calling Party – Miller – on his cell phone en route after being dispatched.  Defendants' Exhibit T at 4:13:10.

**RESPONSE: Admit.**

6.      As the officers enter the area and approach 91st Terrace and Marsh, they see three young African-American males who see the officers arrive.  Defendants' Exhibit T at 4:17:51-55.

**RESPONSE: Admitted.**

7.      Neukirch hits a short siren and the males look back.  The officers start to exit their

---

[4]Radio number 563 was assigned to Defendants Neukirch and Munyan.  Officer Viesselman was assigned radio number 538.  Plaintiff's Exhibit 3, Munyan Deposition Excerpts, at 20:2-14. Sergeant Moran was assigned radio number 530.  Plaintiff's Exhibit 4, Moran Deposition Excerpts at 7:4-11.  Sergeant Ortiz was assigned radio number 560.  Defendants' Exhibit D at 2, 4, 10.

vehicle and one of the officers says, "Come'ere."  Meanwhile, all three males start to walk, but then one runs, dark shorts showing.  Defendants' Exhibit T at 4:18:00-4:18:06.

**RESPONSE: Admit.**

8.　　Munyan, not initially seen on the video, yells, "Drop the gun, drop it.  Drop that!" and chases after the fleeing male, almost entirely from behind, as the fleeing male reaches to his waist line.  Defendants' Exhibit T at 4:18:06-4:18:08.

**RESPONSE: Admit.**

9.　　At about 4:18:08 or 4:18:09, the fleeing male tosses the gun over the fence and at about 4:18:10, disappears around a corner of the wood fence.  Munyan appears in frame at about 4:18:14 and rounds the corner at about 4:18:15 – some five seconds after the fleeing male and some distance – perhaps 40-45 yards – behind.  Defendants' Exhibit T at 4:18:08-16.

**RESPONSE: Admit.**

10.　　As Munyan rounds the end of the wood fence, five seconds behind the subject, he begins shouting, "I've got a party running, he's armed with a gun, black male, black t-shirt.  Running southbound."  Defendants' Exhibit C, Dispatch Radio, Track02.cda beginning at about 2:03 into the recording; Defendants' Exhibit D, Dispatch Transcript at 2; Defendants' Exhibit T beginning at approximately 4:18:12.  Munyan's description does not refer to the fleeing male's shoes.

**RESPONSE: Admit. However, for clarification, Exhibit D reads: "I've got a party armed with a gun. Black male, black t-shirt. Running southbound."**

11.　　Munyan's description is known as a "BOLO" (Be on the Lookout) which is a "flash" description of a suspect's physical and/or vehicle information and it is issued so other officers from all jurisdictions are searching for the suspect even while the issuing officer continues to investigate and obtain information at the crime scene.  The information contained in a BOLO

would include:

  a. The type of crime, location of the crime, and time of occurrence;
  b. The number of suspects involved;
  c. If the suspect/s is/are armed and the type of weapon; and,
  d. Physical descriptors of the suspects – given top to bottom and inside to out format.

There is a format for physical descriptors:

  a. Race and gender;
  b. Age;
  c. Height and Weight;
  d. Hair color, length, and type or style;
  e. Eye color;
  f. Facial hair and type;
  g. Clothing description;
  h. Scars, marks, tattoos and/or deformities.

Officers are trained to follow that order.  Plaintiff's Exhibit 1 (Excerpt, Hoffecker Deposition Exhibit 1, page 3.); Plaintiff's Exhibit 2, Hoffecker Deposition at 22:21-24:18.

**RESPONSE: Admit.**

12.    The dispatcher quickly repeats, "563's in a foot chase.  9112 Marsh.  Black male wearing all black, armed with a gun, running southbound.  Any cars in the area?"  Defendants' Exhibit T beginning at approximately 4:18:20.

**RESPONSE: Admit.**

13.    At approximately 4:18:30, Neukirch advises that he has "the other two in custody on the ground."  Defendants' Exhibit T.

**RESPONSE: Admit.**

14.    Out of sight, Munyan radios, "James A. Reed.  Running through the backyards.  Black male.  Dreads.  Blue shorts."  Defendants' Exhibit T beginning at 4:18:35. The dispatcher responds, "Copy. 91 and James A. Reed.  Black male, dreads, blue shorts."  She adds, "armed with a gun.  Still running southbound."  *Id.* beginning at 4:18:43.

**RESPONSE: Admit.**

15.    Munyan then advises, "Okay, we're gonna be westbound 92nd Terrace," and the dispatcher relates, "92nd Terrace and James A. Reed.  Westbound."  Defendants' Exhibit T beginning at approximately 4:18:50.

**RESPONSE: Admit.**

16.    Several seconds later, Munyan advises, "I need some more cars.  Westbound 92nd Terrace.  I'm not sure where he went."  Defendants' Exhibit T beginning at approximately 4:19:07.  The dispatcher affirms that she is getting cars en route and was still holding the air.

**RESPONSE: Admit.**

17.    At about 4:19:17, Officer Christopher Viesselman advises that he is responding. Defendants' Exhibit T beginning at approximately 4:19:17.

**RESPONSE: Admit.**

18.    At approximately 4:19:29, the dispatcher inquires, "563, where are you at now?"  At about 4:19:35, Munyan responds, 92nd Terrace and James A. Reed, westbound still.  I don't know where he went.  Juvenile Black male, 17-18, about *5'10", skinny*, blue shorts, white tee shirt, shoulder-length dreads.  He was taking his shoes off.  *I'm not sure what kind of shoes he had*."  Defendants' Exhibit T beginning at approximately 4:19:29 (emphasis added); *see also*, *infra*, at PSF ¶ 38 (Bell tells Viesselman that he is 6'3", 155 lbs.).  James A. Reed Road and 92nd Terrace do not intersect.  Plaintiff's Exhibit 10.

**RESPONSE: Admit except, as previously stated, Plaintiff's Exhibit 10 actually demonstrates that James A. Reed Road and 92nd Terrace do in fact intersect, unlike Plaintiff suggests.**

19.    The dispatcher repeats Munyan's description: "Copy.  Party last seen at 92nd Terrace and

44

James A. Reed westbound.  It's gonna be a Black male, juvenile, 17-18 years of age, approximately 5'10", slim build, Black male, dreads, white shirt, blue shorts, no shoes, and still holding the air." Defendants' Exhibit T beginning at approximately 4:19:54.

**RESPONSE: Admit.**

20. Sergeant Jason Moran advises that he is en route. Defendants' Exhibit T at approximately 4:20:08.

**RESPONSE: Admit.**

21. Moments later, Munyan radios to Neukirch, "Pete, he tossed you at least one gun over there by you in the backyard." Neukirch responds that he heard something hit the fence and that he has the other two males on the ground in handcuffs. Defendants' Exhibit T beginning at approximately 4:20:12.

**RESPONSE: Admit.**

22. Miller, the Calling Party, drives slowly by Neukirch's location, calling the two detained minors "nig**rs" and saying something, pointing at them, threatening to kill them, and declaring that he isn't "playing with" them. Defendants' Exhibit T at 4:21:01.

**RESPONSE: Mr. Miller's comments to the two juveniles who did not flee are immaterial to question of probable cause for Plaintiff's arrest.**

23. A few minutes later, Officer Viesselman was driving eastbound, east of Manchester on 87th Street when he saw Tyree Bell. Defendants' Exhibit Z, Viesselman Video, beginning at approximately 4:25:55; Defendants' Exhibit Y, Viesselman Affidavit, at ¶ 6. This was just about 7 minutes and 55 seconds after Neukirch and Munyan first exited their vehicle and contacted the three males. *See*, *supra* at PSF ¶ 7.

**RESPONSE: Admit.**

24.     Viesselman slows his vehicle as he approaches Bell walking westbound toward him.

Defendants' Exhibit Z beginning at approximately 4:25:59.  Bell is talking on his cell phone and

as Bell and the car approach each other, there is white clearly visible on his shorts.  *Id.* beginning

at approximately 4:26:05.

**RESPONSE: Admit.**

25.     As he gets closer to Bell, and the obviously visible white stripes, Viesselman radios to

Munyan.  Defendants' Exhibit Z beginning at 4:26:10. Bell terminates his phone call as he

continues to walk past the passenger side of Viesselman's vehicle and out of frame. Viesselman

repeats the call at 4:26:23.

**RESPONSE: Admit.**

26.     At approximately 4:26:42, Viesselman radios, "Hey, Munyan, are you sure you got his

shoes taken off?  I gotta a younger black male with uh braids, or dreads, ah, 8-7 approaching Blue

Ridge, white shirt, with *black and white shorts*."  Munyan responds, "It's probably worth a ped

check.  He was taking them off as I was running.  But I didn't see him toss them.  And I can't find

any shoes.  So, he might have held them and put them back on.  I don't know.  *Ped check him and

see if he runs*."  Defendants' Exhibit Z beginning at 4:26:42.

**RESPONSE: Admit, except that when listening to the actual evidence no special emphasis
is placed on the words Plaintiff has italicized. See Defendants' Exhibit Z beginning at
4:26:42.**

27.     As Munyan talks, Viesselman begins to back up his vehicle.  Defendants' Exhibit Z

beginning at 4:27:00, ending at approximately 4:27:18-19.  As he backs the vehicle, Viesselman

acknowledges Munyan, saying, "Copy.  538.  Copy.  Ped check."

**RESPONSE: Admit.**

28.     Meanwhile, the dispatcher repeats Viesselman's description to confirm it, saying, "East on 87th and Blue Ridge.  Black male, braids, white shirt, black and white shorts?"  Viesselman responds, "Affirmative".  Defendants' Exhibit Z beginning at 4:27:14-15.

**RESPONSE: Admit.**

29.     Seconds later, Sergeant Moran states that he has found a "tossed black high pointe.  .45 caliber."  Defendants' Exhibit Z beginning at approximately 4:27:27-28; Defendants Exhibit D at 5; Defendants' Exhibit W[5] beginning at approximately 4:27: 27.

**RESPONSE: Admit.**

30.     Meanwhile, beginning at approximately 4:27:19, Viesselman exits his vehicle, saying to Bell, "Come'ere, bud.  Put your phone on the hood for a second.  You got any guns or anything on you?"  Bell does *not* run, but instead, complies as he answers, "No."  Viesselman frisks Bell and asks if he has any identification with him.  When Bell shakes his head no, Viesselman says, "No?" and then asks Bell for his name, his birthday, and from where he was coming.  Bell replies that he was coming from his cousin's and Viesselman presses for a more precise location.  Defendants' Exhibit Z at approximately 4:27:19-4:28:0.

**RESPONSE: Admit.**

31.     When Bell answers, "Down the street," at approximately 4:28:03, Viesselman concludes that he needs to detain Bell.  He takes Bell's phone and handcuffs him.  Viesselman asks for "the actual place where your cousin's house is," and adds, "give me an intersection."  Bell at first says he forgot the street name, but then adds, that his cousin's house was off of Lane.  Defendants' Exhibit Z at 4:28:03-4:28:23.

---

[5]Defendants' Exhibit W is the first, chronologically, of three Moran videos.  It ends at approximately 4:40:59 p.m.

**RESPONSE: Admit. Defendants add: that Bell could not immediately identify the name of the street from where he had just come, further supports Officer Viesselman's reasonable suspicion for this investigatory stop.** *See e.g. U.S. v. Jones*, 269 F.3d 919, 927-28 (8th Cir. 2001).

32.     A few seconds pass and then Bell asks why he is being detained.  Viesselman tells him he was being detained because he matched the description of a party who was in a foot chase with an officer "that was carrying a gun."  He continued, "So as long as I can verify that it's not you with him, then I'm gonna cut you loose and you're gonna be gone.  Okay?  You'll be gone here in just a second."  Defendants' Exhibit Z beginning at 4:29:06-4:29:23.

**RESPONSE: Admit.**

33.     Viesselman contacts the dispatcher to give Bell's name and birth date.  Seconds later, Sergeant Moran asks, "Hey, Viesselman, how's his breathing and sweating?"  Viesselman responds, "A little sweaty.  *He's breathing normal though*."[6]  At approximately 4:30:16, Munyan interjects, "Hey, I'll be able to recognize him if I can get down to you."  Viesselman acknowledges and reiterates his location and then Munyan says, "Hang tight.  I'm out with canine right now."  Defendants' Exhibit Z beginning at 4:29:49.

**RESPONSE: Admit, except when listening to the actual evidence, there is no special emphasis placed on the italicized wording by Plaintiff. Defendants' Exhibit Z beginning at 4:29:49.**

34.     Munyan asks for confirmation as to who found the gun and Sergeant Ortiz asks Munyan if

---

[6]Viesselman was also visibly "a little sweaty."  Defendants' Exhibit Z at 4:27:33-39 (showing perspiration on his right forearm); Plaintiff's Exhibit 6, Weather Data for June 8, 2016, showing temperature at 3:54 p.m. was 87 degrees and at 4:54 p.m. was 86 degrees.  Viesselman later comments, "It's a warm one out here."  Defendants' Exhibit Z beginning at 4:37:13.

he wants Ortiz to pick him up and take him to Viesselman's location to see if the person Viesselman has detained is the fleeing suspect. Defendants' Exhibit Z beginning at approximately 4:30:54; Defendants' Exhibit D at page 7.

**RESPONSE: Admit.**

35.    While they wait for Munyan, Viesselman continues to ask questions of Bell. Defendants' Exhibit Z beginning at approximately 4:30:42. "You got your social?"; "You ever been stopped by the police before?"; "Yeah? For what?" Bell explains it had happened two years earlier and, although his soft-spoken response is unclear, it had something to do with riding his bicycle.

**RESPONSE: Admit.**

36.    Viesselman looks down and then asks Bell, "How do you not lose your shoes? Those look real loose." Defendants' Exhibit Z beginning at 4:31:40. Bell's reply is muffled, and then Viesselman responds, nodding, "They on there pretty good?" Defendants' Exhibit Z at 4:31:43.

**RESPONSE: Admit.**

37.    Viesselman continues, "You understand why I gotcha standin' here?" and Bell affirms that he does. Defendants' Exhibit Z beginning at approximately 4:31:56.

**RESPONSE: Admit.**

38.    Viesselman then asks, "How tall are you, Tyree?" and Bell replies, "6-3." Viesselman then asks, "6-3? You ah tall boy. You play basketball?" Bell gives an affirmative response. Defendants' Exhibit Z beginning at approximately 4:32:16. Viesselman next asks, "How much you weigh?" Bell response is muffled, but he can be heard saying "hundred" and "five". Viesselman, who is taking notes of what is being said, later enters in his report that Bell is 6'3" and 155 pounds. Defendants' Exhibit Z beginning at 4:32:23; Plaintiff's Exhibit 7, Viesselman Report. This is in contrast to the description of the fleeing subject as being 5'10" and skinny.

Neukirch later wrote that Bell was 6'0" and 150 pounds. Plaintiff's Exhibit 8, Neukirch Incident Report at 2. Bell, 5" taller than the description of the fleeing suspect and with a build that is better described as "athletic" than "skinny", did not match the "5'10", skinny" description. Plaintiff's Exhibit 15, Photograph of Bell.

**RESPONSE: The statement that Bell's height was in contrast to that of the fleeing suspect is improper argument. The picture of Bell in Plaintiff's Exhibit 15 speaks for itself, and Plaintiff's characterization of that evidence is argument. As to the factual averments contained in the above paragraph, admit.**

39.    Viesselman continues asking Bell for information, gathering his address, phone number, his mother's name, address, phone number, age, indicating that he was collecting her information in case they needed to get in touch with her. Defendants' Exhibit Z beginning at approximately 4:32:29.

**RESPONSE: Admit.**

40.    But Viesselman continued, "I don't imagine we will. "*You don't seem like you're really out of breath after a foot chase* or anything so I don't imagine it's you but you match what he's wearing so that's why I gotta stop you until we check, OK? And you're the right age, too, he was a juvenile." Defendants' Exhibit Z beginning at 4:34:20 (emphasis added).

**RESPONSE: Admit except when listening to the actual evidence, there is no special emphasis placed on the italicized wording by Plaintiff.**

41.    As the exchange between Bell and Viesselman continues, Neukirch calls in the names of the two parties he has detained at the original scene, and Sergeant Moran calls in information on the .45 caliber Hi-Point pistol. There was no record on either of the parties or the gun. Defendants' Exhibit Z beginning at approximately 4:33:19; Defendants' Exhibit D at pages 8-9 (with dispatcher

citing times between 1632 and 1635 (4:32 - 4:35 p.m.); Defendants' Exhibit W beginning at approximately 4:34:59.

**RESPONSE: Admit.**

42.    As Viesselman and Bell wait on 87th Street, Viesselman continues to ask questions of Bell.  Defendants' Exhibit Z, beginning at 4:37:18 and continuing intermittently.

**RESPONSE: Admit.**

43.    At about 4:39:10, Ortiz radios to Viesselman asking for his location, indicating that Munyan is on his way "over there" and Viesselman tells him about a block east of 87th and Blue Ridge.  Defendants' Exhibit Z beginning at approximately 4:39:10.

**RESPONSE:  Admit.**

44.    Viesselman tells Bell, "It sounds like they're on their way here, so we should be done here pretty quick."  Defendants' Exhibit Z, beginning at approximately 4:39:39.  Viesselman continues to look in both directions for Munyan.

**RESPONSE: Admit.**

45.    At about 4:41:00, Viesselman's video shows an unmarked, black or dark blue pickup truck approaching, just as it crosses with a USPS vehicle.  It is Sergeant Ortiz' vehicle, but Munyan is driving it, alone.  Defendants' Exhibit Z at 4:41:00; Plaintiff's Exhibit 3, Munyan Deposition at 24:6-12.

**RESPONSE: Admit.**

46.    Viesselman notices Munyan as Munyan pulls over and parks at the side of the street road on the opposite side from where Viesselman is parked, about 10 yards, *i.e.*, 30 feet away from where Viesselman and Bell are standing.  Defendants' Exhibit Z at 4:41:04; Plaintiff's Exhibit 3, Munyan Deposition at 24:22-25; 28:25-29:9; 30:6-12 (Munyan probably pulled his vehicle as far

off the road as he could to be out of the way); 30:22-31:11 (that was when Munyan believed he recognized Bell as the fleeing suspect who had thrown the gun).

**RESPONSE: Admit.**

47.    At approximately 4:41:05-:06, Viesselman is turning his body farther to the left, looking over his left shoulder.  At 4:41:07, a faint voice – Munyan's – is barely heard saying, "It's him" or "That's him", and at between 4:41:07 and :08, Viesselman nods affirmatively, acknowledging Munyan.  At about the same time, noise from a vehicle is heard.  The noise could be Munyan either putting the vehicle in park or exiting it.  Defendants' Exhibit Z beginning at 4:41:04; Plaintiff's Exhibit 3, Munyan Deposition at 28:3-12.

**RESPONSE: For purposes of this summary judgment motion only, admit.**

48.    Thus, Munyan, although he claims to have recognized Bell as he was approaching in his vehicle, which is disputed inasmuch as he had to have been paying at least some attention to driving, nevertheless maintains that between 4:41:04 and 4:41:07 – about three seconds – from a distance of about thirty feet, he recognized Bell.  Plaintiff's Exhibit 3, Munyan Deposition at 30:22-31:11; *see*, *supra* at PSF ¶¶ 46, 47.

**RESPONSE: A party asserting that a fact cannot be genuinely disputed must support the assertion by citing to particular parts of materials in the record. Fed. R. Civ. P. 56(c)(1)(a). The cited portion of Officer Munyan's deposition established only that he was about 30 feet away from Bell when he made the identification. Plaintiff's Exhibit 3, Munyan Deposition 24:22-25; 28:25-29:9; 30:6-12; 30:22-31:11. The remainder of Plaintiff's ¶48 are unsupported arguments challenging Officer Munyan's ability to recognize the suspect from 30 feet. This is pure argument, not a fact. Omitted from Plaintiff's arguments in ¶48 is Officer Munyan's testimony that he was about 30 to 40 feet away from the fleeing suspect**

**when the foot chase first began. Plaintiff's Exhibit 3, Munyan Deposition at 31:12-17.**

49.     Bell is then heard asking, "It's me?" and Viesselman responds, "That's what he said." Defendants' Exhibit Z beginning at 4:41:09.

**RESPONSE: Admit.**

50.     Meanwhile, Sergeant Moran had made his way to Viesselman and Bell's location.  Moran's dash camera video shows that at about 4:41:10-11, he turns east onto 87th Street from Blue Ridge Boulevard and at that point, his video captures the flashing lights on Viesselman's SUV.  Plaintiff's Exhibit 9, Second Moran Video beginning at approximately 4:41:10.

**RESPONSE: Admit.**

51.     Moran testified in deposition that he went to the location of Viesselman's pedestrian check of Bell.  Plaintiff's Exhibit 4, Moran Deposition at 20:15-21:8.  Moran does not recall seeing Ortiz' vehicle at that location when he arrived, but testified that he had reviewed his COBAN video and he remembered seeing Ortiz' vehicle on the recording.  *Id.* at 21:18.  Moran further testified that he believed that when he approached Viesselman and Bell, Munyan had come within close proximity and said something along the lines of, "yeah, that's him," and that he was present, standing next to the passenger side of Viesselman's vehicle when that was said.  *Id.* at 22:3-25. The time stamp on Moran's video indicates that he could not have heard Munyan so state because he did not turn onto 87th Street until 4:41:10 and Viesselman's video had captured Munyan at 4:41:07 saying, "It's him" or "That's him", and at between 4:41:07 and :08, Viesselman nods affirmatively, acknowledging Munyan.

**RESPONSE: Plaintiff attempts to create a factual dispute by quibbling with the number of seconds within which Sgt. Moran heard Officer Munyan identify Bell as the fleeing suspect. It is undisputed that Officer Munyan identified Bell as the fleeing suspect; immaterial when**

**or whether Sgt. Moran heard that identification.**

52.    An SUV turns onto 87th in front of Moran, but as soon as it clears the oncoming lane and gets in the same lane as Moran, the pickup truck driven by Munyan can be seen.  It is fully visible from 4:41:13 as Moran approaches.  Plaintiff's Exhibit 9 beginning at approximately 4:41:13.

**RESPONSE: Admit.**

53.    Munyan radios, "We have our party down here on 87th" as Viesselman turns Bell around, saying, "Turn around, I'm going to lock these handcuffs; they're going to be tighter on you." Defendants' Exhibit Z beginning at 4:41:13. The canine units and helicopter unit are advised that "they located the running party."  Defendants' Exhibit D at 10-11.

**RESPONSE: Admit, except for the portion of the patrol car video that Plaintiff misrepresents. Officer Viesselman did not say: "they're going to be tighter on you." Rather, he said, "Turn around, I'm going to lock these handcuffs so they *don't* get tighter on you." Exhibit D at 4:41:13 (emphasis added to demonstrate Plaintiff's misrepresentation). Regardless, this discrepancy between the parties is immaterial as is the factual averment in ¶53.**

54.    As shown in Moran's dash cam video, Viesselman's vehicle is parked on the south side of 87th street and is just east of the intersection of 87th and Manchester.  The truck Munyan was driving can be seen parked on the north side of 87th Street as Moran approaches.  Moran's vehicle comes to a complete stop on the west side of the intersection of 87th and Manchester and the tail end of the truck Munyan was driving can be seen parked off of the road surface on the north side of 87th street.  Plaintiff's Exhibit 9, beginning at 4:41:15 and continuing to 4:41:29.

**RESPONSE: Admit.**

55.     At about 4:41:35, Moran comes into view walking toward Viesselman's vehicle, but with his head at first turned slightly toward Munyan then toward the direction he is walking.  He reaches the front of Viesselman's SUV at about 4:41:48. Plaintiff's Exhibit 9 beginning at approximately 4:41:35.

**RESPONSE: Admit.**

56.     Bell asks if he can call his mother and Viesselman says, "Not yet."  Defendants' Exhibit Z beginning at 4:41:40.

**RESPONSE: Admit.**

57.     At approximately 4:41:54, Bell turns to his left and seems to ask something of Moran but neither his question nor Moran's response is clearly heard on Viesselman's video.  Defendants' Exhibit Z beginning at approximately 4:41:54.

**RESPONSE: Admit.**

58.     At about 4:42:00, Viesselman asks for a paddy wagon to be sent to their location.  Still off-camera, Munyan shouts at Bell, "You were about to get yourself shot."  Defendants' Exhibit Z beginning at 4:42:01; Plaintiff's Exhibit 3, Munyan Deposition at 34:10-14.  At about 4:42:01, on Moran's video, Munyan is seen at the edge of the frame getting out of the truck.  He waits for a vehicle to pass then crosses to Viesselman's vehicle.  Plaintiff's Exhibit 9 beginning at approximately 4:42:00.

**RESPONSE:  Admit.**

59.     At about 4:42:10, someone starts to say something about taking Bell to the original scene as Munyan comes into view of Viesselman's dash camera approximately 2 to 3 seconds later.  Defendants' Exhibit Z beginning at approximately 4:42:9-10.

**RESPONSE: Admit.**

60.     Viesselman leads Bell out of view of his dash camera where Moran again searches him.

Defendants' Exhibit Z beginning at 4:42:15; Plaintiff's Exhibit 4, Moran Deposition at 20:6-11;

20:21-21:3; 25:24-26:3.  Viesselman can be seen on Moran's video coming around the right

front of his vehicle at about 4:42:14.  He brings Bell around the corner of the vehicle and Moran

meets him, taking Bell.  Moran appears to check the handcuffs, then searches Bell.  Plaintiff's

Exhibit 9 beginning at approximately 4:42:14.

**RESPONSE: Admit.**

61.     After handing Bell to Moran, Viesselman crosses in front of his vehicle where Munyan is

walking.  As he does so, Munyan tells him, "Good job," and Viesselman responds saying, "Good

job, you!"  Defendants' Exhibit Z beginning at approximately 4:42:19.

**RESPONSE: Admit.**

62.     In response to an unintelligible comment from the dispatcher related to the request for a

paddy wagon, Viesselman responds, "I think we're gonna take him back over to his other

friends."  Defendants' Exhibit Z beginning at 4:42:30.

**RESPONSE: Admit.**

63.     At approximately 4:42:40, Moran's dash camera also begins to record audio.

**RESPONSE: Admit.**

64.     At about 4:42:43-44, Munyan claims, "*I noticed the red on his shoes when he was

running and started to take them off . . ..*"  Viesselman responds, "That's why I was asking if he

took them off 'cause I knew you'd said that."  Munyan replies, "He'd taken them off . . .."

Defendants' Exhibit Z beginning at approximately 4:42:42.  This is the first time Munyan

mentions noticing red on the fleeing male's shoes, *i.e.*, it is not until he sees Bell's shoes that he

utters the word "red" in connection with the fleeing suspect.  In fact, he had earlier said, "*I'm not*

*sure what kind of shoes he had*." Defendants' Exhibit T beginning at approximately 4:19:29 (emphasis added).

**RESPONSE: Admit Officers Munyan and Viesselman stated as such. The portion of ¶64 that states "This is the first time Munyan mentions noticing red on the fleeing male's shoes, i.e., it is not until he sees Bell's shoes that he utters the word "red" in connection with the fleeing suspect," is improper and uncited argument.**

65.     By 4:42:51, Moran has completed searching Bell and turns Bell toward the SUV. Bell appears to start to lose his balance, stepping from the street over the curb into the grass, then hops as he regains his balance and returns both feet to the street. Even though he continues to stand there, Munyan – seemingly irritated – asks, "Why you movin'? No one told you to move." When Bell starts to explain, Munyan cuts him off saying, "I don't care what you were trying to do." Moran and Viesselman move Bell around the door of the SUV to put him inside. Plaintiff's Exhibit 9 beginning at approximately 4:42:51.

**RESPONSE: Immaterial what occurred as Bell was getting into the SUV; admit.**

66.     At about 4:43:02, Munyan says, "I'm ah going to go [unintelligible] on our video and . . . I'll double-verify it." Plaintiff's Exhibit 9 beginning at approximately 4:43:02; *see also*, Defendants' Exhibit Z beginning at approximately 4:43:02.

**RESPONSE: Admit.**

67.     Bell is placed in the front passenger side seat of Viesselman's SUV at approximately 4:43:06. Plaintiff's Exhibit 11, Second Viesselman Video[7], beginning at approximately 4:43:06.

**RESPONSE: Admit.**

---

[7]The time stamping on Plaintiff's Exhibit 11 uses military time instead of regular time. Thus, 4:43:06 on that video shows a time stamp of 16:43:06.

68.     At about 4:43:10, Viesselman asks Munyan, "So, do you want me to go to 91 and James A. Reed?"  Munyan's response is inaudible, but Viesselman says, "Okay."  Plaintiff's Exhibit 9 beginning at approximately 4:43:10.

**RESPONSE: Admit.**

69.     At about 4:43:12, Munyan crosses the street to the truck and Moran starts back to his vehicle.  Plaintiff's Exhibit 9, beginning at approximately 4:43:12.  Meanwhile, Viesselman begins preparing to leave East 87th Street and Manchester.

**RESPONSE: Admit.**

70.     As Viesselman is preparing to leave, Bell calls out, "My phone!" and Viesselman responds, "Gotcha," and returns to the front of the SUV to retrieve it.  He then adds, "Tyree, I  put it in a brown paper bag; it's gonna go in the back seat, okay?"  Defendants' Exhibit Z beginning at approximately 4:43:18.

**RESPONSE: Admit.**

71.     At about 4:44:01, Viesselman, with Bell beside him starts to head toward the original scene.  Moran, who has pulled his vehicle to a position at the rear of Viesselman's (beginning at about 4:43:54), follows them.  Defendants' Exhibit Z beginning at approximately 4:44:01; Plaintiff's Exhibit 9 beginning at approximately 4:43:54.

**RESPONSE: Admit.**

72.     Once in the car, Bell says, "I'm tellin' you, it wasn't me."  While en route to the original scene, at about 4:44:10, Bell asks Viesselman,"So when do I get a phone call?"  Viesselman responds, "That's not up to me.  That will be up to the detectives and everything, whatever goes on.  I don't even know what actually happened.  So, all I can tell you is that you match the description, that's why I stopped you.  He came up; he was the one that was chasing whoever.

Whether it was you or not, I don't know. He says it was. He's going to go double check his video but he says it was you, he recognizes the shoes and everything. So we're going to go back over here and it's going to be up to whoever's in charge of all of that what happens from here." Plaintiff's Exhibit 11 beginning at about 4:44:10.

**RESPONSE: Admit.**

73.     Viesselman and Bell arrive at the original scene at about 4:46:20. Defendants' Exhibit Z at about 4:46:20. The two other juvenile males are handcuffed, sitting up against a chain link fence facing the street where police vehicles are parked with Neukirch standing near them. Officer Adams is leaning against his vehicle. *Id*. Viesselman exits his SUV. *Id*.

**RESPONSE: Admit.**

74.     The mother of one of the juveniles has arrived on the scene and Viesselman stops her from approaching the juveniles, Adams, and Neukirch saying that she cannot go to them because they are being detained. She asks how long it will be before she can take her child and he tells her he does not know. Defendants' Exhibit Z beginning at approximately 4:46:45.

**RESPONSE: Admit.**

75.     Viesselman and Moran converse briefly about the mother; Moran asks if the radio and sound inside his vehicle is turned down or off. Viesselman said it was not, and asks if he should turn it down. After Moran says to do so, Viesselman complies. Defendants' Exhibit Z beginning at approximately 4:47:26.

**RESPONSE: Admit.**

76.     At about 4:47:38, Munyan is talking to someone, possibly to Ortiz (now driving his truck taking Munyan back to the scene[8]) or on a phone. "Well, I mean he pulled a gun . . . he was running

---

[8]Plaintiff's Exhibit 12, Third Moran Video, shows Ortiz' truck arriving at the scene, Munyan getting out of the passenger side, and Ortiz parking to the rear of the Neukirch/Munyan vehicle.

away from me . . . and you know any overt movement or whatever, but you know, he tossed it right there, so. All right, thanks, brother. I'm going to verify this on my computer." Defendants' Exhibit T beginning at approximately 4:47:38.

**RESPONSE: Admit.**

77. By about 4:48:00, Munyan is back at the scene. At approximately, 4:48:06, Munyan approaches Neukirch's location and the two of them walk toward their vehicle. At about 4:48:10, Munyan says, "Yeah, I'm gonna need, I need to look at the COBAN real quick." Neukirch interjects, "Well, I saw him pull it." Munyan replies, "Oh, I know that," and Neukirch responds, "Yeah." As Munyan enters the car to view the video.[9] Defendants' Exhibit T beginning at approximately 4:48:00.

**RESPONSE: Admit.**

78. The doors of the Neukirch/Munyan patrol car are opened at approximately 4:48:16 and, as Munyan says, "I'm just gonna . . .", Neukirch interrupts, saying, "I'm trying to get the calling party to come back over here to see . . .", Munyan repeats, "I'm gonna", and as Neukirch says "if", the audio on Defendants' Exhibit T stops at about 4:48:23 while the video continues recording for approximately one more minute until it also stops. Defendants' Exhibit T beginning at approximately 4:48:16.

**RESPONSE: Admit.**

---

Plaintiff's Exhibit 12 beginning at approximately 4:47:36. At approximately 4:48:10, Ortiz is seen getting out of the vehicle.

[9]The video screen used in the Neukirch/Munyan vehicle was a COBAN system top cam model. The playback monitor is on the headboard directly behind the rearview mirror. The dimensions of the screen are 4 by 6 inches and approximately 7-inch diagonal. The view is in fairly bright vivid color and there is an option for about three-quarter screen view or a full screen view. Plaintiff's Exhibit 13, Feagans Deposition at 6:20-8:17.

79. From Officer Adams' dash cam, Neukirch and Munyan can be seen entering their vehicle at approximately 4:48:16 and at approximately 4:48:20, Munyan reaches up to switch on the replay of the car's video and their car video recording automatically stops. Defendants' Exhibit U beginning at approximately 4:48:16. At about 4:48:25, Ortiz approaches the Neukirch/Munyan vehicle, opens the back door on the driver's side and leans into the car behind Neukirch. At about 4:49:22, Ortiz stands upright and then gets into the back seat. *Id*. At 4:50:42, Neukirch exits the vehicle and appears to be talking on a phone. *Id*. At 4:51:36, he turns and walks across the corner and out of view.

**RESPONSE: Admit.**

80. Meanwhile, the Neukirch/Munyan vehicle's COBAN video of the chase loads and is played twice at 4:50. Defendants' Exhibit F at 2. At least one of those views lasted a minute or less. Plaintiff's Exhibit 13, Feagans Deposition at 16:12-24.

**RESPONSE: Admit that Defendants' Exhibit F shows that the Neukirch/Munyan video was played twice at 4:50. That at least one of those views lasted a minute or less is pure legal argument based on Officer Feagans' deposition testimony:**

> **Q. There's no indication of how long any particular playback lasted?**
>
> **A. No.**
>
> **Q. The only thing that gives you a rough idea is that it tells you when the next playback started?**
>
> **A. That's correct.**
>
> **Q. All right. So if there's five minutes between playbacks, you can't tell whether the playback lasts 4 minutes and 58 seconds or lasted 15 seconds, correct?**
>
> **A. Right.**

**Plaintiff's Exhibit 13, Feagans Deposition at 16:12-24.**

**According to Plaintiff's argument contained in ¶80, then, the other view at 4:50 lasted up to 32 minutes, because the next playback is at 5:22 p.m. See Exhibit E, pg. 1, ¶5.**

81.     Munyan and Ortiz remain in the Neukirch/Munyan patrol car until Ortiz emerges at 4:53:39 and Munyan exits at 4:53:46. Defendants' Exhibit U beginning at approximately 4:53:38.

**RESPONSE: Admit.**

82.     Meanwhile, Moran and Viesselman continue to talk.  Viesselman comments, "He made it a good distance."  Defendants' Exhibit Z beginning at approximately 4:48:00.  They discuss the fact that one of the moms was recording what was happening and Moran said that was why he had parked a little farther away from Adams and Viesselman's vehicles.  *Id*. beginning at about 4:48:13.

**RESPONSE: Admit.**

83.     Viesselman tells Moran that Bell "claimed he was coming from 87 and Lane, at his cousin's house, named Raven; on his way home; he says he stays at 7003 E. 85th Terrace.  I got his phone number, and name and address, and all that and Mom's also.  He didn't know Mom's birthday, but I got Mom's phone number out of his phone.  Well, he did.  I just pushed all the buttons."  Moran asked, "He did not know his mom's number?"  Viesselman replied, "No.  He barely knew his.  I just was like – I pulled up, and I'm like, 'Hey.  Come'ere.  Put your phone down.  You got anything on you?  Any guns or anything?  No?  I'm gonna check real quick just 'cause somebody's runnin' and you're matchin' the description.'  I was like I'm gonna put you in handcuffs, too, 'cause you're gonna have a lot harder time if you try to run with your hands behind your back than if you're able to free hand.  Moran speculated, "He's probably pretty fast with those long legs," and Viesselman said, "Yeah."  "I'm like, 'How tall are you?' He's like '6'3'".  "I'm like, 'Good Lord!'  Moran

says, "Young and long legs, man; he can move." And, Viesselman says, "Yeah." Defendants' Exhibit Z beginning at approximately 4:48:53.

**RESPONSE: Admit.**

84.    Viesselman continues to volunteer information while chatting with Moran. "When you're like how's he breathing and I was – well, when I first walked up there, pulled up to him and he walked past me I was like he was *sweating pretty good and he looked like he was breathing but it wasn't like I'd look after a foot chase."* "I'm really kinda glad I shut my lights and siren down west of Blue Ridge to kind of come in because he was just walking down the street; so he didn't try to hide." Moran described his path through the neighborhood looking for the fleeing suspect. Moran continued, "I really, really think the video solves everything we need here." "I just don't like dealing with juveniles. It takes forever." The two discuss the differences in processing of juveniles. Defendants' Exhibit Z beginning at approximately 4:50:00.

**RESPONSE: For purposes of this summary judgment motion, admit to Plaintiff's characterization of Officer Viesselman and Sgt. Moran's conversation.**

85.    At about 4:53:24, Bell gets Viesselman's attention to tell him that his mom was calling and to ask him if he would answer the phone for him. Viesselman tells him, "I can't right now. We can't deal with your phone right now." Ortiz approaches and Viesselman relates that Bell's mom is calling his phone. Defendants' Exhibit Z beginning at about 4:53:24.

**RESPONSE: Admitted. However, denied that this accurately represents the cited portion of the video. The portion of the video beginning at 4:53:24 and including Officer Viesselman's statement to Ortiz also includes other information that Plaintiff omitted. After Officer Viesselman answered Bell, but before Sgt. Ortiz approached, Officer Viesselman told Moran that Bell's mother was calling him, and says "I'm betting this lady called his mom."**

**(Presumably referring to the mother of one of the juveniles who did not flee but was detained by Officer Neukirch). Sgt. Moran responded, "Oh, I'm sure. And again, that just helps us strengthen the fact that they know each other, and all this." Furthermore, after telling Sgt. Ortiz that Bell's mom is calling his phone, Sgt. Moran said to Sgt. Ortiz, "So, we're assuming that, at least, is a good indication that they all know each other." Then Sgt. Ortiz responded, "No, they were hanging out together." Plaintiff's Exhibit 12 at 4:54:39-49.**

86.     Munyan is then on this audio heard questioning the two minors.  "Are these your folks up here?"  "Did either of you two have a gun today?"  "Did you know your buddy had a gun?"  He asks or says something about the calling party then, "How are you?  Fifteen?"  "Where do you guys go to school?"  One said he did not go to school but to Job Corps.  "Job Corps at sixteen?"  The other one said he was going to go to Ruskin.  "You guys did two really good things today.  You didn't have a gun on you and you didn't run.  All right?"  Your buddy almost got shot."  He lectures them.  "You guys made a really good decision not to run.  Okay?"  "You want to carry a gun?  Carry lawfully.  Cool.  Do it.  Get a license and do it.  This is America."  "But don't carry it in your pants like a thug . . .."  "Where does your buddy go to school?"  "How old is he?  Sixteen?  Seventeen?"  "What's his name?  Know where he lives?"  "What does he call himself?"  "What's his street name?"  "Jay?"  "What is his real name?"  Adams later joins in the questioning.  "Where were you guys all standin' at?  Right here?  This where you guys were all at when the cops rolled up on you?  Just right here?  Okay.  Cool." . . . "Are you guys related?  You're not.  Just friends?  Okay.  So, I take it, the other guy is just a friend, too?  Not a brother or anything?"  Defendants' Exhibit U beginning at approximately 4:54:39.

**RESPONSE: Admit.**

87.     At about 4:58:26, Neukirch walks back into view from around the fence and then passes

by Adams' patrol vehicle and out of view of Adams' dash cam. Defendants' Exhibit U beginning at about 4:58:26. At about 4:59:18, first Munyan and then Neukirch come back into Adams' dash cam. Ortiz also comes into view as Munyan and Neukirch head for their patrol vehicle and enter it. Ortiz and Adams chat about another matter. At about 5:00:13, Ortiz is heard to say he was going to "get outta here" and he turns and walks toward the corner. *Id*. beginning at about 4:59:18.

**RESPONSE: Admit.**

88.     At about 5:00:25, Ortiz returns to the Neukirch/Munyan patrol car and converses with them for a few seconds, then walks to his vehicle and leaves the scene at approximately 5:00:57. As he walks to his vehicle, Neukirch pulls their vehicle closer to Officer Adams' vehicle. Defendants' Exhibit U beginning at approximately 5:00:23. Neukirch and Munyan stay in the vehicle talking, with Munyan gesturing at times, until Munyan gets out of the car at about 5:07:53 and walks out of view of Adams' dash cam. Defendants' Exhibit U beginning at 5:00:25.

**RESPONSE: Admit.**

89.     At about 5:07:53 on Moran's dash cam video, Munyan can be seen exiting the Neukirch/Munyan patrol vehicle and walking westward toward Viesselman's and Moran's vehicles. Plaintiff's Exhibit 12 beginning at about 5:07:53. He disappears from view while crossing in front of Viesselman's SUV, then reemerges at about 5:08:02 stepping into the grass where Viesselman and Moran are standing. Moran and Munyan walk to where Moran found the gun. Moran went to retrieve the gun from his vehicle. Plaintiff's Exhibit 12 beginning at about 5:08:01.

**RESPONSE: Admit.**

90.     Meanwhile, Bell has been sitting in Viesselman's SUV. At about 5:08:11, Viesselman opens the passenger door. Viesselman and Bell converse (the conversation cannot be heard since

he has turned off the radio, *see*, *supra*, at PSF ¶ 75), then starts to close the door at about 5:08:48. Plaintiff's Exhibit 12 beginning at approximately 5:08:11; *see also*, Plaintiff's Exhibit 11 beginning at approximately 5:08:11.

**RESPONSE: The conversation cannot be heard on Plaintiff's Exhibit 11, but not because Officer Viesselman turned off the radio. Officer Viesselman turned the radio down or off much earlier in the video, at about 4:47:45-50, but his body microphone can still be heard until about 5:01:57. In Defendant's Exhibit Z, Officer Viesselman's microphone is muted from 5:01:57-5:19:15. Otherwise, admitted.**

91.     While Munyan waits for Moran to retrieve the gun from his vehicle, he is heard telling one of the parents (and stretching the truth as depicted in their video), "Well, they had a gun today and they ran from us.  They almost got themselves shot because they pulled it out *on us*."  When pressed by one of the mothers, he asked her son's name, then when she told him, he admitted that her son did not pull the gun and said it was his buddy.  Plaintiff's Exhibit 12 beginning at about 5:08:58. A few moments later, Moran returns with a paper bag holding the gun, the magazine, and one bullet and he and Munyan walk back to the area of Viesselman's vehicle.  *Id*. beginning at about 5:09:55. Viesselman asks, "Do you want to DNA it?" and Moran replies, "No".  Viesselman asks, "To strengthen it?"  Moran again says no, "they'll send it to the lab and do it."  Viesselman says, "Okay.  I always thought it was better if we did it before . . .."

**RESPONSE: Denied that he was stretching the truth. That is not a statement of fact, but Plaintiff's characterization of facts, and it is both unsupported by the evidence Plaintiff cites here and contradicted by other undisputed evidence. Exhibit T, at 4:18:00–10. Denied that the emphasis in Officer Munyan's quote is in the original. Exhibit 12 at 5:08:58 and following. Denied that Sgt. Moran returns with a paper bag—Officer Munyan is holding the**

**paper bag when they return. Exhibit 12 at 5:09:55. Denied that Sgt. Moran replied "no" after Officer Viesselman first asked "Do you want to DNA it?" He appears to say "huh?" and then Officer Viesselman replies "to strengthen it" to explain what he meant. Then Sgt. Moran says "No. They'll send it to the lab and do it." This conversation is at 5:10:19 on Exhibit 12. Otherwise, admitted.**

92.      At 5:10:51, Neukirch exits his vehicle, walks to the rear where Munyan has the trunk open, and then, at 5:11:52 again walks across the corner and out of view. He re-enters the picture at 5:12:36. Defendants' Exhibit U beginning at approximately 5:10:51.

**RESPONSE: Admitted**.

93.      Meanwhile, Viesselman and Moran resume their conversation and reference was made to the fact that neither of the other two juveniles had been in trouble previously. Plaintiff's Exhibit 12 beginning at approximately 5:10:44. Viesselman adds, "This kid says, the only time other time he's ever been stopped by the police – and you can take this with a grain of salt – was two years ago he got stopped riding a bike because he and his buddies were playing and the police stopped them because they were – there was a call that they were . . . ]inaudible[ they were doing something and that was back down at 63rd and College where they used to be, where he used to live." Moran offers a more cynical view, saying that he would take it with a grain of salt. "That's either good, you're not doing anything wrong most of the time or you just haven't been caught very many times. So it's like either one or the other or it's just a complete fabrication." Viesselman continues, "I'm actually surprised he didn't run again, really glad he didn't run from me. Like I was, literally he walked past me and never looked back. So, I put it in reverse, backed up to where he was in front of my car. Jumped out, he made it to about the wheel, and I was walking around, I called him over, he came right to me." Those are three indications of innocence. Plaintiff's Exhibit 12

beginning at 5:10:44 and continuing to approximately 5:11:55.

**RESPONSE: Denied that the portion Plaintiff says is inaudible is actually inaudible. Officer Viesselman clearly says "there was a call that they weren't getting out of the way or they were doing something…" Exhibit 12, 5:11:05. Officer Viesselman is the one who says, "or it's just a complete fabrication" beginning while Sgt. Moran is still saying "you know". Exhibit 12, at 5:11:28. Denied that Officer Viesselman's quote beginning "I'm actually surprised…" is accurate. Officer Viesselman said, "I'm actually surprised he didn't run *again*, really glad he didn't run *again* from me." Exhibit 12, at 5:11:34. (Emphasis added here).**

**Denied that Officer Viesselman's quote contains three indications of innocence. That is an argument about facts, not a fact.**

94.     Having returned from his trip around the corner, Neukirch approaches the two detained minors, gets them to their feet, and he takes their pictures, mid-distance and close-ups. Defendants' Exhibit Z beginning at approximately 5:12:42. He then walks out of the view of Viesselman's dash cam at about 5:13:28. *Id.* He can be seen approaching the side of Viesselman's SUV from Moran's dash cam. Plaintiff's Exhibit 12 beginning at approximately 5:13:28.

**RESPONSE: Admit**

95.     At about 5:13:34, Neukirch opens the passenger door again and tells Bell to step out of the vehicle. Plaintiff's Exhibit 11 and Plaintiff's Exhibit 12 beginning at about 5:13:34. Bell stands at the door of the vehicle for a few seconds as Neukirch takes photographs of him, one of which clearly shows the white stripes on the side and bottom of the legs of his shorts. Plaintiff's Exhibit 15, Photograph of Bell (a/k/a Deposition Exhibit 3). When he is photographed, Bell is facing south, and facing, but he is west of where the other two juveniles who are facing the street are

sitting up against the fence.  Plaintiff's Exhibit 12 beginning at about 5:13:34.

**RESPONSE: Admit.**

96.     As Neukirch photographs Bell, it appears that the detained male in the blue shorts and white tee shirt is watching while Bell is out of Viesselman's car.  Defendants' Exhibit Z beginning at about 5:13:42.  He appears to turn and say something to the other male next to him as Adams stands nearby.  *Id*.

**RESPONSE:Admit.**

97.     At about 5:18:46, Neukirch comes into the view of Viesselman's dash cam, talking on a cell phone.  At about 5:19:14 the audio comes back on in Viesselman's vehicle.  At 5:20:15, Viesselman is heard saying, "It sounds like.  He said we can get the other mom on the way."  At 5:21:17, Viesselman says, "Yeah, it sounds like they're going to go down to JJ.  So, wonder if I'll be the one transporting or if they'll transport."  Moran says that Neukirch and Munyan should be doing it "'cause they gotta to do the report and booking and all that stuff."  Defendants' Exhibit Z beginning at about 5:18:45.

**RESPONSE: Admit.**

98.     Neukirch had consulted with Detective John Mattivi.  Mattivi told Neukirch to put Bell on a twenty-four hour investigative hold and transport him to the Juvenile Justice Center and to release the other two minors to their mothers.  Sergeant Ortiz had responded to the scene and had approved the twenty-four hour hold.  Plaintiff's Exhibit 20, Mattivi Deposition at 12:10-19; Plaintiff's Exhibit 8, Neukirch Report at 5.

**RESPONSE: Admit.**

99.     At about 5:26:23, Munyan starts walking from the Neukirch/Munyan patrol car toward Viesselman's vehicle as Neukirch continues talking on the phone.  Defendants' Exhibit Z

beginning at about 5:26:22. As Munyan approaches Moran and Viesselman, he indicates that they are going to transport Bell, wrap up, and "get outta here."

**RESPONSE: Admit.**

100.    At approximately 5:26:36, Moran says, "I'm gonna bounce it." At 5:27:00, Moran gets into his vehicle and leaves the scene. Plaintiff's Exhibit 12 beginning at approximately 5:26:36.

**RESPONSE: Admit.**

101.    Beginning at about 5:26:50, there is discussion between Munyan and Viesselman about Bell's cell phone and Viesselman said he thought he had turned it off, but apparently not because she had been calling Bell. Munyan advised him that they were "on the phone with Mom now. She has to meet us down at juvenile."

**RESPONSE: Admit.**

102.    At about 5:27:52, Bell is escorted from Viesselman's car by Munyan as Viesselman passes in front of his car. As Bell and Munyan walk past the other two males, the big wide white stripes on Bell's shorts are plainly visible. Defendants' Exhibit Z beginning at approximately 5:27:52.

**RESPONSE: Admit.**

103.    Munyan walks Bell in front of Adams' vehicle to the right front passenger door of the Neukirch/Munyan vehicle. As Bell emerges from behind the front of Adams' vehicle and is walked out into the street the wide white stripes on his shorts are really visible, especially from Adams' dash cam video. Bell is put into the Neukirch/Munyan vehicle at about 5:28:16. Munyan fastens the seat belt around him and activates the interior COBAN camera. Defendants' Exhibit Z beginning at approximately 5:27:57; *see also*, Defendants' Exhibit U beginning at approximately 5:27:58.

**RESPONSE: Admit.**

104.    When Bell is placed in the Neukirch/Munyan vehicle, the two other males are still standing by the fence. *Id*. Adams chats with them, but no one asks either of them about the identification of the suspect. *Id*. But not only could Miller have told the police that Bell was not the fleeing male had he been asked, one of the two males – Charlie Adams – could have also told police that Bell was not the male with the gun. Adams had seen Bell get out of the Viesselman's car in handcuffs while he was photographed. He knew Bell from school although they were not friends. Adams would have told police that Bell was not with him and Dellquan Westbrooks (the other male); that Bell was not the person who ran from police; he was not the person who threw the gun over the fence; and that he had not seen Bell that day until he arrived in the police car. But the police did not ask him or question either of them about who had been with them and had the gun. Defendants' Exhibit R, Miller Declaration at ¶¶ 8, 9, 10; Plaintiff's Exhibit 16 at ¶¶ 3-6.

**RESPONSE: Admit that Officer Adams never asked the two males about the identification of the suspect. To the extent Plaintiff intended to argue that "no one asks either of them about the identification of the suspect" at any time, Plaintiff contradicts himself. As Plaintiff earlier pointed out in his SOF ¶86 (supra), Officer Munyan (and Officer Adams) questioned the two males about the identification of the suspect.**

**Charlie Adams' statements in his affidavit to Plaintiff's counsel two years after this incident that the police did not question him about the identity of fleeing suspect (*see* Plaintiff's Exhibit 16) is blatantly contradicted by the record. *See* Plaintiff's SOF¶86 (supra). By Plaintiff's own presentation of the evidence in his SOF¶86 (supra), Charlie Adams and Dellquan Westbrook (the two males) were questioned by police about the identity of the fleeing suspect. Officer Munyan asked them:**

**"Did you know your buddy had a gun?" "Where do you guys go to school?" "Where**

does your buddy go to school?" "How old is he? Sixteen? Seventeen?" "What's his name? Know where he lives?" "What does he call himself?" "What's his street name?" "Jay?" "What is his real name?" *See* **Plaintiff's SOF¶86 (supra).**

Officer Adams asked them: "Where were you guys all standin' at? Right here? This where you guys were all at when the cops rolled up on you? Just right here? Okay. Cool." . . . "Are you guys related? You're not. Just friends? Okay. So, I take it, the other guy is just a friend, too? Not a brother or anything?" *See* **Plaintiff's SOF¶86 (supra).**

Plaintiff is not permitted to blatantly contradict the record for the purpose of creating a factual dispute. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Either way, it is immaterial what Charlie Adams told Plaintiff's counsel two years after Plaintiff's arrest; there is no evidence in the record that he told police about the identity of the fleeing suspect when asked at the time of Plaintiff's arrest. *See* **Plaintiff's SOF¶86 (supra).**

105. At approximately 5:32:12, Neukirch gets in the driver's seat and a few seconds later, they pull away, headed for the Juvenile Justice Center (JJC) where Bell would be interviewed by Detective Mattivi. Defendants' Exhibit U beginning at approximately 5:32:12. Defendants' Exhibit V (which does not bear a time stamp but shows total time and elapsed time) lasts a total of 29:36 minutes. Neukirch, Munyan, and Bell leave the 91st Terrace and Marsh location with 9 minutes of the total time elapsed. They arrive with 28:17 minutes elapsed, so the trip to JJC took a little over 19 minutes.

**RESPONSE: Admit.**

106. Thus, when Mattivi arrived at the JJC at about 7:00 p.m., Bell had already arrived. Plaintiff's Exhibit 20, Mattivi Deposition at 14:7-10. Either shortly before or after Mattivi arrived, Bell's mother had arrived. *Id*. at 14:11-19. Mattivi interviewed Bell in the presence of his mother

and his aunt and the interview was tape-recorded. *Id.* at 14:20-15:1.

**RESPONSE: Admit.**

107.    Mattivi summarized his interview in his initial report. Plaintiff's Exhibit 20, Mattivi

Deposition at 15:2-4 (referring to Plaintiff's Exhibit 23, Mattivi Report, June 9, 2016).

**RESPONSE: Admit.**

108.    Mattivi's report recounted that Bell had said that he knew one of the parties as "Charlie"

and he understood that Charlie was one of the two juveniles who had been retained and then

released at the scene. Plaintiff's Exhibit 20, Mattivi Deposition at 15:5-24; Plaintiff's Exhibit 23.

**RESPONSE: Admit.**

109.    Mattivi had seen Neukirch and Munyan once he had arrived at the JJC and they were in

the process of completing their reports. Plaintiff's Exhibit 20, Mattivi Deposition at 15:25-16:9.

Mattivi does not recall whether, prior to interviewing Bell, he knew that Neukirch and Munyan

had obtained Charlie's full name, his mother's name, her cell phone number, and his home address,

but once he got Neukirch's report, he would have access to that information because it was in the

report. *Id.* at 16:10-17:19; Plaintiff's Exhibit 8 at 2-3.

**RESPONSE: Admit.**

110.    By the time he finished the interview, Mattivi could have attempted to contact Charlie's

mother via cell phone (and, through her, Charlie himself) but he did not because he "didn't feel

the need to contact her". Plaintiff's Exhibit 20, Mattivi Deposition at 17:20-18:3.

**RESPONSE: Plaintiff omitted a portion of Det. Mattivi's answer. His complete answer was**
**as follows: "<u>At the time</u>, I didn't feel the need to contact her." Plaintiff's Exhibit 20, Mattivi**
**Deposition at 18:1-3**. **(emphasis added). Otherwise, admit.**

111.    Mattivi knew that the incident had begun with Trorant Miller's call to police. Miller's

name and cell phone number also appeared on Neukirch's report. Plaintiff's Exhibit 20, Mattivi Deposition at 18:4-16. By the time Mattivi had finished interviewing Bell and was preparing his incident report, he had not contacted or attempted to contact Miller. *Id*. at 18:17-21. While Mattivi did not know at the time that Neukirch and Munyan had telephoned Miller while en route or that he had shown up at the scene, he did know that the calling party lived in close proximity to where the they encountered the juveniles. *Id*. at 18:22-19:22.

**RESPONSE: Admit.**

112.     Mattivi did not know that Miller actually knew by sight the juvenile who had fled, but he did recall that one reason Miller had called in what he had seen that day was because the male that had fled and pitched the gun had, on occasion, been harassing his kids and others in the neighborhood. Plaintiff's Exhibit 20, Mattivi Deposition at 19:19-20:11. When deposed, Mattivi did not recall knowing that while the juveniles were being detained at the scene, Miller had returned to his home and was there for several hours, but he may have known at the time that Miller would have been available to come to the scene and tell the officers whether Bell was the right guy. *Id*. at 20:12-21.

**RESPONSE: Plaintiff misrepresented Miller's affidavit to Det. Mattivi. Plaintiff represented to Det. Mattivi in his deposition that Miller "knew by sight the juvenile who had fled." Plaintiff's Exhibit 20, Mattivi Deposition at 19:19-20:11. The line of questions and answers in Det. Mattivi's deposition were as follows:**

**Q. And did you know that Mr. Miller actually knew by sight the juvenile who had fled and thrown the gun?**

**A. I did not.**

**Q. Do you know that today, by now?**

**A. I do now.**

**Q. How did you learn that?**

**A. Learned because you said it.**

Plaintiff's Exhibit 20, Mattivi's Deposition at 19:19-20:1.

In reality, Miller never said any such thing. Miller never stated that he <u>actually</u> saw the male flee from Officers Neukirch and Munyan. *See* Exhibit R, Miller's affidavit. And, Miller never stated that he would be able to identify the male <u>who fled from police</u>. *See* Exhibit R, Miller's affidavit. And, Miller never stated that "the male that fled and pitched the gun had, on occasion, been harassing the kids and others in the neighborhood." *See* Exhibit R, Miller's affidavit. There is no evidence in the record that Miller saw the male flee from Officers Neukirch and Munyan, and therefore, obviously, Miller would not be able to identify <u>that</u> male, because he did not see the event.

Rather, Miller stated Plaintiff was not one of the males he saw "on the porch." *See* Exhibit R, Miller's affidavit, ¶9. He further stated that Plaintiff was not one of the three males he "saw on the porch that caused [him] to call 9-1-1." *See* Exhibit R, Miller's affidavit, ¶9.

Accordingly, it is immaterial what Mattivi knew about Miller.

113. At the time he completed the interview, based on the information Munyan and Neukirch had provided and the video they had reviewed Mattivi did not feel any sense of urgency to contact Miller immediately. Plaintiff's Exhibit 20, Mattivi Deposition at 20:22-21:10.

**RESPONSE: Admit.**

114. Mattivi understood that Munyan had gone to where Viesselman was holding Bell and identified him as the person who had fled and thrown the gun. Plaintiff's Exhibit 20, Mattivi

Deposition at 21:11-16. In concluding that it was not necessary to further check the identity of Bell, he was relying on the officers' identification and description of what had taken place. Mattivi did not recall whether only Munyan had identified Bell or whether another officer had identified Bell as well. *Id*. at 21:17-22:3.

**RESPONSE: Admit.**

115. Mattivi did not look at any of the video that evening either before or after he interviewed Bell. He was relying on what Munyan, Neukirch, Viesselman, and others had told him or had written in their reports. Plaintiff's Exhibit 20, Mattivi Deposition at 22:4-15.

**RESPONSE: Admit.**

116. On the evening of June 8, 2016, Mattivi did not know how long it took Munyan to purportedly identify Bell after he arrived at the location where Viesselman was holding Bell. He does not know whether it was more or less than five seconds. He only knows that Munyan identified Bell. Plaintiff's Exhibit 20, Mattivi Deposition at 22:16-24.

**RESPONSE: Admit.**

117. Mattivi has viewed Viesselman's dash cam video and while he did not time it and could not put an exact time frame on it, he knows it did not take very long from the time Munyan arrived for him to identify Bell. Plaintiff's Exhibit 20, Mattivi Deposition at 22:25-23:9; *see*, *supra*, at PSF ¶ 45-49 (approximately three seconds).

**RESPONSE: Admit.**

118. Regardless of how long it took Munyan to supposedly identify Bell, Munyan's identification as depicted in Viesselman's dash camera video (Defendants' Exhibit Z) was the primary reason that Mattivi did not conduct any further investigation after interviewing Bell. Plaintiff's Exhibit 20, Mattivi Deposition at 25:23-26:4.

**RESPONSE: Admit.**

119.    During Mattivi's interview of him, Bell insisted on his innocence.  He described how he had walked from school to home, found it locked, had forgotten his key, so had gone to his cousin's where no one was home, and had started back toward home, accounting for where he had been walking.  Plaintiff's Exhibit 20, Mattivi Deposition at 26:10-18; *see also*, Plaintiff's Exhibit 24, Bell Deposition at 10:12-17; at 11:3-11; at 46:21-47.

**RESPONSE: Admit.**

120.    Although Mattivi could have viewed the video before he interviewed Bell, he did not, and claimed that part of the reason it took him three weeks to review video was "waiting for the video to be ready for [him] to view."  Plaintiff's Exhibit 20, Mattivi Deposition at 26:24-27:2.

**RESPONSE: Admit.**

121.    Even though Bell was supposedly on a twenty-four hour investigative hold and even though he was a juvenile, Mattivi had "no set time frame for how quickly or how long [he] take[s] upon reviewing dash cam footage."  Plaintiff's Exhibit 20, Mattivi Deposition at 27:3-5.  It just happened that three weeks later, "the case had come back around for follow-up" and "that's when [he] took the time to review it."  *Id*. at 27:7-10.  There was no mechanism or diary or tickle system that brought the case back around for follow-up.  *Id*. at 27:16-19.

**RESPONSE: Admit.**

122.    Despite the fact that Bell was maintaining his innocence, and despite the fact that there was video available that would (and ultimately did) exonerate Bell so that he could be released from custody that Bell and his mother begged him to review, Mattivi was going to let the case be determined by DNA testing.  Plaintiff's Exhibit 20, Mattivi Deposition at 27:19-28:3; Defendants' Exhibit EE, James Deposition at 13:22-14:1; at 21:13-25; at 22:5-23:8.

**RESPONSE: Admit that Det. Mattivi was going to determine this case based on DNA. The remainder of Plaintiff's ¶122 is improper argument.**

123.     When asked if the DNA results ever came back, Mattivi testified that they "never got to the point to get the DNA back because in that time frame, I had viewed the video."  He further testified that at the time of Bell's arrest, from the time of submission of the DNA samples until the time a report is provided could be anywhere between six months and a year.  Had Mattivi actually waited until the DNA results came back, there was a possibility that Bell – being held on what, if he were an adult, would have been a felony firearms charge – could have been held for six months to a year, especially since Mattivi further testified that he "was not aware that [Bell] was still incarcerated until the day [he] viewed the video well."  Plaintiff's Exhibit 20, Mattivi Deposition at 27:16-28:22.

**RESPONSE: Admit.**

124.     Finally, after Bell has spent three weeks in detention at the JJC, and numerous entreaties from his mother to do so, including a text on June 28, Mattivi reviewed the video and photographs and determined that Bell was not the fleeing suspect and after reviewing the information with the prosecutor, a determination was made that Bell would be released and the charges would be dropped.  Mattivi called Bell's mother to tell her she could come pick up her son, that he had looked at the video and the fleeing suspect was not him.  As soon as she was able to leave work, she went to pick up her son and "he came dancing out the door."  Plaintiff's Exhibit 19, Mattivi Reports, June 29, 2016; Defendants' Exhibit EE, James Deposition at 22:1-23:15; *id*. at 24:22-23.

**RESPONSE: Denied that Mattivi determined Bell was not the fleeing suspect. His report, cited here by Plaintiff, states: "Based on my observations, I *believe* the fleeing suspect shown in the initial video and video of Bell's arrest appear to be two different people." Exhibit 19,**

**at 1. (emphasis added).**

125.    Mattivi did not ask Munyan and Neukirch about Charlie and if they had gotten Charlie to say whether or not he could say whether Bell was the fleeing male who had tossed the gun because they had left the JJC by the time Mattivi finished interviewing Bell. He could have contacted them, but he did not because he did not feel it was necessary. He also could have contacted them the next morning, but he did not. Plaintiff's Exhibit 20, Mattivi Deposition at 31:6-24.

**RESPONSE: Admit.**

126.    Between the two juveniles, at least one of whom was known to Bell, and Calling Party Miller, there were three people who possibly could have confirmed whether or not the police had apprehended the right person. Plaintiff's Exhibit 20, Mattivi Deposition at 31:25-32:4. But none of them were asked by Mattivi on June 8, and none of them were asked after June 8 either. *Id*. at 32:8-10. Indeed none of them were asked whether or not Bell was the party who had fled and thrown the gun throughout the entire time Bell was locked up in the JJC. *Id*. at 32:11-16. That was because Munyan's identification – which Mattivi admitted was made within about three seconds (*see*, *supra*, at PSF ¶ 117) – was considered without more to be sufficient, despite the inherent fallibility of eyewitness identification made under the circumstances that were present in this instance. *Id*. at 32:17-20; *see*, *infra*, at PSF ¶ 211.

**RESPONSE: Immaterial that Det. Mattivi did not confirm Bell's identity with the two juveniles and Calling Party Miller, because officers already questioned the two juveniles when the officers were investigating this incident, and the two juveniles never confirmed Bell was <u>not</u> the fleeing suspect, but rather implied that he was. *See* Plaintiff's SOF ¶ 86, supra. Furthermore, Calling Party Miller could identify the males he "saw on the porch" before officers arrived. *See* Exhibit R, Miller's affidavit, ¶¶ 9-10. But there is no evidence that**

**Calling Party Miller could have identified the suspect who fled from police.** *See* **Exhibit R.**

127.    Mattivi, who was going to make a recommendation to the prosecutor as to whether or not Bell should be detained, and on whether they had the right person, understood that Viesselman had articulable suspicion to detain Bell for the pedestrian check/*Terry* stop and hold him until Munyan arrived.  Plaintiff's Exhibit 20, Mattivi Deposition at 33:17-34:3.  He also understood that in order for the *Terry* stop to be converted into an arrest, there had to be evidence that a reasonable and prudent officer could rely upon to believe a crime had been committed and that the person stopped had committed the crime.  *Id*. at 33:24-34:10.  This was consistent with his training.  *Id*. at 34:11-14.  There had to have been probable cause to arrest Bell.  That arrest occurred when Munyan identified Bell, Viesselman nodded his head and had Bell turn around and tightened his handcuffs. *Id*. at 35:6-15.

**RESPONSE: Admit.**

128.    It was also part of Mattivi's training that when contemplating a probable cause arrest, a police officer may not ignore potentially exculpatory evidence that is reasonably at hand. Plaintiff's Exhibit 20, Mattivi Deposition at 34:24-35:5.

**RESPONSE: Admit.**

129.    Mattivi's June 29 decision to recommend that charges against Bell be dropped was based on his comparison of the videos and photographs.  Plaintiff's Exhibit 20, Mattivi Deposition at 36:17-21.

**RESPONSE: Admit.**

130.    Viesselman's dash cam video – including the point at which Bell gets out of Viesselman's SUV and walks to the Neukirch/Munyan vehicle[10] – would have been one of the videos that

---

[10]Defendants' Exhibit Z at beginning at approximately 5:27:52.

Mattivi looked at when he decided that the depiction of Bell in it and other videos and the photograph did not match the video of the fleeing suspect. Plaintiff's Exhibit 20, Mattivi Deposition at 37:18-7. As Bell is walking the white stripe on the side of his shorts is pretty constantly visible. *Id*. at 39:6-12; at 39:24-40:1; 40:18-23.

**RESPONSE: Admit.**

131.    After interviewing Bell on June 8, Mattivi did not ask Munyan or Neukirch anything further about their identification of Bell; he had only briefly spoken with them when he arrived at the JJC when Munyan had assured him that they had reviewed the video. Plaintiff's Exhibit 20, Mattivi Deposition at 41:14-42:7.

**RESPONSE: Admit.**

132.    Mattivi did not ask Munyan or Neukirch why they had not contacted Miller to come verify the identification of Bell. Plaintiff's Exhibit 20, Mattivi Deposition at 42:17-20.

**RESPONSE: Immaterial that Det. Mattivi did not ask Officers Munyan or Neukirch why they had not contacted Miller to identify Bell, because Miller could only identify the males that he saw "on the porch." *See* Exhibit R, ¶¶9-10. There is no evidence that Miller could have identified the male who fled from police. *See* Exhibit R.**

133.    Mattivi did not ask Neukirch or Munyan why they had not asked either of the two detained juveniles, *i.e.*, Charlie and the other one, whether or not they were arresting the right suspect. If Bell was telling the truth to Mattivi, it was possible that Charlie would have been a potentially exculpatory witness. Plaintiff's Exhibit 20, Mattivi Deposition at 43:7-15.

**RESPONSE: Immaterial that Det. Mattivi did not ask Officer Neukirch or Munyan why they had not asked either of the two detained juveniles whether they were arresting the right suspect, because Officer Munyan had already questioned the two juveniles when he was**

investigating this incident, and the two juveniles never confirmed Bell was **not** the fleeing suspect, but rather implied that he was. *See* **Plaintiff's SOF ¶ 86, supra.**

134.    Miller also would have been a potentially exculpatory witness on June 8, 2016.

Plaintiff's Exhibit 20, Mattivi Deposition at 43:16-18.

**RESPONSE: Plaintiff misrepresents the record. For the reasons stated in Defendants' response to Plaintiff's SOF ¶ 112, above, there is no evidence in the record that Miller would have been a plainly exculpatory witness.** *See* **Exhibit R;** *see also Kuehl v. Burtis*, **173 F.3d 646, 650-51 (8th Cir. 1999).**

135.It was even possible that the mothers of the two detained juveniles could have been potentially exculpatory witnesses if their sons had told them who the fleeing and gun-tossing suspect was. Plaintiff's Exhibit 20, Mattivi Deposition at 43:19-25.

**RESPONSE: Objection. This SOF is rank speculation. There is no evidence in the record that the mothers of the two detained juveniles were plainly exculpatory witnesses. As plaintiff knows, officers cannot ignore evidence that "conclusively establish[es] the suspect's innocence;" however, they are not required to conduct "mini-trials."** *See Kuehl*, **173 F.3d at 650-651.**

136.    There was an abundance of potentially exculpatory evidence that could have cleared Bell on the evening of June 8 or the next morning.  But none of those potentially exculpatory leads were pursued by Mattivi, Munyan, or Neukirch.  Plaintiff's Exhibit 20, Mattivi Deposition at 44:1-10.

**RESPONSE: Plaintiff's uncited statement that there "was an abundance of potentially exculpatory evidence that could have cleared Bell," misrepresents the record as a whole and specifically, Det. Mattivi's deposition testimony. The only "potentially exculpatory**

evidence," according to Plaintiff, is the two male juveniles, and possibly their mothers, and Calling Party Miller. *See* Plaintiff's SOFs ¶¶133-135. Therefore, object to Plaintiff's mischaracterization of "an abundance of potentially exculpatory evidence" in ¶136 as misleading and not reflective of the record.

With regard to Det. Mattivi's testimony, he never testified "there was an abundance of potentially exculpatory evidence that could have cleared Bell." The testimony was as follows:

Q. …There were a lot of potentially exculpatory evidence that could have cleared this innocent plaintiff on the evening of June 8th, 2016, or certainly the next morning, isn't that right?

A. It's possible.

Q. But none of those potentially exculpatory leads were pursued by you, Munyan, or Neukirch, correct?

A. That's correct.

Plaintiff's Exhibit 20, Mattivi Deposition at 44:1-10. Therefore, object to Plaintiff's citation to Det. Mattivi's testimony as nothing more than rank speculation about the "abundance of potentially exculpatory evidence."

137.     Three weeks later, Mattivi reached the conclusion that Bell was not the individual initially chased by the arresting officers and observed tossing a gun.  Plaintiff's Exhibit 20, Mattivi Deposition at 44:11-17.

**RESPONSE: Admit.**

138.     Calling Party Miller was three houses away but was not brought to the scene, nor was Bell taken to his house, to confirm whether Bell was the person he saw with the gun.  Neukirch

testified in deposition that he recalls contacting Miller, but does not remember if he specifically asked whether Miller could say whether Bell was the fleeing party, nor does he remember whether he asked Miller if Miller knew any of the three persons that he had called to report. Plaintiff's Exhibit 14, Neukirch Deposition at 87:3-17.

**RESPONSE: Immaterial what Officer Neukirch remembers about Miller. Miller already testified he could identify the males he saw "on the porch," before officers arrived, but never testified he saw the suspect flee from police.** *See* **Exhibit R.**

139.    However, Neukirch had the opportunity to use Miller to test Munyan's purported identification of Bell and at one point, it appeared that he was attempting to get Miller to come to where the juveniles were being detained.  Defendants' Exhibit T beginning at about 4:48:20.  At about 4:51:36, Neukirch started in the direction of Miller's house and returned at 4:58:26. Defendants' Exhibit U at 4:51:36 and 4:58:26.  It can be inferred from Neukirch's report that Neukirch talked to Miller during this time.  *See*, Plaintiff's Exhibit 8 at 5.

**RESPONSE: Immaterial who Miller saw on the front porch before the officers arrived.**

140.    But Miller affirms that he was not asked by the police to identify any of the persons they had in custody and that if they had asked him, he would have told them that Bell was not one of the three males he saw on the porch and was not the male he saw holding the gun.  Defendants' Exhibit R, Miller Declaration at ¶¶ 8-10.

**RESPONSE: Immaterial who Miller saw on the front porch before the officers arrived.**

141.    At 5:11:52, Neukirch again walks across the corner and out of view, but seconds later, he re-enters the picture at 5:12:36.  Defendants' Exhibit U beginning at approximately 5:10:51. Neukirch now attests that he changed his mind about wanting Miller to go to the scene because Miller had yelled at two of the juveniles earlier and had threatened to kill them, and the mother

of one of them had arrived, so Neukirch wanted to avoid a confrontation. Defendants' Exhibit S, Neukirch Affidavit at ¶ 32. Neukirch does not offer an explanation as to why Bell was not taken around the corner *to* Miller. *See*, *infra*, at PSF ¶ 144 (it did not happen).

**RESPONSE: Without citation to the record, Plaintiff implies that Officer Neukirch changed his testimony about not wanting Miller to go to the scene. There is no evidence, and Plaintiff certainly points to none, that Officer Neukirch changed his testimony regarding Miller.** *See* **Plaintiff's SOFs ¶¶138-140. Immaterial that "Bell was not taken around the corner to Miller," because Miller would have only been able to tell police that Bell was not the suspect he saw "on the porch" before police arrived.** *See* **Exhibit R.**

142.     When Ortiz questioned Neukirch and Munyan, after Bell was transported back to the scene, his questions would have been like: "Is that the guy?" or "is that the suspect?" and if he said, "yes, that is the one with the gun," yes or no, then they "would have taken it from there." Defendants' Exhibit HH, Ortiz Deposition at 27:9-28:2.

**RESPONSE: Admit.**

143.     Ortiz does not remember pointing at Bell and asking Munyan and Neukirch, "Is that the guy who ran?" Defendants' Exhibit HH, Ortiz Deposition at 28:17-29:2. He also does not remember asking them whether or not they remember seeing those big white stripes on his pants. *Id*. at 29:3-6. He does not remember asking whether they had talked to the calling party to see if he could identify the person who had been arrested but he knew at that time that the calling party had also identified Bell.[11] He learned that by talking to Munyan and Neukirch, but he does not know which one of them said it. *Id*. at 29:7-22. He is "pretty sure" that one of the police officers went to get the calling party and asked him to come back and take a look at the guy they had

---

[11]By all other accounts, Miller did not identify Bell.

arrested. He is not sure whether he was present and doing something else, but he knew that when Neukirch and Munyan identified Bell, the calling party also identified Bell as being the one with the weapon. *Id*. at 29:23-30:10.

**RESPONSE: Immaterial that Sgt. Ortiz recalled Officers Neukirch and Munyan told him the calling party identified Bell as being the one with the weapon, because even if Miller had so identified Bell, based on Miller's affidavit, that could only have been before Officers Neukirch and Munyan arrived. *See* Exhibit R. Immaterial who Miller saw with a gun before officers arrived.**

144.    Ortiz affirms that Bell, while in custody was not walked down around the corner to the calling party's house. Defendants' Exhibit HH, Ortiz Deposition at 30:19-24. He does not specifically remember whether or not the calling party was walked from his house back around the corner to where Bell was being held. *Id*. at 30:25-31:6; at 34:3-7 (cannot say with confidence that the calling party came from his house on Marsh to the scene where Bell was in custody and identified him because he does not remember).

**RESPONSE: Admit.**

145.    Ortiz approved the arrest based on the fact that the officers "observed this person with a weapon, and they saw him, two witnesses or two different police officers, Neukirch and Munyan, so that was . . . enough for me to sign the authorization." Defendants' Exhibit HH, Ortiz Deposition at 35:9-21.

**RESPONSE: Admit.**

146.    Ortiz is "pretty sure" that Munyan drove Ortiz' vehicle back to the scene and parked it a couple of blocks away and then walked to where Ortiz was. Defendants' Exhibit HH, Ortiz Deposition at 35:15-25; *but see*, *supra*, at n. 8 (Munyan is let out of Ortiz' vehicle and Ortiz is

seen getting out of the vehicle on the driver's side after parking it).

**RESPONSE: Sgt. Ortiz's recollection about where Officer Munyan parked his vehicle after arresting Bell is immaterial.**

147.    Ortiz did not question Munyan about the eyewitness identification he had made. Munyan just said he had made it and that was good enough for him. Ortiz also did not question him about any potential discrepancies in his eyewitness identification. He conducted no questioning of Munyan to test his identification of Bell. He did not ask Munyan to narrate the basis for his identification. Defendants' Exhibit HH, Ortiz Deposition at 39:1-21. He did not ask Munyan to repeat the description that he had put on the radio. *Id*. at 40:15-24. Ortiz did not ask Munyan whether or not he was focused on the gun and he does not remember asking Munyan where he had first seen the gun or how he had first known there was a gun present. He also does not remember whether he asked Munyan if the subject who had fled had the gun in his hand or in a waistband. *Id*. at 40:25-41:16.

**RESPONSE: Immaterial whether Sgt. Ortiz asked the specific questions proposed by Plaintiff's counsel in Sgt. Ortiz's deposition. *See* Exhibit HH, Ortiz Deposition 39:1-12; 40:15-24. Sgt. Ortiz would have asked Officer Munyan what happened and then have had him start from the very beginning. *See* Exhibit HH, 40:2-6. He would have asked Officer Munyan to narrate or describe what he had seen during the chase of the suspect who fled and threw the gun. *See* Exhibit HH, 39:22-40:1.**

148.    When officers respond to a call for service involving a weapon they pay attention to the hands of the suspect for officer safety. Defendants' Exhibit HH, Ortiz Deposition at 41:18-42:7. If by the time officers arrive, someone has stuck a weapon in their waistband, the officers have to be careful to locate the gun for officer safety and for public safety, and even the safety of the

individual who has the weapon. The presence of a gun is an important part of academy and field training of officers. *Id*. at 42:8-21. Officers are trained both by field experience and in the academy that when they arrive at a scene such as this, if there is a report of a gun to be focused on locating and securing the gun or the individual(s) with the weapon. They focus on hands and the position of the hands. *Id*. at 42:22-43:15. They are trained to look closely at hands as well as the whole picture, the surroundings, including anything or anybody else that could be a threat or could be used as concealment. *Id.* at 43:17-44:1.

**RESPONSE: Immaterial whether officers (specifically Officer Munyan in this case) are focused on the suspect's hands, because regardless, Sgt. Ortiz trains and expects his officers to provide a very detailed description of the suspect.** *See* **Exhibit HH, 58:13-18.**

149.    Ortiz does not remember whether the fleeing suspect moved his hand toward his waistband, or if the hand came away from the waistband with a gun in it, nor does he recall that the gun was thrown over the fence, but his officers would have been trained to pay attention to that gun to make sure it wasn't pointing at them. Defendants' Exhibit HH, Ortiz Deposition at 44:2-24. One reason that officers are trained to focus on the hand that may be getting a gun is so that if the subject turns towards the officers with it, they can be prepared to shoot him if necessary. *Id*. at 45:5-10.

**RESPONSE: Immaterial whether officers (specifically Officer Munyan in this case) are trained to pay attention to a gun to make sure it wasn't pointing at them, because regardless, Sgt. Ortiz trains and expects his officers to provide a very detailed description of the suspect.** *See* **Exhibit HH, 58:13-18.**

150.    In Ortiz' experience, it is possible that the presence of a gun can affect an eyewitness identification's correctness or truthfulness. Defendants' Exhibit HH, Ortiz Deposition at 45:24-46:6.

**RESPONSE: Immaterial whether, generally, the presence of a gun can affect an eyewitness identification's correctness or truthfulness, because Sgt. Ortiz supervised Officers Neukirch and Munyan for years and months, respectively, prior to the Bell arrest, and to Sgt. Ortiz's knowledge, neither had arrested someone without probable cause, arrested the wrong person, or made a mistaken identification of a suspect.** *See* **Exhibit HH, Ortiz Deposition, 58:19-59:25.**

151.    Ortiz does not know whether there is such a thing as cross-race identification variability and he would not expect officers in his command to know whether or not that could be a factor in the reliability of an identification.  Defendants' Exhibit HH, Ortiz Deposition at 49:11-23.

**RESPONSE: Immaterial whether Sgt. Ortiz knows about cross-race identification, because he trains and expects his officers to provide a very detailed description of a suspect.** *See* **Exhibit HH, Ortiz Deposition, 58:13-18.**

152.    Ortiz did not ask any questions of either Munyan or Neukirch that tested the reliability of his memory of the person he had identified.  Defendants' Exhibit HH, Ortiz Deposition at 49:24-50:11.

**RESPONSE: Plaintiff misstates Sgt. Ortiz's deposition testimony. Sgt. Ortiz did not testify that he "did not ask any questions….that tested the reliability of [the officers' memories];" rather, Sgt. Ortiz responded, "no," to the question, do you recall whether you asked any questions that tested the reliability of the officers' memory.** *See* **Exhibit HH, Ortiz Deposition, 49:24-50:11. In other words, Sgt. Ortiz does not recall whether he asked these questions.**

153.    Ortiz does not remember any officer asking either of the two juveniles who were detained, or their mothers, whether or not they knew the person – Bell – who was seated in Viesselman's

car.  He does not know whether or not either of those juveniles knew Bell or went to school with him.  He also does not know whether either of them could identify whether or not Bell had been the one who had fled and thrown the gun.  Defendants' Exhibit HH, Ortiz Deposition at 50:20-51:12.

**RESPONSE:  Immaterial whether Sgt. Ortiz recalls any officer asking the two juveniles whether they knew Bell. It is undisputed that at the scene, Officer Munyan reported to Sgt. Ortiz, he talked to the two other juveniles and they reported the suspect's street name was "Jay," and one responded, "Yah, I seen you when you pulled up," after Officer Munyan asked, "You know we got him, right? (referring to Tyree Bell)." *See* Defendants' SOF ¶¶ 42-43.  Furthermore, after telling Sgt. Ortiz that Bell's mom is calling his phone, Sgt. Moran said to Sgt. Ortiz, "So, we're assuming that, at least, is a good indication that they all know each other." Then Sgt. Ortiz responded, "No, they were hanging out together." *See* Defendants' response to Plaintiff's SOF ¶153--Plaintiff's Exhibit 12 at 4:54:39-49.**

154.    If one of the juveniles said he went to school with Bell he's not the one that ran and threw the gun Ortiz would not take it at face value but it would possibly be something to investigate.  He does not believe that was done.  Defendants' Exhibit HH, Ortiz Deposition at 51:14-52:2.

**RESPONSE: Just to clarify: Sgt. Ortiz testified he would not take it at face value if one of the juveniles (who was with the fleeing suspect at the time of the crime) said Bell was not the fleeing suspect. *See* Exhibit HH, Ortiz Deposition, 51:14-21. Admit.**

155.    Ortiz also does not know whether either of the mothers were asked if they knew the person sitting in Viesselman's car.  Nor does he know whether either of the juveniles were asked whether or not they could identify the person who had been with them, fled, and threw the gun.  He also does not remember whether either of the mothers were asked for permission of the officers to

question their sons about the identification of Bell nor does he know why that was not done. Defendants' Exhibit HH, Ortiz Deposition at 52:7-24.

**RESPONSE: Immaterial whether Sgt. Ortiz now recalls if the two juveniles were questioned about the identity of the person who fled. It is undisputed that they were.** *See* **Defendants' response to Plaintiff's SOF ¶¶ 86, 153. Admit.**

156.    Ortiz was the ranking officer at the scene and he was in charge.  Defendants' Exhibit HH, Ortiz Deposition at 53:3-19.  As such, he would know if the mothers had been asked for permission to interview their sons, but he does not think that was done.  *Id.* at 53:21-54:9. Ortiz's experience is that friends are not going to tell police the truth, but it was something they could test.  *Id.* at 54:15-24.  He does not remember that being done.  *Id.* at 55:1-3.

**RESPONSE: Immaterial whether Sgt. Ortiz now recalls if the two juveniles were questioned. It is undisputed that they were.** *See* **Defendants' response to Plaintiff's SOF ¶153. Admit.**

157.    Ortiz did not know that Bell had insisted it had not been him.  Viesselman and Munyan did not tell him that.  Ortiz said that 100% of people are going to tell them that they it was not them or that they didn't do it; however, he admitted that is possible that sometimes they are innocent when they tell police that.  Defendants' Exhibit HH, Ortiz Deposition at 55:4-17.

**RESPONSE:  Admit.**

158.    It is Ortiz' expectation that his officers would investigate any potentially exculpatory evidence that is reasonably at hand and they are trained to do so.  It would be his expectation that investigation at the scene would be something that they would do carefully.  As their supervising officer, that is something that he would monitor to make certain that they were carefully following any potentially exculpatory evidence.  Defendants' Exhibit HH, Ortiz Deposition at 55:19-56:11.

**RESPONSE: Admit.**

159. As of the date of his deposition, Ortiz believed that Bell is the person that fled and threw the gun over the fence based on the two officers telling him that. He has not viewed the video since the day of the incident. Defendants' Exhibit HH, Ortiz Deposition at 56:12-57:2.

**RESPONSE: Admit.**

*Eyewitness identification training of KCPD officers*

160. KCPD officers are trained that if there is only one crime and one suspect, if the officer has reasonable suspicion that a crime has occurred, and the officer is investigating that crime and can satisfy that he no longer has reasonable suspicion, the person is to be let go. Plaintiff's Exhibit 25, Glaeser Deposition at 33:12-20. Similarly, officers are trained that if, when in the process of investigating a suspicious circumstance, the officer becomes aware of factors or information that are exculpatory, that a potential suspect provides information that ends the suspicion, the officer would release the person or end the stop. *Id*. at 34:15-35:16.

**RESPONSE: Admit.**

161. If, for example, when conducting a stop, someone tells the officer that a person stole from my store, but someone else tells the officer that no, it was someone else, it would require more investigation because there is doubt as to the validity of the information. The officer might be required to extend the length of the investigatory stop. The officer might inquire as to whether there is security video that he could review to see if one or the other of the people did it, or the officer reasonably believed did it or not. If the officer were to look at the tape and see a person wearing different shirt and has or does not have a beard, and if the officer believes he did not do it, he would end the stop. Plaintiff's Exhibit 25, Glaeser Deposition at 35:17-36:15.

**RESPONSE: Admit.**

162. In making a determination about whether to end a stop or convert it to an arrest, under the

policies and practices of the KCPD, the officer would be expected to put their arms around all of the reasonably accessible evidence. The would be expected not to ignore on aspect of the evidence that was available. Plaintiff's Exhibit 25, Glaeser Deposition at 36:16-37:10. If officers encounter a situation with contradictory evidence, all evidence is going to be considered. *Id*. at 45:8-21.

**RESPONSE: Admit.**

163.    In general, it would have been the expectation of the KCPD that a sergeant at the scene would make some determination about whether or not the officers had acted with prudence and caution to conduct an inquiry to determine whether or not the suspect has committed the crime, but there may be instances where a supervisor will not have an opportunity to do a lot such as where the officer has been on scene for 45 minutes and conclude their investigation within 30 seconds of a sergeant's arrival. In such an instance it may be limited to asking officers to tell them what they saw, why they stopped the person, what they did, and this is what they have concluded. So there is some review or conversation about what happened, but he may not ask, did you continue examining to see if there are other people who might have committed the crime. Plaintiff's Exhibit 25, Glaeser Deposition at 45:22-46:19. But generally, a supervisor is going to get the story of what happened, ensure compliance with policy, make sure they are following up and doing a thorough and complete investigation, but as a matter of reasonableness, would not go knock on every door in a three-block area to see if anybody wants to tell a different story. *Id*. at 47:8-16.

**RESPONSE: Admit.**

164.    It is generally known throughout law enforcement that eyewitness identifications sometimes are inherently unreliable. Plaintiff's Exhibit 25, Glaeser Deposition at 47:17-25.

**RESPONSE:Admit.**

165.    The KCPD would expect its patrol officers and sergeants to know that where video is

potentially exculpatory and reasonably accessible or at hand, that the video, like available evidence, should be examined. Plaintiff's Exhibit 25, Glaeser Deposition at 49:1-10. Even if the video was old and of potentially poor quality, an officer of reasonable prudence and caution would at least look at it and evaluate it. *Id*. at 50:15-20. If the officer has access to the information, he would be expected to consider it. *Id*. at 51:18-19.

**RESPONSE: Admit.**

166.    If a sergeant at the scene observes a suspect being arrested without reasonably accessible and potentially exculpatory video having been reviewed, the sergeant would intervene and say, "hold on, let's look at the video," if they believed an illegal arrest was being made. Plaintiff's Exhibit 25, Glaeser Deposition at 51:20-52:6.

**RESPONSE: Admit.**

167.    If in the course of conducting a reasonable investigation a KCPD officer had access to and had examined information, or had access to information that satisfied the officer's reasonable suspicion, or did not allow the officer to elevate that to probable cause (absent a warrant) it would be an improper arrest in violation of practices and expectations of the department and if a supervisor was aware of it, the supervisor would tell the officer that s/he arrest cannot be made. Plaintiff's Exhibit 25, Glaeser Deposition at 52:11-53:9.

**RESPONSE: Admit.**

168.    The policies and practices of the KCPD align with a 1999 Eighth Circuit United States Court of Appeals opinion that says, "An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence standing by itself suggests that probable cause exists." Plaintiff's Exhibit 25, Glaeser Deposition at 55:13-56:18.

**RESPONSE: Admit.**

169.    In the five years ending June 30, 2016, it was the policy and practice of the KCPD that an officer contemplating an arrest is not free to disregard plainly exculpatory evidence that is readily accessible.  Plaintiff's Exhibit 25, Glaeser Deposition at 59:20-60:6.  They must consider all available potentially exculpatory evidence that is immediately accessible if it is readily available in determining probable cause.  *Id*. at 60:8-24.

**RESPONSE: Admit.**

170.    In the five years ending June 30, 2016, it was the policy and practice of the KCPD that an officer may make an arrest if a credible eyewitness claims to have seen the suspect commit the crime, but the officer may not arrest the suspect if, in addition, the officer has access to a videotaped account of the crime that conclusively establishes the suspect's innocence.  Plaintiff's Exhibit 25, Glaeser Deposition at 60:25-61:14. So sergeants and patrol officers would be trained to understand that even a credible eye witness must be weighed against a video tape that conclusively establishes the suspect's innocence.  *Id*. at 61:15-62:6.

**RESPONSE: Admit.**

171.    In the five years ending June 30, 2016, KCPD officers were taught that eyewitness identification by police officers is no more or less reliable than anybody.  Plaintiff's Exhibit 25, Glaeser Deposition at 62:7-15.

**RESPONSE: Admit.**

172.    In 2016, after a foot chase where the suspect eludes capture, but some time and some distance later when a suspect is detained there are factors that would play into whether dash cam video depicting part of the chase would be viewed to determine whether or not the suspect in custody was the person who had been involved in the foot chase.  Plaintiff's Exhibit 25, Glaeser Deposition at 77:12-78:1.  Some of those factors would include: the duration of the time of the

contact between the officer and the person that he was pursuing; the lighting conditions at the time; the nature of the exchange, whether the officer faced the person or did he only see the person from behind, so how much of a view did he have; the number of people in the area that might also physically match that same description; the duration of time for which the officer had lost sight of this person before recontacting the person; it could even be the condition of the person; whether the person demonstrated an accelerated heart rate; kind of the uniqueness of the description of the person's identifying characteristics, such as tattoos or scars or limps. *Id*. at 78:2-79:8. These and similar factors are the subject of training for KCPD officers, both formal supported by field training and experience. *Id*. at 82:9-17.

**RESPONSE: Admit**

173.    Where officers were "pretty sure" they had the right person and wanted to kick in the door (on a warrant), they were overruled because "pretty sure" is not absolute and is not probable cause. "Pretty sure" may be reasonable suspicion, but it is not probable cause. KCPD does not arrest people based on reasonable suspicion. Plaintiff's Exhibit 25, Glaeser Deposition at 80:3-15.

**RESPONSE: Admit.**

174.    An officer in 2016 in the field would be trained to understand the concept of exculpatory evidence and whether evidence was exculpatory, inculpatory, or neutral as well as how to analyze or evaluate the weight of potentially inculpatory or exculpatory evidence. Plaintiff's Exhibit 25, Glaeser Deposition at 93:13-94:5. An officer in the field in 2016 would be expected to understand these concepts sufficiently to implement or utilize them in the field. *Id*. at 94:10-13. Additionally, a KCPD officer in the field in 2016 would be expected to weigh the potentially exculpatory evidence that might be readily accessible before making a probable cause arrest. *Id*. at 94:14-20.

And, in order to weigh the potentially exculpatory or inculpatory evidence readily at hand before making a probable cause arrest, the officer would understand he has to look at it. *Id*. at 94:21-25.

**RESPONSE: Admit.**

175. Officer Jeffrey Hoffecker is an instructor at the regional police academy who has been an officer with the KCPD since 1999 and was also a field training officer for five to seven years between approximately 2010 and 2016. He graduated from the police academy himself in 1999. Plaintiff's Exhibit 2, Hoffecker Deposition at 6:9-7:2; at 8:25-9:2. Hoffecker was deposed about eyewitness identifications and related matters. *Id*. at 9:14-18.

**RESPONSE: Admit.**

176. Hoffecker received instruction on eyewitness identification issues from his POST required basic training for police officer curriculum and from his on-the-job, on-the-street experience. Plaintiff's Exhibit 2, Hoffecker Deposition at 10:3-9. POST stands for Missouri Police Officer Standards and Training which is training dictated by the State of Missouri to be given to recruits statewide. There are also POST standards for continuing education as well as for the original academy training. *Id*. at 11:6-15.

**RESPONSE: Admit.**

177. Hoffecker believes that when he went through the academy in 1999, there was not any time in that experience devoted to the question of eyewitness identifications and their potential fallibility. Plaintiff's Exhibit 2, Hoffecker Deposition at 14:10-14.

**RESPONSE: Immaterial whether Hoffecker learned about eyewitness misidentifications in the Academy; because he learned about eyewitness issues in the field from his on-the-job training. Plaintiff's Exhibit 2, Hoffecker Deposition 13:7-11.**

178. Hoffecker does not think that when he was in academy officers were instructed that calling

out or radioing about the possible presence of a gun can result in eyewitness misidentifications. Plaintiff's Exhibit 2, Hoffecker Deposition at 20:22-21:4.

**RESPONSE: Immaterial whether Hoffecker learned about eyewitness misidentifications in the Academy; because he learned about eyewitness issues in the field from his on-the-job training. Plaintiff's Exhibit 2, Hoffecker Deposition 13:7-11.**

179.    Hoffecker is aware of two pieces of information in training materials that relate to the subject of eyewitness misidentifications.  Plaintiff's Exhibit 2, Hoffecker Deposition at 21:5-9. One of the most important would be the procedures for conducting a show-up identification of a witness.  *Id*. at 21:13-17.

**RESPONSE: Admit.**

180.    Officers are provided with training on how to develop a suspect description to put out to other officers and what is included in such a description.  In addition, there are procedures for conducting the show-up identification.  Plaintiff's Exhibit 2, Hoffecker Deposition at 22:21-23:6. *See*, *supra*, at PSF ¶ 11 (citing Hoffecker Deposition at 22:21-24:18 describing a BOLO ("be on the lookout") or flash description).

**RESPONSE: Admit.**

181.    When an officer responding to a BOLO sees someone that may match the description given in the BOLO, that is when that officer is about to engage in a show-up and the officer would take that subject into custody and detain them for purposes of the investigation.  The victim, witness, or officer who provided the initial description would be the person to come identify the suspect in the show-up identification.  Plaintiff's Exhibit 2, Hoffecker Deposition at 26:2-27:8.  A show-up is a means to identify a suspect in which the witness or the victim comes directly to the scene of the arrest or detention and they identify the suspect there.  If they come at a later time, a photo

lineup is used.  *Id*. at 27:9-17.

**RESPONSE: Admit.**

182.    Show-ups generally should be conducted within 20 to 30 minutes of the detention while the person is held at the site of the arrest or detention and the victim, or witness – which could be a police officer come to the location where the suspect is being held.  No one should coach the witness, officer, or victim.  Plaintiff's Exhibit 2, Hoffecker Deposition at 28:16:29:11.  The detaining officer continues to restrict the suspect's movement while awaiting the witness and is to pay attention to any comments or spontaneous utterances made by the suspect during that time that might aid in the investigation although they might not help in the identification.  *Id.* at 29:13-30:19. There is also general instruction about when to give a *Miranda* warning.  *Id*. at 30:20-22.  Those are the components of instruction on how a show-up identification is conducted that is provided to basic training recruits. *Id*. at 30:23-31:2.

**RESPONSE: Admit.**

183.    Recruits are also instructed as to what can cause a misidentification of a detained suspect. The victim or witness must be positive that the person is the suspect before an arrest is made. Factors such as darkness, distance, the weather, the length of time that the witness observed the suspect, and the time elapsed since the observation and their impact on the validity of the identification are explored with recruits.  Plaintiff's Exhibit 2, Hoffecker Deposition at 31:5-32:3; at 32:16-23.  Recruits are taught to ask whether the witness or victim is sure, whether they are positive, 100 percent sure, but not necessarily to ask the witness, "Was there sufficient light?" or "Could you see?".  However, they are instructed that there are a lot factors that can impact the strength of the identification.  *Id*. at 33:5-34:5.

**RESPONSE: Admit.**

184.    More specifically, an officer would indicate that a suspect has been located that matches the description that the witness/victim gave and then ask if the person would be able to identify them if they saw the person.  If the witness/victim says "yes", the show-up identification would be conducted.  If they say, "no, I could not identify them," there would be no point in conducting the show-up.  Plaintiff's Exhibit 2, Hoffecker Deposition at 34:11-35:8.  An officer does not so much ask, "Was there enough light?  Did you get a good look?  Did you see the suspect long enough?".  Rather it goes to whether or not the witness/victim can provide answers to questions regarding race, gender, age, height, weight and if the witness/victim can provide an answer or give a description for these categories, then there is not a reason to doubt that the person could make an identification.  *Id*. at 35:9-36:2.

**RESPONSE: Admit.**

185.    In Hoffecker's opinion, police officers are better at making eyewitness identifications than layperson not trained in law enforcement based on their experience and training, but that does not mean that police would disregard the identification of a citizen witness or victim.  Plaintiff's Exhibit 2, Hoffecker Deposition at 36:8-19.

**RESPONSE: Admit.**

186.    When a police officer is the witness who makes the BOLO broadcast and a second officer stops the suspect so that the first officer/witness goes to the location where the second officer is holding the suspect, if the first officer/witness says, "I can identify the suspect and tell you whether or not that was the person I saw, officers are not trained to engage in any other procedures to test that police officer's identification of a suspect.  Plaintiff's Exhibit 2, Hoffecker Deposition at 36:20-37:6.  The question is the same as with any citizen witness, *i.e.*, "Would you be able to identify the suspect?"  *Id*. at 37:7-12.  Questions such as, "Was there enough light?"  "Did you see

them long enough?" "Did you have a good enough view?" would not be asked by an officer of a fellow officer making a show-up identification. *Id*. at 37:13-22. The same would be true of officers' field training. *Id*. at 38:4-12.

**RESPONSE: Admit but add the following portion omitted by Plaintiff so that Plaintiff's SOF ¶ 186 is not misleading: this training on witness identification described in Plaintiff's SOF ¶186 is the same if the witness is a police officer or citizen. Plaintiff's Exhibit 2, Hoffecker's Deposition at 33:5-22; 34:11-36:2.**

187.    Sergeants are not trained to ask those kinds of questions of officers where the officer was the witness, responded, and made a show-up identification when reviewing an arrest. Those questions would not be asked of an officer just as they are not asked of a citizen witness. The question would be the same as is asked of a citizen witness, "Can you identify the suspect if you saw him again?" Plaintiff's Exhibit 2, Hoffecker Deposition at 38:14-39:3.

**RESPONSE: Admit.**

188.    When interviewing a witness, "thorough" means that it is important to get an accurate account of the incident based on what they saw to get all the information possible during the interview. The officer should not do an incomplete interview. If there is a suspect description it is important to get as much information about the suspect as possible with the BOLO points kept in mind. Plaintiff's Exhibit 2, Hoffecker Deposition at 49:1-23.

**RESPONSE: Admit.**

189.    With respect to a neighborhood canvass, officers are taught to conduct such interviews as soon as possible, but only in instances where the officer thinks it might yield information. Plaintiff's Exhibit 2, Hoffecker Deposition at 49:24-50:14. As to criteria for distinguishing when it is important to go talk to the neighbors, it depends on the case and type of offense, or the

proximity of the neighbor's house to the offense. If the neighbor has already been contacted, there would be no need to follow up on it. But if the officer thinks there is evidence or information to collect, it should at least be attempted. If the neighbor turns out to be the party who reported the potential crime, it is more likely that the officer would go and talk to the neighbor. *Id*. at 50:21-51:17. That is something that should definitely be done in a thorough investigation and officers would be trained to do that, unless the reporting party specifically requests to not be contacted. *Id*. at 51:18-52:1.

**RESPONSE: Admit.**

190.    When a police officer responding to a call is the witness to a potential crime, the suspect escapes, and a BOLO flash description is broadcast, that officer becomes a witness. Plaintiff's Exhibit 2, Hoffecker Deposition at 53:14-19. When that officer witness then respond (sic) to where someone matching the flash description has been detained, that officer or witness is in the presence of a detaining officer as well. *Id*. at 53:20-25.

**RESPONSE: Admit.**

191.    In that case where there are two officers and one suspect, the witness officer has the responsibility for making the correct determination as to the identification of the suspect. Plaintiff's Exhibit 2, Hoffecker Deposition at 54:1-5. In such an instance, the detaining officer's responsibility might be to write a supplemental report documenting the circumstances of finding or detaining the suspect. *Id*. at 54:6-11.

**RESPONSE: Admit.**

192.    Officers are trained that when they are observing an eyewitness identification there are criteria that if present will suggest that the identification is likely to be a good one. One example would be to not coach the witness – the detaining officer would not say to the witness officer

something like, "Here's your guy." "I found him. There he is." Rather, that officer should ask, "Is this the guy." Plaintiff's Exhibit 2, Hoffecker Deposition at 54:14-55:1.

**RESPONSE: Admit.**

193.    When a detaining officer has a suspect and the witness officer arrives, the detaining officer is observing a show-up identification. In that instance, officers are trained to speak up if they see something happen that could undermine the validity of the eyewitness identification. If the show-up identification was going against the guidelines, the other officer should speak up. Plaintiff's Exhibit 2, Hoffecker Deposition at 55:4-19.

**RESPONSE: Admit.**

194.    If the witness officer, having said words to the effect, "I'll be able to identify him; I'll recognize him," arrives and identifies the detaining officer's suspect, the detaining officer is not trained that he should interrogate the identifying witness officer with questions such as, "Are you sure? Did you have enough light? Did you see him long enough?" Those questions would not be asked just as they are not asked of citizen witnesses. The officer conducting the show-up would want to assure that during the identification, as opposed to during the offense, the witness would have a good view of the suspect. Plaintiff's Exhibit 2, Hoffecker Deposition at 55:20-56:16.

**RESPONSE: Admit.**

195.    Sergeants read reports and approve or disapprove them. If a sergeant reads an officer's police report and it appeared that there was no probable cause for arrest, but an arrest was made the sergeant would tell the officer that the situation needed to be cured. Either, "There's no probable cause," or "You need to put more facts in your report that substantiate the probable cause." Plaintiff's Exhibit 2, Hoffecker Deposition at 57:7-58:4. However, officers are not trained that when they make an eyewitness identification of a suspect and then there is an arrest, that their

sergeants are going to be looking to assure that the eyewitness identification was properly conducted. That guidance would more likely come from a detective. *Id*. at 58:5-12.

**RESPONSE: Admit.**

196. Hoffecker is aware that eyewitness fallibility is something that an officer should be aware of when conducting an identification. The officer needs to follow procedures to make sure the identification is done properly to attempt to avoid the problem of fallibility. Hoffecker is not aware of anything, other than failure to follow proper procedure that may contribute to fallibility of identifications. Plaintiff's Exhibit 2, Hoffecker Deposition at 58:25-59:18.

**RESPONSE: Admit but add the following portion omitted by Plaintiff so that Plaintiff's SOF ¶ 196 is not misleading: Hoffecker testified that other factors that can cause misidentification that officers are trained to be aware of are "distance and lighting and maybe weather. There are a lot of factors." Plaintiff's Exhibit 2, Hoffecker's Deposition at 33:15-22.**

197. Hoffecker has heard of the International Association of Chiefs of Police (IACP), but was not aware that for more than 20 years, the IACP has given priority to correcting eyewitness identification problems. Plaintiff's Exhibit 2, Hoffecker Deposition at 59:19-25. He is aware that over the last 30-odd years, with the availability of DNA an scientifically validated evidence, that a number of innocent people have had their convictions overturned. He recognizes that in some significant portion of them eyewitness identifications turned out to be wrong. *Id*. at 60:1-18. In his training of recruits, that awareness of wrongful convictions resulting from misidentifications plays a part in his explanation of the reason for guidelines on how to conduct a show-up. One such is that the show-up ought to occur within 20 to 30 minutes when the incident is fresh in the person's memory because that is the time when a person can correctly identify a suspect. If it was longer

than that amount of time, a detective would conduct a photo line-up later. *Id*. at 60:25-61:18.

**RESPONSE: Admit.**

198. KCPD officers are not cautioned that the presence of a weapon can interfere with accurate eyewitness identification. Plaintiff's Exhibit 2, Hoffecker Deposition at 61:19-23.

**RESPONSE: Immaterial, because officers are trained that if a witness cannot develop a description of the suspect (such as race, gender, age, height, weight) then that witness would not be able to identify the suspect (regardless of the presence of a weapon). Plaintiff's Exhibit 2, Hoffecker Deposition at 35:9-36:2; 62:25-63:13.**

199. KCPD officers are not taught that when the witness and the subject are of different races, that cross-race identifications can contribute to inaccurate identifications. Plaintiff's Exhibit 2, Hoffecker Deposition at 61:19-23.

**RESPONSE: Immaterial, because officers are trained that if a witness cannot develop a description of the suspect (such as race, gender, age, height, weight) then that witness would not be able to identify the suspect. Plaintiff's Exhibit 2, Hoffecker Deposition at 35:9-36:2; 62:25-63:13.**

200. KCPD officers are not taught that the duration of an event that the eyewitness sees can contribute to either misidentifications or accurate identifications depending on the duration. Plaintiff's Exhibit 2, Hoffecker Deposition at 62:19-24.

**RESPONSE: Admit but add the following portion omitted by Plaintiff so that Plaintiff's SOF ¶ 200 is not misleading: Hoffecker testified to the fact in Plaintiff's SOF ¶ 200, but then clarified that "[the opportunity for observation] would go back to the developing of the description of the suspect and the interview of the witness or victim. If that subject was unable to provide any kind of description or just a very vague description, then I think the**

**officer would realize that they would—they would not be able to identify the suspect.**" *See* **Plaintiff's Exhibit 2, Hoffecker Deposition at 62:25-63:13.**

201.    When interviewing a citizen victim or witness about the description of the suspect, officers are taught to assess how good the opportunity for observation was, whether face-on, sideways, from behind, at an angle and if the witness' descriptions are non-existent or vague, the officer should realize that the witness would not be able to identify the suspect. Plaintiff's Exhibit 2, Hoffecker Deposition at 62:25-63:13. But the officer is not trained to question him- or herself as to angles, duration, lighting or other factors. If the officer can identify, then he would identify. If he couldn't, he wouldn't. *Id*. at 63:14-22; 64:19-23. Other than common sense, officers are not trained that when they believe they can make an identification, they should test their own belief against factors such as duration, lighting, presence of a weapon. *Id*. at 65:4-21.

**RESPONSE: Admit but add the following portion omitted by Plaintiff so that Plaintiff's SOF ¶ 201 is not misleading:**

**Hoffecker testified that officers are trained to use good judgment, common sense "and the guidelines given here," when making identifications.** *See* **Plaintiff's Exhibit 2, Hoffecker Deposition at 65:22-25.**

202.    Recruits to be patrol officers are not trained in the topic of whether there are differences in the accuracy of eyewitness identifications when line-up identifications are compared to show-up identifications. Plaintiff's Exhibit 2, Hoffecker Deposition at 66:6-21.

**RESPONSE: Admit.**

*The eyewitness identification problem and variables impacting reliability – generally and here*

203.    Dr. Gary Wells, Ph.D. is the Distinguished Professor of Psychology and the Stavish Chair in the Social Sciences at Iowa State University. Dr. Wells has written an expert report for this

litigation.  Wells' expertise is in social influence, human memory, and judgment, in general, and eyewitness identification evidence in particular.  He has published over 125 peer-reviewed publications reporting his studies of eyewitness identification and has received national awards for that work.  His research studies on eyewitness identification are funded by the National Science Foundation.  He was a planning panel member working group member, and author on the U.S. Department of Justice publication *Eyewitness Evidence: A Guide for Law Enforcement*, published in 1999.  Wells has given workshops and lectures on eyewitness identification to attorneys, prosecutors, police, and judges throughout the country and has worked with prosecutors, law enforcement, and other public officials and policy makers to help reform eyewitness identification procedures in many states and jurisdictions as well as in Canada.  He co-chaired and co-authored the National Institute of Justice Training Guide on Eyewitness Evidence for law enforcement, published in 2001.  Plaintiff's Exhibit 22 at 1.

**RESPONSE: Admit.**

204.    Perhaps the most general and yet informative single statement that can be made about the reliability of eyewitness memory is that memory is not at all like a video system.  While a functioning video system faithfully records everything within the visible spectrum that comes through the lens, the human memory records only a small portion of what comes into view.  For most everyday tasks, this small portion or "gist" is sufficient to function quite well and if it misfires, the consequences are usually not costly.  But this kind of mistake can have devastating consequences in the legal system.  Plaintiff's Exhibit 22 at 3.

**RESPONSE: Admit that Plaintiff's expert testified as such.**

205.    To study this problem, researchers developed experiments which involved staging "crimes" for unsuspecting people.  These experiments showed that eyewitnesses will readily

misidentify the perpetrator of the staged crime under certain conditions. Since the researchers created the witnessed event and knew who the real "culprit" was (a researcher's accomplice), they could score identification responses definitively as either accurate or mistaken. The researchers could then methodically manipulate variables to see how those variables influence the reliability of eyewitness identification. These variables are categorized into two types: system variables and estimator variables. Plaintiff's Exhibit 22 at 3-4.

**RESPONSE: Admit that Plaintiff's expert testified as such.**

206. Both system variables and estimator variables affect the reliability of eyewitness identifications. System variables are under the control of the justice system but estimator variables are not. Instructions given to a witness prior to an identification procedure warning them that the person they are about to view might not be the culprit and not to guess is a system variable because officers have control over whether or not to give that warning. Other variables reduce the reliability of eyewitness identifications over which the justice system has no control. Though those estimator variables cannot be controlled by law enforcement, law enforcement must be cautious about an eyewitness identification when such estimator variables are present and be more vigilant about finding other evidence that could corroborate or refute the identification. Plaintiff's Exhibit 22 at 4.

**RESPONSE: Admit that Plaintiff's expert testified as such.**

207. Estimator variables are well known. They include weapon focus – the tendency of a witness to focus attention on a weapon which divides their attention and thereby reduces time spent attending to the face. Stress and fear reduce the ability of an eyewitness to identify a person they viewed under such circumstances. Cross-race and cross-ethnicity identifications are impaired relative to same-race or same-tonicity identifications. Other factors include distance, lighting, and

duration of the event.  Plaintiff's Exhibit 22 at 4.

**RESPONSE: Admit that Plaintiff's expert testified as such.**

208.     The most powerful system variable as it impacts the reliability of an eyewitness identification is whether a lineup or a showup procedure is used.  In a lineup, the suspected person is embedded among known-innocent fillers who also generally fit the description of the culprit.  In contrast, showup is the presentation of a single person without fillers.  Studies very clearly show high rates of mistaken identification for showups compared to lineups and their superiority stems from the fact that the fillers in lineups provide protection for an innocent suspect that is not present in a showup identification. Plaintiff's Exhibit 22 at 4-5.

**RESPONSE: Admit that Plaintiff's expert testified as such.**

209.     As Dr. Wells details in his report, knowledge about the eyewitness identification problem has been disseminated widely to further the case that law enforcement must recognize that human memory is not like a video system, that eyewitnesses are often mistaken, that eyewitness evidence usually needs corroboration, and that law enforcement, which stages identification procedures, is on the front line of assuring eyewitness identification is reliable.  Exonerations of innocent people because of forensic DNA testing who were convicted by mistaken identifications prompted the Department of Justice to convene a group to create a guide on the collection and preservation of eyewitness evidence.  That 1999 guide was distributed free to every law enforcement agency in the United States and was followed in 2000 with free training CDs.  Since that time, many states and major police department have officially and publicly reformed how the collect and attempt to verify eyewitness identification evidence.  The International Association of Chiefs of Police and the Major Cities Police Chiefs Association, of which the KCPD is a member, have adopted policies that warn of the vagaries of eyewitness identification and that specify explicit steps that can be

taken to insure integrity of those identifications and recommend better practices to avoid mistaken identification. Most police academies have offered training on eyewitness identification issues as apart of their initial training since about the year 2000, and some were doing so before then. Plaintiff's Exhibit 22 at 5-6.

**RESPONSE: Admit that Plaintiff's expert testified as such.**

210. Dr. Wells and Major Glaeser agree that problems with eyewitness identification are generally known throughout law enforcement. They also agree that law enforcement officers are not superior to the average citizen in terms of eyewitness reliability. Published studies comparing lay citizens and law enforcement officers and overall, they show the same performance difficulties. Plaintiff's Exhibit 22 at 6.

**RESPONSE: Admit that Plaintiff's expert testified as such.**

211. The Bell identification was a showup procedure. In and of itself, that fact should have given any well-trained officer pause. There were additional estimator variables present. The view that Neukirch and Munyan had of the fleeing suspect was at some considerable distance – not face-to-face. The fleeing suspect was moving fast and the amount of time to view him was only a few seconds. Additionally, the view was almost exclusively of the fleeing person's back side. There was a weapon involved which adds a stress that negatively impacts reliability.[12] The identification was cross-race and cross-ethnic – Bell is African-American and all of the involved officers save Sergeant Ortiz, who is Hispanic, were white. Plaintiff's Exhibit 22 at 6-7.

---

[12]Even Munyan admitted – though he used it as an excuse as to why he did not observe whether there was a white stripe on the fleeing suspect's shorts – that he was initially focused on the gun in the fleeing suspect's hand (at least for the few seconds before it was tossed over the fence before the suspect rounded the corner). DSF ¶ 62. In addition, the fast-moving suspect and the distance between him and Munyan underscore the incredibility of Munyan's claim that he saw red on the fleeing suspect's shoes.

**RESPONSE: Admit that Plaintiff's expert testified as such.**

212.     Despite the presence of these conditions which are high on the list for factors that contribute to mistaken eyewitness identifications, neither officer seemed concerned enough about the prospects of a mistaken identification to carefully compare the video to Bell and his clothing despite the fact that he was readily available, literally only feet away from the video, and could have been escorted to the Neukirch/Munyan patrol vehicle to stand near where the video could be reviewed. A careful examination and direct comparison to Bell would have shown that they had the wrong person. But such a comparison was not made. Nor did officers ask the 911 caller, Miller, to view TB even though Miller was easily reachable and would have been able to tell the officers that Bell was not the person he had seen. Plaintiff's Exhibit 22 at 7.

**RESPONSE: Immaterial that a "direct comparison to Bell" as Plaintiff's expert described was not done. The Fourth Amendment does not require such "direct comparisons," if such would not have exonerated the suspect. *See Kuehl*, 173 F.3d at 650. Here, as previously stated, such "direct comparison" would not have exonerated Plaintiff. Given all the other similarities between the fleeing suspect and Plaintiff, including age, height, weight, body build, hair color/style/length, white t-shirt, black and red shoes, that he was within 5-6 blocks of the crime scene only 7 minutes after the crime occurred, the minor clothing differences (shorts and socks) do not defeat probable cause; and even if the officers had discovered the differences in the shorts and socks, both officers reasonably believed, based on their experiences, that fleeing suspects shed clothing to avoid detection; therefore, the differences in the shorts and socks were not exculpatory evidence for them.**

213.     The behavior of the officers indicates that they either did not receive effective training on eyewitness identification or failed to apply that training to this situation. In particular, Neukirch

and Munyan seem to have had no appreciation of the fundamental idea that memory is not like a video and is fallible, full of gaps, and not an exact representation of details. Their failure to carefully study the video of the fleeing male and compare it to Bell seems to suggest that they did not consider the possibility that a showup identification could be mistaken. Any officer who had received basic training on eyewitness identification would have known to trust a video comparison rather than an eyewitness identification, particularly when it was a showup identification based on a brief and chaotic view of a fleeing person. Given the existence of the video, any reasonably-trained officer would know that there was a chance of mistaken identification and to carefully check the video. Plaintiff's Exhibit 22 at 7.

**RESPONSE: Immaterial whether they had training as described by Plaintiff's expert; that officers simply did not follow their training does not establish that they had no probable cause to arrest, (*see generally, Hill v. California*, 401 U.S. 797 (1971)), nor is it sufficient to establish § 1983 failure to train claim. *See Board of Cty. Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 410 (1997).**

214. Sergeant Ortiz' behavior was also concerning. He did not question Munyan carefully about the identification. Had he done so, he would have realized that Munyan had a relatively poor and short view of the fleeing person yet was quite quick to make a showup identification while still approximately 30 feet away from Bell (and claims that part of that identification took place while he was still driving and parking). Had Ortiz learned that, he might then have looked more closely at the video and would have seen that Bell was a different person from the male who fled the scene. Ortiz, too, either was not given effective training on eyewitness identification or failed to apply the training. Given that Ortiz had to make the determination whether to approve the arrest based on Munyan's identification, he should have carefully questioned Munyan about the view he had

of the fleeing male and the basis and circumstances of the showup identification. Ortiz should also have asked about other witnesses, such as calling party Miller, who, as indicated would have been able to exculpate Bell. Any officer who had received basic training on eyewitness identification would have known to trust a video comparison rather than an eyewitness identification, particularly when it was a showup identification based on a brief and chaotic view of a fleeing person. Plaintiff's Exhibit 22 at 7-8. Ortiz took the identification by Munyan and seemed to trust it as if there was no possibility of a mistake, as if he thought memory works like a video system, which is an indication of someone who does not have a "proper, modern, healthy skepticism about eyewitness identification evidence." Plaintiff's Exhibit 21, at 18:3-9.

**RESPONSE: Immaterial that, according to Plaintiff's expert, Sgt. Ortiz did not question Officer Munyan's identification or more thoroughly examine the video; this does not rise to the level of deliberate indifference, which is required for liability to attach to Sgt. Ortiz. *See Corwin v. City of Independence, MO*, 829 F.3d 695, 699 (8th Cir. 2016).**

215.    And "[i]f anyone is going to get training on eyewitness identification issues, it is detectives." Plaintiff's Exhibit 22 at 8. But Mattivi failed to check the video of the fleeing person against the photograph[13] for 21 days. So even Mattivi seems to give little credibility to the idea that a showup identification under these "very poor witnessing conditions" might be mistaken. *Id*. Either he received no effective training on eyewitness identification or failed to apply that training to this case. *Id*. Again, any officer who had received basic training on eyewitness identification would have known to trust a video comparison rather than an eyewitness identification, particularly when it was a showup identification based on a brief and chaotic view of a fleeing person. *Id*.

---

[13]Or against Defendants' Exhibit Z, the Viesselman video.

**RESPONSE: Immaterial that Det. Mattivi did not get training as described by Plaintiff's expert;** *see* **Defendants' response to Plaintiff's SOF ¶ 213 above.**

216.   Wells' review of legal bulletins produced as part of the eyewitness identification training clarifies more strongly that there was not good training.  It was "bare bones" and it appeared there were several topics commonly addressed in training that were not included.  Plaintiff's Exhibit 21, Wells Deposition at 5:4-17.

**RESPONSE: Immaterial that there was "not good training."  For § 1983 liability on a training claim, attendance at a training academy and on-the-job training (Hoffecker and Glaeser testified both occurred here,** *see* **Plaintiff's SOF ¶¶160-201) is sufficient for proper training.** *See Tucker v. Evans***, 276 F.3d 999, 1003 (8th Cir. 2002).**

217.   The conduct of the officers, the sergeant, and the detective demonstrated a "tendency just to simply assume that an ID was made, and, of course, ID's are reliable, which is a big red flag in terms of a consequence of . . . not being trained or not applying the training one had to the situation."  Plaintiff's Exhibit 21, Wells Deposition at 6:15-7:14; *see also*, Defendants' Exhibit HH, Ortiz Deposition at 25:8-26:8 (although he saw a resemblance, if Munyan had not identified the person, Ortiz would not have been able to identify him from the video alone; he was going with what the officers had told him; the video alone was not sufficient to make a probable cause arrest).

**RESPONSE: Immaterial that officers were "not being trained or not applying the training" according to Plaintiff's expert.  For § 1983 liability on a training claim, a plaintiff must additionally show the governmental entity knew the training procedures were inadequate and likely to result in a constitutional violation.** *Andrews v. Fowler***, 98 F.3d 1069, 1076 (8th Cir. 1996).**

218.     Just viewing the video in the patrol car for the purpose of testing the proposition that Bell was the person in the video is inadequate without having Bell there.  It was not a side-by-side comparison where the officer reviewing the video is in the car and Bell was standing outside the car where the officer could look at the screen, then look at Bell to compare features such as eyes, body build, details of clothing in a back and forth process, moving the reviewer's eyes from the live body to the video image.  Plaintiff's Exhibit 21, Wells Deposition at 13:1-14:10.  If the officers had, in fact, followed that process and they still got it wrong, there must have been something wrong with their eyes because most people who would look at this and conclude that the fleeing party and Bell were different people.  *Id.* at 14:11-21.

**RESPONSE:   Plaintiff's expert stated the same in Plaintiff's SOF ¶ 212; therefore, Defendants incorporate by reference their response to Plaintiff's SOF ¶212 as though fully set forth herein.**

<u>**Reply Argument**</u>

**I.**     *Kuehl v. Burtis* **and** *Baptiste v. J.C. Penney, Co*. **are not sufficiently similar to the present case to have placed the constitutional question here beyond debate.**

Plaintiff argues that *Kuehl v. Burtis*, 173 F.3d 646 (8th Cir. 1999) and *Baptiste v. J.C. Penney, Co.,* 147 F.3d 1252 (10th Cir. 1998) clearly established that a police officer may not "arrest [a] suspect if there is evidence that conclusively establishes innocence." (Opposition, p. 99). Plaintiff claims Officers Munyan and Neukirch did not conduct a "careful side-by-side review of the video while Bell was close enough to observe the differences" in his shorts (Plaintiff had white stripes, not solid dark color like the fleeing suspect), height (Plaintiff was 5 inches taller than fleeing suspect), length of hair (Plaintiff's dreads were "short," whereas the fleeing suspect had "shoulder-length" dreads), body build (Plaintiff was athletic, not skinny like the fleeing suspect). (Opposition, p. 93-94). And, had they conducted such careful review of the video, they would have concluded they had no probable cause to arrest Plaintiff. (Opposition, p. 94).

The problem with Plaintiff's argument is that neither *Kuehl* nor *Baptiste* sufficiently put the officers on notice that by not conducting a careful side-by-side review of the video, they were violating the Plaintiff's Fourth Amendment rights. In *Kuehl*, the officer ignored plainly exculpatory evidence that negated the intent for the underlying crime. *Kuehl, 173 F.3d* at 651. He refused to interview an eye witness to the event that "would have further exonerated [the suspect] and negated probable cause;" he failed to conduct a more thorough interview of the suspect which would have negated the suspect's intent for the underlying crime of assault; and he ignored a witness's retraction of her earlier statement. *Id.*

In *Baptiste*, the security guards' allegations were based solely on the suspect's conduct which was memorialized in its entirety on a videotape. *Baptist,* 147 F.3d at 1257. The officers viewed the

very same conduct on the videotape, which the court concluded failed to establish probable cause; therefore, it was not reasonable for officers to rely on the security guards' allegations. *Id.*

*Kuehl* and *Baptist* put officers on notice that they cannot ignore plainly exculpatory evidence; but neither of these cases would have put any of the defendant officers on notice that they were violating Plaintiff's Fourth Amendment rights when they did not conduct a side-by-side comparison of the Plaintiff to the patrol car video.

The most glaring difference between *Kuehl* and *Baptiste* and the present case is that the officers in *Kuehl* and *Baptiste* did not witness the alleged criminal act. *Kuehl,* 173 F.3d at 648; *Baptiste*, 147 F.3d at 1257. Here, Officers Neukirch and Munyan did. In addition, unlike the officers in *Kuehl* and *Baptiste*, who ignored evidence from eye witness accounts and video evidence, Officers Neukirch and Munyan did not ignore the video. They replayed it at least eight times. (*See* Defendants' SOFs ¶¶ 38, 47-48, 53). Moreover, Plaintiff does not allege they ignored it; rather, Plaintiff claims that their review of it was not good enough. (Opposition, p. 94).

To demonstrate the officers' inadequate review, Plaintiff makes a circular argument—had they reviewed it more carefully by doing a side-by-side comparison they would have noticed the differences between the fleeing suspect and Plaintiff. (Opposition, p. 94). And, because they did <u>not</u> review it more carefully with a side-by-side comparison, they did <u>not</u> notice the differences. (Opposition, p. 94). However, Plaintiff fails to compromise the discrepancy between the arresting officers' failure to do a side-by-side comparison review, allegedly resulting in their failure to establish Plaintiff's innocence, with Det. Mattivi's review of the patrol car videos, but not by a side-by-side comparison to Plaintiff, which resulted in his conclusion that Plaintiff was innocent. (Plaintiff's SOF ¶ 130). Qualified immunity is analyzed from the perspective of a reasonable officer; and if an officer acts in a manner about which officers of reasonable competence could

disagree, the officer should be immune from liability. *Johnson v. Schneiderheinz*, 102 F.3d 340, 341 (8th Cir. 1996). Arguably, based on this undisputed evidence, the officers reviewed the same video, but none of them reviewed the video by a side-by-side comparison to Plaintiff; and yet, they reached divergent conclusions about Plaintiff's innocence. Under *Johnson v. Schneiderheinz*, this is evidence that the law as Plaintiff would have it, that officers violated Plaintiff's Fourth Amendment rights by not conducting the side-by-side comparison view of the patrol car video to Plaintiff, was not the clearly established law, and the defendant officers should be immune from liability.

Regarding Plaintiff's argument that *Kuehl* and *Baptiste* put the defendant officers on notice that it is a Fourth Amendment violation to fail to review video for witness identification in the specified manner of a side-by-side comparison, neither *Kuehl* nor *Baptist* requires such oversight of officers' investigations, but instead, requires that officers not ignore plainly exculpatory evidence. *Kuehl*, 173 F.3d at 651; Baptist, 147 F.3d at 1257. The undisputed facts here demonstrate that the officers did not ignore the video.

Of course, Plaintiff's argument, in the first place, assumes that the differences between the Plaintiff and fleeing suspect (white stripe v. no white stripe, shoulder-length v. short dreads, 5-inch height difference, and athletic v. skinny) are, in and of themselves, exculpatory. Plaintiff makes this assumption without citation to any case. Moreover, Plaintiff fails to address a single case cited by Defendants in their summary judgment motion that supports the existence of probable cause to arrest Plaintiff in spite of these differences. (Summary judgment motion, pp. 17-20).

Relatedly, throughout his Opposition, Plaintiff spends a significant amount of his brief challenging the credibility of Officers Munyan and Neukirch:

- "For the first time when Munyan arrived where Viesselman was detaining Bell, Munyan claimed to have seen red on the fleeing suspect's shoes;" (Opposition, p. 93);

- "There were more reasons to question Munyan's identification that were immediately evident." (Opposition, p. 93);

- "trying to link the name, 'Jay'-which the other two males had given Munyan as the fleeing suspect's street name—[] is unavailing." (Opposition, p. 94);

- "an officer may make an arrest if a *credible* eyewitness claims to have seen the suspect commit the crime" (emphasis by plaintiff, referring to the eyewitness officers)(Opposition, p. 94).

However, a simple review of the law pertaining to the qualified immunity analysis would have revealed to Plaintiff that an officer's subjective beliefs are not relevant. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). The objectively (not subjectively) reasonableness standard governs the qualified immunity analysis. *Id*. Therefore, accusing the officers of not being "credible eyewitnesses" is misplaced.

In addition to the careless review of the patrol car video, Plaintiff claims Officers Munyan and Neukirch and Detective Mattivi did not ask Calling Party Miller or the two other male juveniles or their mothers to verify whether Plaintiff was the fleeing suspect; and had they done so, such verification would have established Plaintiff's innocence. (Opposition, p. 96-98). Once again, Plaintiff points to *Kuehl* and *Baptiste* as providing notice to the defendant officers that failing to verify Plaintiff's identification with Miller, the two other juveniles or their mothers, violated Plaintiff's Fourth Amendment rights. With this argument, Plaintiff encounters the same problem he had when he claimed a side-by-side comparison review of the video would have established the Plaintiff's innocence. Just like the side-by-side comparison review would not, and did not,

establish his innocence; a verification of Plaintiff's identity from Miller and the two other juveniles and their mothers would not, and did not, establish his innocence. Miller never saw the suspect flee from officers; and therefore, would not be able to identify him. (*See* Exhibit R). Rather, he saw three males standing on a porch before officers arrived, none of whom were the Plaintiff. (*See* Exhibit R, ¶¶9-10). Therefore, Miller was not an exculpatory witness; particularly, in light of the fact that both officers saw the suspect flee and were able to identify him themselves.

Regarding the two other juveniles, it is undisputed that Officer Munyan and Officer Adams questioned them about the identity of the fleeing suspect. (Plaintiff's SOF ¶ 86). It is also undisputed that their interview of these two other juveniles did not result in Plaintiff's exoneration; instead, a reasonable inference can be made that, based on the officers' questions to them and their corresponding answers or rather, their failure to answer, they were willing to stay silent about Plaintiff's alleged innocence. (Plaintiff's SOF ¶ 86). Either way, they did not establish their friend's innocence, when they had the opportunity to do so, and when it mattered. (Plaintiff's SOF ¶ 86). Producing an affidavit to Plaintiff two years after the incident claiming that you would have disclosed Plaintiff's innocence had you only been asked, is disingenuous and conflicts with the undisputed evidence in the record.

Finally, that the mothers of the two juveniles may have had exculpatory evidence about the identity of the fleeing suspect (assuming their sons disclosed the fleeing suspect's actual identity to them) is rank speculation. The mothers saw even less than Miller did. They did not arrive to the scene until after Plaintiff was arrested.

Regarding the clearly established law with respect to qualified immunity, the particularized question is whether it was beyond debate that the officers could not lawfully arrest Bell, given the following circumstances:

- Two officers personally observed both the fleeing suspect and Plaintiff and later reviewed their patrol car video at least eight times to confirm they were the same person;

- Plaintiff and the fleeing suspect were similar in age, height, weight, body build, hair color, hair style, and hair length, and both wore unstained white t-shirts and black and red shoes;

- Plaintiff was found in an area he could have reached within the time since the pursuing officer lost sight of the suspect, in the same direction that the pursuing officer suspected he ran;

- No one else fitting the description was found by other officers, including canine and a police helicopter, who responded to the area;

- The officers discovered that Plaintiff knew at least one of the other two juveniles who had been with the suspect;

- One of the fleeing suspect's companions answered in the affirmative when Officer Munyan asked him "You know we got him, right?" and neither of them protested that Bell was the wrong person.

For the reasons stated in Defendants' initial brief, and particularly in light of *Hill v. California*, 401 U.S. 797 (1971), *Wright v. St. Louis Bd. Of Police Com'rs*, 4:12CV00107 AGF, 2014 WL 4187797 (E.D. Mo. Aug. 22, 2014), and *United States v. Oakley*, 153 F.3d 696 (8th Cir. 1998), the Fourth Amendment was not violated under these circumstances, much less was the question "beyond debate." 686 F.3d 494, 496-97 (8th Cir. 2012). Plaintiff failed to identify a single case to establish otherwise.

Plaintiff raises other issues in his Opposition that are immaterial to the question of probable cause, given totality of the circumstances. As Plaintiff pointed out, the totality of the circumstances, not facts viewed in isolation, determines the existence of probable cause. *Kuehl*,

173 F.3d at 650. (Opposition, p. 89). That Plaintiff would have had to have run to get to the location where Officer Viesselman discovered him, that he was "breathing normal" and was a "little sweaty," and that Officer Munyan made a "3-second, long distance []identification" of Plaintiff, does not dilute probable cause, given the totality of what the officers knew at the time. (*See* Summary judgment motion, p. 18). And, Plaintiff fails to cite to a single case to establish that these facts viewed in isolation, or viewed together, negate probable cause.

## II.     Plaintiff does not make a case against Sgt. Ortiz for individual liability.

Plaintiff alleges that Sgt. Ortiz "did not carefully question Munyan," "[should] have looked more closely at the video," and "should have asked about other witnesses." (Opposition, pp. 98-99). To establish a §1983 claim for failure to supervise against Sgt. Ortiz, Plaintiff must show that Sgt. Ortiz was deliberately indifferent. *See Green v. Nocciero*, 676 F.3d 748, 752 (8th Cir. 2012). As a prerequisite to establishing deliberate indifference, Plaintiff must show that Sgt. Ortiz knew that his supervision was inadequate and would likely result in a constitutional violation. *See Livers v. Schenck*, 700 F.3d 340, 355-56 (8th Cir. 2012). Here, Sgt. Ortiz testified that he supervised Officers Neukirch and Munyan for years and months, respectively, prior to Plaintiff's arrest, and to his knowledge, neither had arrested someone without probable cause, arrested the wrong person, or made a mistaken identification of a suspect. (*See* Exhibit HH, Ortiz Deposition, 58:19-59:25). Plaintiff has provided no evidence that Sgt. Ortiz was on notice that his supervision was inadequate and would likely result in a constitutional violation.

## III.     Det. Mattivi had no constitutional obligation to review the video sooner.

Without citation to any case law, Plaintiff largely argues that Det. Mattivi simply should have reviewed the patrol car video sooner. (Opposition, p. 100). However, there is no such constitutional requirement, provided that there was probable cause to arrest Plaintiff, and hold him over for trial.

*See Gerstein v. Pugh*, 420 U.S. 103, 114 (1975); *see also, Manuel v. City of Joliet, Ill.*, 137 S.Ct. 911, 918 (2017). The undisputed facts here establish that there was probable cause to arrest the Plaintiff, and within forty-eight hours, a court determined there was probable cause to hold Plaintiff over for trial. (*See* Summary judgment motion, pp. 18, 27). Plaintiff's claims against Det. Mattivi, therefore, fail.

## IV.   Conclusory statements regarding the Fourteenth Amendment claim against Det. Mattivi and the claim against the Board and the Chief do not establish liability.

Lastly, without citation to any case or statutory law or any reference to the record, Plaintiff makes the conclusory statement that the three-week detention was "conscience-shocking," without addressing a single one of Defendants' arguments raised in their summary judgment motion. Plaintiff's Fourteenth Amendment against Det. Mattivi fails for all the reasons stated in Defendants' summary judgment motion.

Likewise, without citation to any case law or any reference to the record, Plaintiff makes the conclusory statement that the "record is rife with evidence of awareness of and inadequate training…and poor policies." (Opposition, p. 101). Assuming that's true, that's still not enough to establish a §1983 training/*Monell* claim against the Board or the Chief. Plaintiff must additionally show that Board and the Chief knew their training and/or policies/customs/practices were inadequate and would likely result in a constitutional violation. *Livers*, 700 F.3d at 355-56. There is no such evidence in the record here, and this claim must therefore be dismissed.

## V.   Conclusion.

For the reasons stated above, Defendants respectfully request that the Court enter an order granting their motion for summary judgment and dismissing Plaintiff's claims with prejudice.

Respectfully submitted,

**JOSHUA D. HAWLEY**
Attorney General of Missouri

*/s/ Diane Peters*
Missouri Bar No. 54784
Assistant Attorney General
615 E 13th Street, Ste. 401
Kansas City, Missouri 64106
T: (816) 838-2285
F: (816) 889-5006
Diane.Peters@ago.mo.gov
ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2018, the foregoing was filed electronically via the Court's ECF system, and by way thereof, served upon the following:

Arthur A. Benson II #21107
Jamie Kathryn Lansford #31133
4006 Central Avenue
Kansas City, Missouri 64111
Phone: (816)531-6565
Fax:     (816)531-6688
abenson@bensonlaw.com
jlansford@bensonlaw.com

*/s/ Diane Peters*
 Assistant Attorney General