# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| TYREE BELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:17-CV-00695-DGK |
| | ) | |
| PETER NEUKIRCH, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANTS' SUMMARY JUDGMENT MOTION

This case arises out of Plaintiff Tyree Bell's arrest and detention for a crime he did not commit. Plaintiff is suing members of the Kansas City, Missouri, Police Department ("KCPD") involved in his arrest, as well as KCPD Police Chief Richard Smith and the individual members of the Missouri Board of Police Commissioners ("the Board"), for violating his Fourth and Fourteenth Amendment rights. He claims these violations occurred because of the KCPD's policies, procedures, or customs and its negligent training and supervision of its officers. Now before the Court is Defendants' motion for summary judgment (Doc. 56). Because the officers are entitled to qualified immunity, the motion is GRANTED.

### Background

Around 4:10 p.m. on June 8, 2016, KCPD Officers Peter Neukirch and Jonathan Munyan were dispatched to the corner of James A. Reed and 91st Terrace. A homeowner in the area ("the calling party") had reported three black juvenile males on the corner were playing with guns.

Seven minutes later, Munyan and Neukirch arrived near the street corner and saw three black male juveniles talking to a few teenage girls in the front yard of a residence. As the officers

got closer, the three males turned away from the patrol car and quickly went around the street corner. Seconds later, as the officers turned the street corner, they stopped their patrol car next to the juveniles, who were—at this point—walking.

Immediately as the officers exited their patrol car, one of the juveniles, who was wearing a white shirt and black shorts, turned toward the officers, grabbed his waist, and began running in the opposite direction. While running away, he pulled a gun from his shorts and tossed it over a fence. Munyan chased after him, yelling, "Come here! Drop the gun! Drop it! Drop it!"

While in pursuit, Munyan gave updated locations on dispatch radio. But by 4:19 p.m., Munyan had completely lost sight of the suspect, though he guessed on dispatch radio that the suspect had run north. Munyan described the suspect as a "juvenile, black male, 17-18, about 5'10", skinny, blue shorts, white t-shirt, shoulder-length dreads. He was taking his shoes off. I'm not sure what kind of shoes he had on."

A couple of minutes later, Munyan set up a perimeter around James A. Reed and 91st Terrace and requested that other officers respond to assist in locating the fleeing suspect. Five other officers, including Officer Chris Viesselman, responded to the area. None saw anyone fitting the description of the fleeing suspect until 4:26 p.m.—approximately seven minutes after Munyan started chasing the suspect—when Viesselman saw a black juvenile male with dreads, a white t-shirt, and black and white-striped shorts walking near 87th Street and Blue Ridge Boulevard. The juvenile would later be identified as Plaintiff Tyree Bell.

At first, because Plaintiff had his shoes on, Viesselman questioned Munyan on dispatch radio about the suspect taking off his shoes. Munyan responded that he did not see the suspect take his shoes off and could not find any shoes, so it was possible the fleeing suspect "held them

2

and put them back on." Munyan told Viesselman to conduct a pedestrian check of Plaintiff. Viesselman got out of his car, summoned Plaintiff, and conducted a pedestrian check.

Plaintiff, who told the officer he was 6'3" and 155 pounds, fully complied with Viesselman's requests. When asked what he was doing in the area, Plaintiff told Viesselman he was walking back to his house from his cousin's. Plaintiff also gave Viesselman his home address and his mother's name, address, and phone number.

Viessleman explained to Plaintiff why he had detained him, noting, "You don't seem like you're really out of breath after a foot chase or anything, so I don't imagine it's you, but you match what he's wearing so that's why I gotta stop you until we check, okay? And you're the right age, too. He was a juvenile." Plaintiff nevertheless remained handcuffed in front of the patrol car while he and Viesselman waited for Officer Munyan to arrive and identify if Plaintiff and the fleeing suspect were the same person.

While Plaintiff and Viesselman were waiting for Munyan, another officer recovered the gun at the original scene and asked the dispatcher to run its serial number. The dispatcher found no records for the gun.

At 4:41 p.m., Munyan arrived at 87th Street and Blue Ridge Boulevard, parked on the opposite side of the two-lane street, within seconds identified Plaintiff as the fleeing suspect, and radioed, "We have our party down here at 87th." A minute later, Munyan got out of his vehicle and walked across the street to where Plaintiff and Viesselman were waiting. Munyan told Viesselman that he "noticed the red on his shoes when he was running and started to take them off."

After agreeing that the officers should transport Plaintiff back to the original scene,

3

Viesselman put Plaintiff in his patrol car and headed back to the of corner James A. Reed and 91st Terrace. While in route, Plaintiff told Viesselman that he was not the fleeing suspect.

Around 4:46 p.m., Viesselman and Plaintiff arrived back at the original scene, where Neukirch and the two other juveniles were waiting. Unlike the fleeing suspect, the two other juveniles had not tried to run, and Neukirch had quickly detained them. They remained handcuffed and sat along a fence, while Plaintiff remained in the patrol car.

Viesselman exited the patrol car to talk with another officer at the scene. At the same time, Munyan and Neukirch, along with Sergeant Luis Ortiz, reviewed patrol car video of the fleeing suspect to "double-verify" the identification. The log file on the patrol car reported that the officers played the video at least twice.

Around 4:50 p.m., Neukirch called and discussed the case with Detective John Mattivi, reporting that he and Munyan saw a juvenile suspect flee from them with a gun, Munyan chased him on foot, lost sight of him, minutes later another officer found Plaintiff who fit the fleeing suspect's description, and Munyan identified Plaintiff as the fleeing suspect. Neukirch also reported to Mattivi that he, Munyan, and Ortiz reviewed the patrol car video to confirm that Plaintiff was indeed the fleeing suspect. Based on this information, Mattivi told Neukirch to put Plaintiff on a twenty-four-hour investigative hold and to take him to the Juvenile Justice Center ("JJC"). He also told Neukirch to release the two other juveniles.

From 4:54 p.m. to 4:56 p.m., Munyan asked the other juveniles for information about Plaintiff. On the patrol car video, Munyan is heard asking the juveniles, "So you don't know where he lives?" And then, "Jay? What's his real name?" Though the juveniles' response cannot be heard, Munyan reported back to Ortiz that Plaintiff's street name was "Jay." He also reported

4

that when he asked the juveniles, "You know we got him, right?" (referring to the fleeing suspect), one of the juveniles responded, "Yeah, I seen you when you pulled up." No one directly asked either of the juveniles whether Plaintiff was the fleeing suspect. The officers also did not ask the calling party, who lived three houses away, to confirm whether Plaintiff was the person he saw with the gun. Around 5:00 p.m., Ortiz left the scene. He did not return or go to JJC.

Meanwhile, Neukirch went to the calling party's house but decided against having him come to the scene because earlier, while waiting for Plaintiff to return to the scene, the calling party yelled at the two juveniles and threatened them. Neukirch arrived back at the scene around 5:10 p.m. and took Plaintiff's photograph just outside the patrol car. At 5:22 p.m., Munyan played back the patrol car video two more times.

Ten minutes later, Neukirch and Munyan, with Plaintiff, left the original scene and went to JJC. During the approximately twenty-minute ride to JJC, Plaintiff had a calm demeanor and indicated he knew one of the two other juveniles involved.

Once at JJC, Munyan took Plaintiff inside. Neukirch watched the patrol video again in his car. The file log indicates the video was played back four times. Munyan and Neukirch again assured Mattivi they had reviewed the video footage and identified Plaintiff. The officers then wrote a report regarding Plaintiff's arrest, and, once they were done with the report, left. They had no further involvement with his case.

Mattivi interviewed Plaintiff after reading him his Miranda rights. Plaintiff's mother and aunt, along with Deputy Juvenile Officer Michael Grimes, were also present. Plaintiff told Mattivi he walked home from school by himself, realized he had locked himself out of the house, and therefore walked to his cousin's house. When he arrived, no one was home, so he started

5

walking back to his house by himself. That is when Viesselman stopped him.

Plaintiff denied any involvement in the crime, and his mother also insisted he was not involved. Therefore, with Plaintiff's consent, Mattivi took a DNA sample to compare to the DNA found on the gun. Mattivi did not make any further investigation that night. He did not call the other two juveniles or their parents, did not call the calling party, and did not review the patrol car videos. Plaintiff remained in custody.

On June 9, 2016, the Juvenile Officer of Jackson County, Missouri, filed a petition with the Family Court Division, alleging Plaintiff carried a firearm in violation of Mo. Rev. Stat. § 571.030 and fled from officers in violation of Mo. Rev. Stat. § 575.150. The next day, the Jackson County Juvenile Court conducted a probable cause hearing pursuant to Rule 127.081.[1] Counsel represented Plaintiff at the hearing, and the juvenile court determined probable cause supported Plaintiff's continued detention. Plaintiff had a second hearing on June 22, 2016, and the juvenile court ordered Plaintiff's continued detention and set a trial date for August 4, 2016.

During this time, Plaintiff's mother had made frequent attempts to talk with Mattivi, and she had repeatedly requested he review the patrol car videos and photographs to determine if Plaintiff was in fact the fleeing suspect.

On June 29, 2016, Mattivi watched the patrol car videos from Plaintiff's arrest for the first time. After watching these videos, Mattivi believed that Plaintiff and the fleeing suspect were different people because they had on different shorts and socks. He sought and received a second and third opinion from his sergeant and the prosecutor, who agreed both with his initial determination. Mattivi immediately released Plaintiff from detention. This civil action followed.

---

[1] Rule 127.08 provides the procedure to be followed at a juvenile's detention hearing.

6

## Standard of Review

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The party seeking summary judgment bears the burden of showing that there is no genuine dispute as to any material fact. *Celotex Corp*, 477 U.S. at 323. When a party is asserting qualified immunity, "[t]he party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences." *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008).

Qualified immunity protects a police officer from liability in a 42 U.S.C. § 1983 action unless the officer's conduct violated a clearly established constitutional or statutory right. *Winslow v. Smith*, 696 F.3d 716, 730 (8th Cir. 2012) (citing *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009)). Whether an officer is entitled to qualified immunity depends on two questions: "'(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct.'" *Id*. at 730–31 (quoting *Brown*, 574 F.3d at 496). The court may address the questions in any order, but the officer will be found immune unless both are answered affirmatively. *Id*. at 731 (citation omitted).

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011). "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id*. (quoting *Malley v. Briggs*, 475 U.S. 335, 341(1986)). "To

overcome qualified immunity, a plaintiff must be able to prove that 'every reasonable official would have understood that what he is doing violates' a constitutional right[.]" *Story v. Foote*, 782 F.3d 968, 970 (8th Cir. 2015) (quoting *al–Kidd*, 131 S. Ct. at 2083). A right is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

## Discussion

Plaintiff alleges he was falsely arrested and wrongfully detained for three weeks based on misidentification. He brought this lawsuit under 42 U.S.C. § 1983, which creates a "species of tort liability," *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976), for the "deprivation of any rights, privileges, or immunities secured by the Constitution," 42 U.S.C. § 1983. Count I alleges an unlawful arrest and detention claim under the Fourth and Fourteenth Amendment against Officers Neukirch and Munyan, Detective Mattivi, and Sergeant Ortiz. Count II alleges a substantive due process wrongful arrest and detention claim under the Fourteenth Amendment against Officers Neukirch and Munyan, Detective Mattivi, and Sergeant Ortiz. Count III alleges a negligent training claim against the Board, Chief Smith, and Sergeant Ortiz; Count IV alleges a negligent supervision claim against the Board, Chief Smith, and Sergeant Ortiz; and Count V alleges a deprivation of constitutional rights directly caused by official policies, procedures, practices, customs, and usages against the Board, Chief Smith, and Sergeant Ortiz.

**I.     Officers Neukirch and Munyan, Sergeant Ortiz, and Detective Mattivi are entitled to qualified immunity on Plaintiff's Fourth and Fourteenth Amendment wrongful arrest claims.**

Wrongful arrests implicate both the Fourth Amendment right not to be arrested without

probable cause and the Fourteenth Amendment protection against deprivations of liberty without due process of law. In the Eighth Circuit, the analysis for unlawful arrest claims brought under the Fourteenth Amendment is identical to those brought under the Fourth Amendment. *See Walker v. City of Pine Bluff*, 414 F.3dd 989, 992 (8th Cir. 2005); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) (holding that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth Amendment, the claim must be analyzed under that standard, not under the rubric of substantive due process). Thus, the Court analyzes Plaintiff's claims under the Fourth Amendment.

A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause. *See* U.S. Const. amend. IV; *United States v. Watson*, 423 U.S. 411 (1976). A law enforcement officer is entitled to qualified immunity if he has "arguable" probable cause—that is, if he reasonably (but wrongly) believes probable cause exists. *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008). The mistake must be objectively reasonable. *Id*.

Probable cause exists when the totality of the circumstances shows that a prudent person would believe that the arrested has committed a crime. *See Illinois v. Gates*, 462 U.S. 213, 238–39 (1983); *United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997). In determining whether an officer had probable cause, a court must "examine the events leading up to the arrest, and then decide whether the facts, viewed from the standpoint of an objectively reasonable … officer amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal quotations and citation omitted). Therefore, a court must give officers "substantial latitude in interpreting and drawing inferences from factual circumstances." *Washington*, 109 F.3d at 465. But that latitude is not without limits. For example, "[a]n officer contemplating an arrest is not

free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999). And "law enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances." *Id*.

Given the totality of the circumstances, the officers could reasonably believe probable cause existed to arrest Plaintiff, so they are entitled to qualified immunity. Here, the fleeing suspect and Plaintiff were physically similar: they both were black, juvenile males who had a similar height, weight, body build, hair color, hair style, and hair length. They also both wore unstained white t-shirts and black and red shoes. Although Plaintiff's and the fleeing suspect's shorts and socks were different, the officers' experience told them that fleeing suspects frequently wear more than one pair of shorts or socks and will shed clothing in a foot pursuit.

Moreover, Plaintiff was the only juvenile in the area fitting the suspect's description, and he was found about a mile north of the original scene approximately seven minutes after the chase began, a distance he could have covered given that he outran Munyan, who can run a six-and-a-half-minute mile without his gear. Further, not only did Munyan and Neukirch personally observe the fleeing suspect and Plaintiff, but they also reviewed the video evidence multiple times. Given the similarities between the two juveniles, the officers reasonably—but wrongly—believed they were the same person.

*Hill v. California*, 401 U.S. 797 (1971), is instructive. In *Hill*, officers had probable cause to arrest Hill, and when they arrived at his residence to arrest him, they found a man who fit Hill's description and was in Hill's home. *Id*. at 799-801. The man, however, identified himself as Miller and produced identification in that name. *Id*. at 799. The officers, finding Miller not

credible and believing Miller was Hill, searched the residence and arrested Miller. *Id*. The Court upheld the arrest because "when the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." *Id*. at 802.

So too here, the officers had probable cause to arrest the fleeing suspect, and they reasonably mistook Plaintiff for the fleeing suspect because of the similarities between the two juveniles and the fact that Plaintiff was found so close to the original scene. *See United States v. Oakley*, 153 F.3d 696, 697 (8th Cir. 1998) (finding probable cause existed where race, height, weight, pants, and hat matched the suspect's description, and the suspect was found twelve blocks from the crime scene less than an hour after the crime); *Hill v. Scott*, 349 F.3d 1068, 1073 (8th Cir. 2003) (finding that arrest of wrong person was not unreasonable given the remarkably similar descriptions of the arrestee and the suspect). The arrest, therefore, is valid.

Plaintiff claims that, regardless of any inculpatory evidence, the officers ignored exculpatory evidence and failed to conduct a "minimal further investigation," which would have exonerated him. *Kuehl*, 173 F.3d at 650 (citations omitted). He argues that had the officers conducted a closer inspection of the patrol car video, they would have seen the differences between him and the fleeing suspect. Namely, they would have noticed that the fleeing suspect's shorts were blue, while Plaintiff's were black with a white stripe on each side, and that the juveniles were different heights. He also claims the officers ignored other exculpatory evidence, like the fact that it would have been unlikely for Plaintiff to have run a mile in seven minutes without losing his breath. Finally, he argues the officers should have questioned the calling party and the two other juveniles (or at least their mothers) to ask if Plaintiff was the fleeing suspect. Had they done

so, Plaintiff claims he would have been exonerated.

Plaintiff relies on *Kuehl*, a case in which the Eighth Circuit held there was no probable cause to arrest the defendant because the officers failed to conduct a thorough investigation and ignored exculpatory evidence. 173 F.3d at 651. That case, however, is factually inapposite.

There, a store clerk inadvertently struck a customer with her hand. *Id*. at 648-49. After arriving at the scene, an officer arrested the store clerk for assault. *Id*. at 649. The officer relied solely on the customer's account of events and refused to believe the store clerk's version, even though he observed a sizeable bruise over her left eye. *Id*. at 651. The officer also ignored a witness's efforts to retract her statement that the store clerk slapped the customer, and he also failed to interview other witnesses who saw the entire altercation and thoroughly question both the store clerk and the customer. *Id*.

Unlike the officer in *Kuehl*, here the officers investigated and considered all of the evidence, both inculpatory and exclupatory. The officers personally observed the fleeing suspect and did not simply rely on another's eyewitness identification. They also reviewed the patrol car video more than eight times. Despite the differences between the fleeing suspect's and Plaintiff's shorts and socks, the officers still had probable cause because their training and experience led them to believe the fleeing suspect could have easily shed a pair of shorts in the time gap when no officer was near. *See Hannah v. City of Overland, Mo.*, 795 F.2d 1385, 1290 (8th Cir. 1986) (finding officers are entitled to rely on their training and experience).

Although the officers did not ask the two other juveniles if Plaintiff was the fleeing suspect, the juveniles implied the officers had arrested the correct person. And even if the officers had asked them, nothing suggests they would have told the truth or that the officers would have

believed the juveniles over their own observations after reviewing the patrol car video. Similarly, nothing put the officers on notice that the calling party would have been able to identify the fleeing suspect better than the officers had.

The qualified immunity doctrine "allows officers to make reasonable errors," *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996), and allows considerable room for "mistaken judgments," *Borgman v. Kedley*, 646 F.3d 518, 522 (8th Cir. 2011). Unfortunately, that is exactly what happened in this case. Based on the totality of the circumstances, the officers acted objectively reasonable in believing they had probable cause to arrest Plaintiff. Neukirch, Munyan, and Ortiz are entitled to qualified immunity.

Likewise, Mattivi placed Plaintiff on an investigative hold in reliance on the information Neukirch and Munyan provided him. Because the information provided was itself based on probable cause, qualified immunity bars Plaintiff's unlawful arrest claim against Mattivi as well. *United States v. Hensley*, 469 U.S. 221, 231 (1985) (finding police officers are entitled to rely on information from fellow officers, so long as that information was itself based on probable cause).

**II.     Officers Neukirch and Munyan, Sergeant Ortiz, and Detective Mattivi are entitled to qualified immunity on Plaintiff's wrongful detention claims.**

   **A.     Plaintiff's Fourteenth Amendment claims fail.**

The Fourteenth Amendment does not guarantee that only the guilty will be arrested and detained. Rather, it protects against the deprivation of liberty without due process of law. To establish a substantive due process violation, Plaintiff must show that the officers "intentionally and recklessly failed to investigate, thereby shocking the conscience." *Akins v. Epperly*, 588 F.3d 1178, 1184 (8th Cir. 2009) (quotations omitted). "An officer's negligent failure to investigate inconsistencies or other leads is insufficient to establish conscious-shocking misconduct." *Id*.

13

Instead, the Eighth Circuit has held that "(1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, [and] (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence" all indicate conscience-shocking behavior. *Id*. (quotation omitted). "Conduct intended to injure will generally rise to the conscience-shocking level, but negligent conduct falls beneath the threshold of constitutional due process." *Id*. at 1183 (internal quotation and citation omitted).

Neukirch, Munyan, and Ortiz were only personally involved in Plaintiff's twenty-four-hour investigative hold, not his three-week detention. Therefore, any claim against these Defendants predicated on Plaintiff's detention fails. *See Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985) (finding an officer can only be liable for conduct in which he has personal involvement). Moreover, Plaintiff's twenty-four-hour hold was based on probable cause, and therefore does not shock the conscience. Neukirch, Munyan, and Ortiz are entitled to judgment.

Unlike the other officers, Mattivi was personally involved in Plaintiff's three-week detention. Plaintiff claims that Mattivi's failure to watch the patrol car videos for three weeks violated his substantive due process rights. But Plaintiff has not shown that Mattivi's conduct was conscience-shocking. There is no evidence that Mattivi ever coerced or threatened Plaintiff or that there was a systematic pressure to implicate him. And contrary to Plaintiff's position, there is also no evidence that Mattivi purposefully ignored exculpatory evidence once he became aware of its existence.

This is not a case where Mattivi knew the videos would be exculpatory yet ignored them. Rather, Mattivi relied on multiple assurances from Neukirch and Munyan that they reviewed the

patrol car video and confirmed that Plaintiff was the fleeing suspect. Mattivi had no reason to believe Plaintiff's claims that the video was exculpatory in light of his fellow officers' assurances. *Hensley*, 469 U.S. at 231; *see also United States v. Washington*, 108 F.3d 459, 465 (8th Cir. 1997) ("An officer is not required to believe the statements of a suspect."). Rather, Mattivi believed Plaintiff's innocence would be determined by DNA testing, and he therefore took Plaintiff's DNA to compare it to the DNA evidence on the gun. In other words, Mattivi did not purposefully ignore exculpatory evidence, but rather reasonably believed the patrol car videos would not prove Plaintiff's innocence.

This is also not a case where Mattivi knew Plaintiff was wrongfully detained yet held him regardless. Once Mattivi determined the video evidence to be exculpatory, he immediately released Plaintiff. Hence, Mattivi's actions cannot be said to shock the conscience. Mattivi is entitled to qualified immunity.

### B. Plaintiff's Fourth Amendment rights were not violated.

"The Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). This determination must occur within forty-eight hours of the arrest. *Atwater v. City of Lago Vista*, 532 U.S. 318, 364 (2001). Thus, the reasonableness of pretrial detention is based on whether there is probable cause to hold a suspect prior to trial. *Manuel v. City of Joliet, Ill.*, 137 S.Ct. 911, 918 (2017).

The Supreme Court has also recognized that a state actor can be liable for wrongful detention over protests of innocence after the passage of an unreasonable amount of time. *Baker v. McCollan*, 443 U.S. 137, 145 (1979) (finding a three-day detention did not amount to a due

process violation). This liability "depend[s] on what procedures the State affords defendants following arrest and prior to actual trial," and "repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of liberty ... without due process of law." *Id.* (internal quotations and citation omitted).

As the Court noted above, probable cause supported Plaintiff's arrest. And within forty-eight hours, the juvenile court judge held a probable cause hearing—a significant procedural protection—before ultimately determining Plaintiff should remain detained. The court's order stated that "the court, receiving evidence relevant to the necessity for detention of the juvenile … and considering the information and evidence presented at the hearing, finds detention of the above named juvenile is required" (Doc. 56-32). Thereafter, Plaintiff was no longer detained simply on the investigative hold but was held in custody pursuant to a court order. *See, e.g., Rivera v. Cnty. of Los Angeles*, 745 F.3d 384, 391-92 (9th Cir. 2014) (finding due process was not violated when the plaintiff had an initial hearing before a judge within a day of his arrest and then was detained for two weeks before being released). Moreover, Plaintiff had another judicial hearing on June 22, 2016, and the judge again decided to continue to detain Plaintiff.

Under the circumstances, Plaintiff was not detained for a prolonged amount of time without the proper procedures, and, thus, his Fourth Amendment claim fails.

**III. The Board, Chief Smith, and Sergeant Ortiz are not liable in their official capacities.**

Plaintiff alleges the Board, Smith, and Ortiz—acting in their official capacities—failed to adequately train and supervise Neukirch, Munyan, and Mattivi. He also claims the KCPD's official policies and customs resulted in Plaintiff's wrongful arrest and detention.

The Eighth Circuit has held that "[a] suit against a public official in his official capacity is

actually a suit against the entity for which the official is an agent." *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006). Plaintiff's claims against the KCPD are treated as claims against a municipality. *Gorman v. Easley*, 257 F.3d 738, 743 (8th Cir. 2001). "A municipality can only be liable for a § 1983 violation if the execution of the municipality's official policy or custom inflicts a constitutional injury." *Green v. Missouri*, 734 F. Supp. 2d 814, 853 (E.D. Mo. 2010) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). To establish liability, a plaintiff must show a constitutional violation resulted from "(1) an official policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Independence, Mo.*, 829 F.3d 695, 699 (8th Cir. 2016).

As an initial matter, there can be no supervisory liability because there is no individual liability on the underlying substantive claims. *See Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018) ("'there must be an unconstitutional act by a municipal employee' before a municipality can be held liable") (citation omitted).

Moreover, Plaintiff's conclusory argument alleges only that the "record is rife with evidence of awareness of and inadequate training … and poor policies, procedures, and practices" (Doc. 71 at 101). He does not identify any official policy. Nor does he identify a pattern of constitutional violations similar to the incident in this case, which would evidence an unofficial custom. Plaintiff's failure to show an official policy or a pattern of similar constitutional violations forecloses his claim. *See Ulrich v. Pope Cty.*, 715 F.3d 1054, 1061 (8th Cir. 2013) (finding "an isolated incident of alleged police misconduct cannot, as a matter of law, establish a municipal policy or custom creating liability under § 1983").

For this same reason, the Court finds Plaintiff's claim that KCPD failed to train or supervise

its officers is without merit. To be liable under this theory, the failure must amount to "deliberate indifference." *Perkins v. Hastings*, 915 F.3d 512, 528 (8th Cir. 2019) (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011)); *Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 807 (8th Cir. 1994) ("The standard of liability for failure to supervise is demonstrated deliberate indifference or tacit authorization of the offensive acts.") (internal quotations and citation omitted). A pattern of similar constitutional violations by untrained or unsupervised employees is ordinarily necessary to demonstrate a deliberate indifference. *Perkins*, 915 F.3d at 523. As discussed, Plaintiff has not established a pattern of similar constitutional violations.

The Board, Smith, and Ortiz are entitled to judgment.

**IV.     Sergeant Ortiz is not liable in his individual capacity.**

"A supervisor may be held liable if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Id*. at 524 (internal quotation and citation omitted). The plaintiff must show that the supervisor "(1) had notice of a pattern of unconstitutional acts committed by subordinates; (2) was deliberately indifferent to or tacitly authorized those acts; and (3) failed to take sufficient remedial action; (4) proximately causing injury to [the plaintiff]." *Brewington v. Keener*, 902 F.3d 796, 803 (8th Cir. 2018) (internal quotation marks omitted) (quoting *Livers v. Schenck*, 700 F.3d 340, 355 (8th Cir. 2012)). To prove deliberate indifference, the plaintiff must show that the supervisor "had notice that the training procedures were inadequate and likely to result in a constitutional violation." *Livers*, 700 F.3d at 356.

Plaintiff claims Ortiz should have questioned Munyan about his eyewitness identification, looked more closely at the patrol car videos, and asked other witnesses about the fleeing suspect.

Plaintiff, however, presents no evidence that Ortiz knew of a pattern of unconstitutional acts committed by his subordinates, much less that he was deliberately indifferent to or tacitly approved those acts. Again, Plaintiff does not allege any other incidents of similar misconduct and does not show an unconstitutional policy or custom. On this record, Plaintiff has failed to show a failure to train or supervise, and Ortiz is entitled to qualified immunity.

## Conclusion

This is a difficult case, and the Court is sympathetic to the difficulties Plaintiff faced during his arrest and detention. However, under Eighth Circuit precedent, Defendants are entitled to summary judgment. Defendants' motion is GRANTED.

**IT IS SO ORDERED.**

Date:  March 21, 2019                     /s/ Greg Kays
                                          GREG KAYS, JUDGE
                                          UNITED STATES DISTRICT COURT