# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1713

_____

Tyree Bell

*Plaintiff - Appellant*

v.

Officer Peter Neukirch, in his individual capacity; Officer Jonathan Munyan, in his individual capacity; Detective John Mattivi, in his individual capacity

*Defendants - Appellees*

Sergeant John Doe, I, in his individual and official capacities; Captain John Doe, II, in his individual and official capacities; John Doe, III, in his individual and official capacities; Darryl Forte, in his former official capacity as Police Chief of the Kansas City, Missouri Police Department

*Defendants*

Leland Shurin, in his official capacity as President and a member of the Board of Police Commissioners of Kansas City, Missouri

*Defendant - Appellee*

Angela Wasson-Hunt, in her official capacity as Treasurer and a member of the Board of Police Commissioners of Kansas City, Missouri; Michael Rader, in his official capacity as a member of the Board of Police Commissioners of Kansas City, Missouri

*Defendants*

Nathan F. Garrett, in his official capacity as a member of the Board of Police Commissioners of Kansas City, Missouri; Mayor Sylvester "Sly" James, in his official capacity as a member of the Board of Police Commissioners of Kansas City, Missouri; Luis Ortiz, in his individual and official capacities; Richard C. Smith, Police Chief of the Kansas City, Missouri Police Department; Mark Tolbert, in his official capacity as a member of the Board of Police Commissioners of Kansas City, Missouri; Don Wagner, in his official capacity as a member of the Board of Police Commissioners of Kansas City, Missouri

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: February 11, 2020
Filed: October 28, 2020

_____

Before SMITH, Chief Judge, COLLOTON and STRAS, Circuit Judges.

_____

SMITH, Chief Judge.

About seven minutes after a black juvenile male with a gun fled from police in Kansas City, Missouri, officers arrested Tyree Bell a mile away from the scene. Bell and the suspect shared only generic characteristics in common: black, juvenile, and male. Bell, however, had several characteristics distinct from the suspect: he was taller than the suspect; had distinguishable hair from the suspect; and wore shorts, shoes, and socks that differed from those donned by the suspect. These distinctions are depicted on a police video recording that the arresting officers reviewed. Three weeks later, with Bell still in custody, a detective reviewed the video and concluded that Bell was not the offender. Authorities promptly released Bell and dismissed all charges. Bell then sued

-2-

the arresting officers, alleging that they seized him without probable cause. He also raised claims against the detective and a sergeant who authorized the detention, and he named the sergeant, the police chief, and members of the Board of Police Commissioners of Kansas City as defendants in their official capacities based on alleged failures to train and supervise the arresting officers.

The district court, describing it as a "difficult case," ruled that the arresting officers were entitled to qualified immunity, because a reasonable officer could have believed that there was probable cause to arrest Bell. *Bell v. Neukirch*, 376 F. Supp. 3d 989, 1004 (W.D. Mo. 2019). We conclude, however, that the evidence, viewed in the light most favorable to Bell, would support a finding that the arresting officers violated Bell's clearly established right to be free from an unreasonable seizure without probable cause under the circumstances. We therefore reverse the dismissal of the claims against those officers. We affirm the district court's grant of summary judgment in favor of the other defendants.

## I. *Background*

Police in Kansas City received a 911 call just before 4:08 p.m. on June 8, 2016. The caller reported that a couple of black juvenile males with guns were present with four or five teenage girls outside a house on Marsh Avenue. He explained that the males were pulling out the guns, hugging the girls, and playing with the weapons. The caller expressed concern that someone could get hurt. He identified the first black juvenile male as having dreads, wearing a white t-shirt and jeans, and having a gun in his pocket. The caller identified the second black juvenile male as wearing a black shirt and having a gun. The caller suggested that police could apprehend them. He also advised that the police could contact him at the phone number he was calling from.

At approximately 4:10 p.m., Kansas City, Missouri Police Officers Peter Neukirch and Jonathan Munyan responded to the call to investigate the suspicious gun activity. At 4:13 p.m., while en route to the area, Officer Munyan called the 911 caller.

Appellate Case: 19-1713    Page: 3    Date Filed: 10/28/2020 Entry ID: 4970342

The caller advised Officer Munyan that the suspects were no longer outside on the corner but had entered the home located at the address.

At approximately 4:18 p.m., the officers arrived at the location and drove their vehicle toward three black juvenile males who were walking along the side of the street. Officer Neukirch sounded a siren briefly, and the young men looked at the police car. As the officers exited their vehicle, one of the three males began to run. Officer Munyan yelled for him to "drop the gun" and gave chase. The runner tossed a gun over a fence on his left-hand side, continued to the end of the block, turned left at the corner, and continued to flee. Officer Munyan followed around the corner, but he could not catch the suspect.

Officer Munyan then announced a description of the fleeing suspect over a police radio: "Black male. Dreads. Blue shorts." Shortly thereafter, Officer Munyan elaborated: "Juvenile black male, 17-18, about 5'10," skinny, blue shorts, white t-shirt, shoulder-length dreads. He was taking his shoes off. I'm not sure what kind of shoes he had." A video recording of the initial police encounter taken from the patrol car shows that the fleeing suspect had all-black bushy hair that did not reach his neckline.[1] The video also shows that he wore a plain white t-shirt; dark solid-colored shorts; and long, striped gray socks that rose near mid-calf. The video reveals that the suspect was not wearing basketball sneakers but instead a low-cut footwear, no more than ankle high.

About a mile away at approximately 4:25 p.m.—seven minutes after the suspect began to flee—Officer Chris Viesselman saw Bell walking along 87th Street and talking on his cell phone. Officer Viesselman asked Officer Munyan by radio whether he was sure that the suspect had removed his shoes and explained that he "[had] a

---

[1]The video is inconclusive as to whether the suspect had dreadlocks, as the officers claim.

Appellate Case: 19-1713    Page: 4    Date Filed: 10/28/2020 Entry ID: 4970342

younger black male with . . . braids or dreads . . . approaching Blue Ridge, white shirt, with black-and-white shorts." Officer Munyan replied, "It's probably worth a ped[estrian] check. He was taking them off as I was running. But I didn't see him toss them. And I can't find any shoes. So, he might have held them and put them back on. I don't know. Ped[estrian] check him and see if he runs."

In the meantime, Bell had casually walked past Officer Viesselman's parked patrol car apparently unalarmed by his presence. Officer Viesselman backed up his car so that Bell was in front of it. Bell did not run. Officer Viesselman exited his car and called Bell over; Bell came right to Officer Viesselman. Officer Viesselman frisked Bell and asked for identification. Bell said that he was not carrying identification and that he was coming from his cousin's house down the street. Officer Viesselman decided to detain Bell and handcuffed him.

Video footage from Officer Viesselman's dashcam and photographs of Bell show Bell wearing a white t-shirt, black shorts with a wide white stripe on each side, short black socks, and black Nike Air Jordan basketball shoes trimmed in red with a red logo on the tongue. Bell's hairstyle appears to be short dreadlocks above the neckline, and his haircolor is black with brown-colored tips.

Bell asked why he was detained, and Officer Viesselman said that Bell matched the description of a suspect who was carrying a gun during a foot chase with police. Another officer asked Officer Viesselman by radio about Bell's breathing and sweating. The weather in Kansas City was sunny and about 86 degrees. Officer Viesselman responded that Bell was "[a] little sweaty," and that "[h]e's breathing normal, though." Officer Munyan then interjected by radio that he would be able to recognize the suspect if he could get to Officer Viesselman's location. The supervising officer, Sergeant Luis Ortiz, notified Officer Viesselman that Officer Munyan was on his way.

-5-

As they waited, Officer Viesselman questioned Bell. Looking at Bell's feet, Officer Viesselman asked, "How do you not lose your shoes? Those look real loose." He then added, "They['re] on there pretty good?" Viesselman then questioned Bell about his height. Bell said that he was 6'3," to which Officer Viesselman commented, "You['re] a tall boy. Play basketball?" Officer Viesselman also asked Bell how much he weighed; Bell said he weighed 155 pounds. Officer Viesselman remarked to Bell that "[y]ou don't seem like you're really out of breath after a foot chase or anything, so I don't imagine it's you, but you match what he's wearing, so that's why I gotta stop you until we check." Officer Viesselman added that "[y]ou're the right age, too; he was a juvenile."

Officer Munyan arrived shortly thereafter, driving an unmarked pickup truck. He pulled over on the opposite side of the street, about 30 feet from Officer Viesselman and Bell. From his patrol vehicle, Officer Munyan identified Bell as the fleeing suspect. As officers searched Bell, Officer Munyan said that he had "noticed the red on his shoes when he was running and started to take them off." Officer Viesselman responded, "That's why I was asking if he took them off 'cause I knew you'd said that." Officer Munyan replied, "He'd taken them off at some point." Bell was placed in Officer Viesselman's vehicle, where he insisted to the officer that "it wasn't me."

Officer Munyan returned to the original scene to view the video recording of the initial encounter while sitting in the vehicle that he shared with Officer Neukirch. A log file for the camera system shows that the video was played back two times at 4:50 p.m. The log does not reveal how much of the video was played, but one of the replays must have lasted less than one minute for a second playback to start during the same minute at 4:50 p.m.

Bell waited in Officer Viesselman's vehicle until Officer Neukirch told him to exit at 5:13 p.m. Officer Neukirch took photographs of Bell. At 5:22 p.m., Officer

-6-

Munyan played back the video two more times, with both replays beginning during the same minute. Based on information provided by Officers Munyan and Neukirch, either Sergeant Ortiz or Detective John Mattivi approved placing Bell on a 24-hour "investigative hold." Officers Neukirch and Munyan then drove Bell to the Juvenile Justice Center, where he was interviewed by Detective Mattivi and detained. Officer Neukirch played the video back four times, twice beginning at 5:52 p.m. and twice at 5:53 p.m. Officers Munyan and Neukirch again assured Detective Mattivi that they had reviewed the patrol car video and identified Bell as the fleeing suspect.

Two of the juveniles detained at the initial scene were present when Officer Viesselman brought Bell to the location. Neither Officer Munyan nor Officer Neukirch asked the other two juveniles whether Bell was the third juvenile with the gun who fled from police. Bell presented evidence that if officers had asked one of the juveniles whether Bell was the fleeing male, the witness would have informed police that Bell was not the suspect.

Officers Munyan and Neukirch also declined to ask the 911 caller to come to the scene to identify Bell. Officer Neukirch averred that he decided not to summon the caller because the caller had yelled at two of the juveniles earlier and threatened to kill them, so Officer Neukirch was afraid of "an unnecessary verbal confrontation." Bell presented evidence that if officers had shown the 911 caller a picture of Bell, then the caller would have said that Bell was not among the males on a nearby front porch about whom he called the police.

Two days after the seizure, on June 10, a juvenile court judge determined that there was probable cause to detain Bell for unlawfully carrying a gun and fleeing from officers. The court conducted a second hearing on June 22 and ordered Bell's continued detention until a trial in August. The record does not show what information was presented to the juvenile court judge at the two hearings.

-7-

On June 29, after Bell had been detained for three weeks, Detective Mattivi watched the patrol car video for the first time. He concluded that Bell was not the suspect who possessed a gun and fled from police. He observed that Bell's shorts were different from the suspect's shorts: the suspect's shorts were "black or dark blue," while Bell's had "a white colored pattern on the front/sides." Detective Mattivi also saw that the suspect wore "long grey colored socks that rode half way up his calves," while Bell's socks "were short and black in color." After Detective Mattivi reviewed the information with a prosecutor, the authorities dropped the charges and released Bell.

Bell later sued Officers Munyan and Neukirch, Detective Mattivi, Sergeant Ortiz, the chief of police, and members of the Board of Police Commissioners ("Board"). The district court concluded that Officers Munyan and Neukirch were entitled to qualified immunity because they "could reasonably believe probable cause existed to arrest" Bell. *Bell*, 376 F. Supp. 3d at 999. The court concluded that Detective Mattivi enjoyed qualified immunity because he reasonably relied on information from Officers Munyan and Neukirch. The court dismissed a claim against Sergeant Ortiz for failure to supervise because there was insufficient evidence of deliberate indifference, and it dismissed claims against the Board members, the police chief, and Sergeant Ortiz in his official capacity for similar reasons.

## II. *Discussion*

On appeal, Bell argues that the district court erred in granting qualified immunity to Officers Munyan and Neukirch. According to Bell, Officers Munyan and Neukirch arrested and detained him without probable cause and no reasonable officer could have believed that probable cause existed. As a result, he contends, qualified immunity does not bar his claims against the officers.

"We review the district court's grant of summary judgment and qualified immunity rulings de novo." *Samuelson v. City of New Ulm*, 455 F.3d 871, 875 (8th

-8-

Cir. 2006). Police officers are "entitled to qualified immunity unless (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Walton v. Dawson*, 752 F.3d 1109, 1116 (8th Cir. 2014) (quotation omitted).

## A. *Constitutional Violation*

The first question is whether Officers Munyan and Neukirch violated Bell's constitutional rights by arresting him without probable cause. *See* U.S. Const. amend. IV. Whether the officers had probable cause to arrest Bell depends on whether they had probable cause to believe that Bell was the same person who discarded a gun and fled from police at the original scene near Marsh Avenue.

"In conformity with the rule at common law, a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). The existence of probable cause "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id.* The standard is a "practical, nontechnical conception" that calls for "facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111–112 (1975). "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence have no place in the probable-cause decision." *Florida v. Harris*, 568 U.S. 237, 244 (2013) (cleaned up). "Probable cause . . . is not a high bar: It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians act." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (cleaned up). *But it is a bar*. An arrest must be supported by more than a reasonable, articulable suspicion that a person committed a crime. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989). There must be a "fair probability" or a "substantial chance" that

-9-

the person seized has committed an offense. *Illinois v. Gates*, 462 U.S. 213, 243 n.13, 246 (1983).

The probable cause requirement is designed "to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime." *Brinegar v. United States*, 338 U.S. 160, 176 (1949). "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part." *Id.* at 176. "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." *Hill v. California*, 401 U.S. 797, 804 (1971). As a result, probable cause may justify an officer's arrest of an otherwise innocent person when that person *reasonably* fits the description of the suspect. *See id.* "But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." *Brinegar*, 338 U.S. at 176. Police officers need not "always be correct," but they must "always be reasonable." *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990).

Law enforcement officers are afforded "substantial latitude in interpreting and drawing inferences from factual circumstances." *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999). However, "such latitude is not without limits." *Id.* "First, because the *totality* of circumstances determines the existence of probable cause, . . . .[a]n officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Id.* Under the Fourth Amendment, we must "analyze the weight of all the evidence—not merely the sufficiency of the incriminating evidence—in determining whether [an officer] had probable cause to arrest [an individual]." *Id.* Second, while officers need not conduct a "mini-trial" before making an arrest, they "have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as law enforcement would not be unduly hampered if the agents wait to obtain more facts before seeking to arrest." *Id.* (cleaned up).

-10-

Bell maintains that several obvious exculpatory factors nullified probable cause in his case. We conclude that the totality of circumstances was insufficient to warrant a prudent officer in believing that Bell was the suspect who possessed the gun and fled the original scene.

Bell's appearance and that of the suspect differ markedly. They are both black male juveniles wearing white t-shirts, but their full descriptions diverge at that point. First, Officer Munyan described the suspect's height as 5-foot-10-inches; Bell was five inches taller at 6'3." Second, when Bell was apprehended a mile away from the scene after only seven minutes, he had just completed a call on his cell phone, was breathing normally, and appeared only a little sweaty—an unlikely condition if he had covered that much ground so quickly in 86-degree heat. Third, Bell's apparel was distinctly different from the suspect's apparel. Bell's shorts were black with large white stripes on the sides; the suspect's were solid dark blue or black. Officer Munyan averred that he could not determine definitively from the patrol car video whether there were white stripes on the fleeing suspect's shorts. But we have reviewed the video: the absence of white stripes is obvious. Bell's socks were short and black; the suspect's socks were gray and reached his calf. When Detective Mattivi later watched the video and noticed these discrepancies, he promptly concluded that police had arrested the wrong person. Fourth, Bell and the suspect had different hair styles and hair color. While both had hair above their necklines, the suspect's hair is all black and bushy; by contrast, Bell's hair is in short dreadlocks with colored tips. Fifth, the video footage shows the suspect wearing low-cut shoes or sandals, while Bell wore black Nike Air Jordan basketball shoes trimmed in red with a red logo on the tongue. Lastly, Bell's relatively fresh appearance is noticeably inconsistent with what a reasonably prudent officer would expect to observe after running a mile in about seven minutes while changing shoes and clothing as Officer Viesselman observed.

Where a seized person's characteristics differ this substantially from what reasonably would be expected from the suspect, an officer does not have probable

-11-

cause for an arrest. In *United States v. Evans*, 851 F.3d 830 (8th Cir. 2017), for example, there was no probable cause to arrest a man for rape, despite a height, build, and shoes that matched a description of the attacker, where the arrestee lacked a scar on his abdomen and tattoos on his neck and hands that were also part of the suspect's profile. *Id*. at 835–36. It was insufficient that the arrestee displayed a healed spider bite on his abdomen, or that police thought the tattoos described by the victim could have been removable hand stamps required for reentry to local entertainment clubs, temporary tattoos, or reminder notes that the perpetrator wrote on his hands and washed off. *Id*. at 833–34. Likewise, a "discrepancy of a generation" in age defeated an assertion of probable cause where an undercover officer purchased drugs from a female named "Mary Tilma" who "[l]ooked to be about 24," but the sheriff arrested 41-year-old Mary Tillman, who lived in a trailer near the drug sale and turned out to be the suspect's aunt. *Tillman v. Coley*, 886 F.2d 317, 318, 321 (11th Cir. 1989). Where officers were advised to seize a fleeing suspect wearing a black shirt and tan pants, they lacked probable cause to arrest a subject walking toward them wearing a light blue shirt and blue jeans. *Sharp v. County of Orange*, 871 F.3d 901, 910 (9th Cir. 2017). This case falls into the same category.

As previously discussed, our review of the video footage shows the suspect as wearing low-cut shoes, as opposed to Bell's black shoes with red trim and logos. But the officers maintain that probable cause was bolstered by the red trim and logos on Bell's shoes, because Officer Munyan testified that he saw red on the suspect's shoes as he was fleeing. There is a genuine dispute of fact, however, about whether Officer Munyan actually saw red coloring on the suspect's shoes. First, the video footage does not show any red trim on the suspect's low-cut shoes. Second, when Officer Munyan broadcast his description of the fleeing suspect, he said: "I'm not sure what kind of shoes he had." Only after he saw Bell's shoes with red trim did Officer Munyan state that he saw red on the fleeing suspect's shoes. Officer Munyan argues that the two statements are not inconsistent—that is, he could have seen red trim or logos on the suspect's shoes without knowing the "kind of shoes." But given that the purpose of the

-12-

radio broadcast was to assist in identifying the suspect, and the broadcast included details about height, weight, hair style, shirt color, and shorts color, a reasonable jury could find that if Officer Munyan really saw red on the fleeing suspect's shoes, then he would have included that information with the earlier description rather than saying that he was "not sure" about the shoes.

The officers also rely on Officer Munyan's assertion that one of the detained juveniles at the scene "implied" that Bell was the fleeing suspect. According to Munyan, he said to the other two juveniles, "You know we got him, right?," and one responded, "Yeah, I seen you when you pulled up." But whether this dialogue occurred is a disputed issue of material fact that depends on an assessment of Officer Munyan's recollection and credibility. Even assuming it happened, moreover, the record does not show whether it was reasonable for Officer Munyan to believe that the other juveniles were in a position to identify Bell when the police vehicle "pulled up." More to the point, the alleged statement is at best ambiguous about whether the quoted juvenile meant to identify Bell as the fleeing suspect or whether he merely acknowledged that the police had detained someone. Officers have a duty to conduct a "reasonably thorough investigation" before making an arrest, *Kuehl*, 173 F.3d at 650. The officers could have used readily available sources for corroborative identification such as the juveniles and the 911 caller rather than rely on an ambiguous implication.

The officers submit that the discrepancy in shorts and socks could be explained by their training and experience that suspects shed items of clothing during foot pursuits to change appearance. Officer Munyan avers that in his experience, "fleeing suspects frequently wear more than one shirt, more than one pair of pants or shorts, or more than one pair of socks." Officer Neukirch says that same thing, and adds that he was trained at the police academy "that during foot pursuits, suspects will often wear more than one shirt, pants, or pair of socks for the purpose of changing their appearance." On this view, the officers assert probable cause based on a substantial chance that after Bell eluded Officer Munyan at the original scene, he shed a solid-

-13-

colored pair of shorts that he wore over the black-and-white striped shorts, and discarded a long gray pair of socks that covered a short pair of black socks, yet prominently displayed a single white t-shirt throughout the supposed pursuit.

We think there is a genuine dispute of fact about whether the potential for layered clothing supports a determination of probable cause under these circumstances. The officers do not describe any particular occasion on which they experienced a suspect who shed clothing during a foot chase. Officer Neukirch does not provide detail about the police academy's training on this subject. There is thus an unresolved factual issue about the scope of the officers' training and experience. It stands to reason that a bank robber who plots a crime and a getaway might well plan to discard an outer layer of clothing while making an escape. Even an unplanned effort at evasion might lead a suspect who is naturally wearing multiple layers to shed, say, an outer jacket or sweatshirt so that pursuing officers would see only an unfamiliar shirt. But the officers have presented no evidence of training or experience to suggest that juvenile males showing off a gun to teenage girls on a front porch during a warm afternoon in June are likely to wear multiple pairs of shorts and socks, just in case they end up in a foot chase with police.

Without evidence that officers have training or experience to expect a suspect to shed clothing in comparable circumstances, we think the inference that Bell discarded an outer pair of solid-colored shorts and an outer pair of long gray socks is implausible. Not only was Bell's clothing different from the suspect, but Bell's height was five inches different from Munyan's description of the suspect, and Bell did not exhibit the signs of exertion that a prudent officer typically should expect from a suspect who had just traversed a seven-minute mile in the heat. Taken together, the circumstances do not support a determination of probable cause.

-14-

## B. *Clearly Established*

Having determined that Officers Munyan and Neukirch violated Bell's constitutional rights by arresting him without probable cause, we must next determine whether "the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quotation omitted). If their unlawful conduct was clearly established, then they are not entitled to qualified immunity. *See id.*

"Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable officer would understand what he is doing is unlawful." *Id.* (quotations omitted); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) ("An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014))). For a right to be clearly established, "existing law must have placed the constitutionality of the officer's conduct beyond debate." *Wesby*, 138 S. Ct. at 589 (quotation omitted). The "legal principle must have a sufficiently clear foundation in then-existing precedent." *Id.* "The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* (cleaned up). Then-existing "precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that every reasonable official would know." *Id.* at 590 (cleaned up).

Under the clearly established prong, "the legal principle [must] clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quotation omitted). As a result, the rule must be defined at "a high degree of specificity." *Id.* (quotation omitted). "[C]ourts must not define clearly established law at a high level of generality, since doing so

-15-

avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* (quotation omitted). According to the Supreme Court, "[a] rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established." *Id.* (quotation omitted).

In the context of the Fourth Amendment, "the specificity of the rule is especially important." *Id.* (quotations omitted). "Probable cause turns on the assessment of probabilities in particular factual contexts and cannot be reduced to a neat set of legal rules." *Id.* (cleaned up). Because the concept of "probable cause" is "imprecise," officers frequently may find it difficult to apply the general standard to a particular situation. *Id.* Therefore, to overcome a defense of qualified immunity, it is often important for a plaintiff "to 'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.'" *Id.* (alteration in original) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam)). "[E]xisting precedent must place the lawfulness of the particular arrest beyond debate"; however, "there does not have to be a case directly on point." *Id.* (quotations omitted). Moreover, "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness must be apparent." *White*, 137 S. Ct. at 552 (cleaned up). In the warrantless-arrest context, "a body of relevant case law is usually necessary to clearly establish the answer with respect to probable cause." *Wesby*, 138 S. Ct. at 590 (quotations omitted).

In a case involving an arrest without probable cause, officers have qualified immunity if they "reasonably but mistakenly conclude[d] that probable cause [wa]s present." *Id.* at 591 (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). "This circuit often refers to this standard using the shorthand

-16-

'arguable probable cause.'" *Michael v. Trevena*, 899 F.3d 528, 534 n.3 (8th Cir. 2018). "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is objectively reasonable." *Borgman v. Kedley*, 646 F.3d 518, 523 (8th Cir. 2011) (quotation omitted). In some cases, "law enforcement officials will . . . reasonably but mistakenly conclude that probable cause is present"; in those cases, the officials are entitled to qualified immunity. *Anderson*, 483 U.S. at 641. Under the "arguable probable cause" standard, "so long as [the officer] is reasonable, the governing standard for a Fourth Amendment unlawful arrest claim 'is not probable cause in fact but arguable probable cause . . . that is, whether the officer should have known that the arrest violated plaintiff's clearly established right.'" *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005) (alteration in original) (quoting *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996)). The idea is that if probable cause was reasonably "arguable" or debatable, then the officer's action was objectively legally reasonable. *See id.* In other words, we must determine whether it was "objectively legally reasonable" for an officer to conclude that the arrest was supported by probable cause. *Anderson*, 483 U.S. at 641.

Bell argues that "fourteen obvious evidentiary reasons should have negated probable cause" to believe that he was the fleeing suspect. In light of the exculpatory evidence that distinguished him from the suspect, Bell maintains that no prudent officer would have believed that there was probable cause to arrest him. "If all this was objectively reasonable," he asks, "what would be unreasonable?"

At the time of Bell's arrest, existing precedent established the general proposition that a warrantless arrest must be supported by probable cause. *Habiger*, 80 F.3d at 295. *Kuehl* fleshed out that standard by establishing that an officer must not disregard plainly exculpatory evidence, even if substantial inculpatory evidence suggests that probable cause exists. 173 F.3d at 650. Officers also have a duty to conduct a reasonably thorough investigation before arresting a suspect. *Id.* There was thus no probable cause in *Kuehl* to arrest a subject for assault where readily available

-17-

exculpatory evidence showed that no offense was committed. *Kuehl* also cited favorably a decision denying qualified immunity for officers who relied on a security guard's allegation of shoplifting to establish probable cause when a videotape viewed personally by the officers showed that no crime occurred. *Id*. at 650 (citing *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1259–60 (10th Cir. 1998)).

Taking the evidence in the light most favorable to Bell, it was clearly established at the time of Bell's warrantless arrest that no reasonable officer in the position of Officers Munyan and Neukirch could have believed that probable cause existed to arrest Bell based on the plainly exculpatory evidence available to them. Bell wore different shorts and socks than the suspect wore at the scene. His height varied by five inches from Munyan's real-time description of the suspect. Bell did not exhibit signs of exertion that would be expected of a suspect who ran a mile in seven minutes on a warm afternoon. Given the glaring differences, there was not arguable probable cause to believe that Bell was the fleeing suspect. Bell's right to be free from an arrest and detention under the circumstances was clearly established. It is an obvious case of insufficient probable cause.

The officers assert that they acted reasonably because they reviewed the video recording of the suspect multiple times before confirming that Bell should be arrested. There is a factual dispute over how thoroughly they reviewed the video. Given Officer Munyan's averment that he could not tell whether the suspect's shorts included a broad white stripe on the side, a reasonable jury could conclude that Officer Munyan did not reasonably consider the video. But even assuming that the officers collectively watched the video eight times as they claim, it should have been obvious to any reasonable officer that Bell's shorts and socks were different from the suspect's shorts and socks at the scene. Qualified immunity requires more than subjective good faith; it requires objectively reasonable official conduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 815–16 (1982). Simply scanning a video does not make conduct objectively reasonable if an officer ignores or overlooks plainly exculpatory evidence. *Baptiste*, 147 F.3d at

-18-

1259–60. Qualified immunity does not protect the "plainly incompetent," *Malley v. Briggs*, 475 U.S. 335, 341 (1986). An officer who repeatedly watched the video and failed to take note of the substantial discrepancies between Bell and the suspect demonstrates less diligence that what is expected of competent police officers about to limit someone's liberty by arrest.

The officers fall back on their claim that it was reasonable to think that Bell shed an outer layer of shorts and socks, so they reasonably could have believed that there was probable cause on that assumption. The record includes only a general undisputed fact allegation that the officers had prior experience with suspects shedding an outer layer of clothing in undefined circumstances. As we have said, unless there is evidence that the officers had training or experience about suspects discarding layered clothing in a situation reasonably comparable to this one, the inference that Bell dispensed with a second pair of shorts and socks is implausible. Without more, it was not objectively reasonable to believe that Bell may have attempted to change his appearance by discarding solid dark-colored shorts in favor of underlying black-and-white shorts, and by removing long gray socks to reveal short black socks, while retaining his single white t-shirt and walking along the side of a road towards a parked patrol car during the supposed getaway. Even the initial detaining officer found little suspicious about Bell's appearance or demeanor. "Judges are not required to exhibit a naivete from which ordinary citizens are free." *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.).

The breadth of the officers' position illustrates the obviousness of its shortcoming. They contend that it was reasonable to believe that Munyan's height estimate of 5'10" could be off by five inches. They argue that it was reasonable to believe that a fleeing suspect found a mile away after only seven minutes would breath normally and sweat little on an 86-degree sunny afternoon. They maintain that it was reasonable to mistake one pair of shoes for another. And they assert that it was reasonable to believe that the suspect could be found wearing any combination of t-

-19-

shirt, shorts, and socks, because suspects are known to change their appearance by discarding layered clothing during foot pursuits. On that view, a reasonable officer could have believed that there was probable cause to arrest any black male aged approximately 17–18, with a dreadlock hair style[2] and slender build, who was found within a one-mile radius of the original scene, if the young man's height ranged from 5'5" to 6'3" and he was wearing a white t-shirt, shorts, and socks of any color or design. We cannot accept that such an implication represented an objectively reasonable interpretation of the law at the time of Bell's arrest.

## C. *Remaining Claims*

As to the remaining claims, we affirm the district court's dismissal. It was objectively reasonable for Sergeant Ortiz and Detective Mattivi to rely on an assurance of probable cause from two officers who witnessed the crime and who represented that they had confirmed Bell's identity as the suspect through video evidence. *See Borgman*, 646 F.3d at 623. The claims against the official-capacity defendants fail because there is insufficient evidence that this particular arrest was the result of an official policy of the police department. Bell does not identify a pattern of constitutional violations or otherwise support an allegation that the department was deliberately indifferent to the need for its officers to ensure that arrests are supported by probable cause. *See Thiel v. Korte*, 954 F.3d 1125, 1129 (8th Cir. 2020) (explaining "violation must stem from an official municipal policy or custom" to hold government officials liable).

## III. *Conclusion*

For these reasons, the district court's grant of summary judgment in favor of Officers Munyan and Neukirch is reversed, and the case is remanded for further proceedings on Bell's claims against them under 42 U.S.C. § 1983 and the Fourth Amendment. The judgment is otherwise affirmed.

---

[2]Again, the video is inconclusive as to whether the suspect had dreadlocks.

COLLOTON, Circuit Judge, concurring.

Whether police officers are entitled to qualified immunity in a Fourth Amendment case depends on whether a given search or seizure, even if unlawful, was "objectively legally reasonable." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). In a case alleging an unlawful arrest, therefore, officers are entitled to qualified immunity if they "reasonably but mistakenly concluded that probable cause was present." *District of Columbia v. Wesby*, 138 S. Ct. 577, 591 (2018) (internal quotation and alterations omitted). Where a constitutional rule is developed at a high level of generality, and there are no decisions declaring a constitutional violation under similar circumstances, an official frequently will be entitled to qualified immunity. *Id.* That is because without further definition of a general constitutional rule, it often will be "objectively legally reasonable" for an officer to believe that his understanding of the scope of the disputed right is correct. But it is also well established that "general statements of the law are not inherently incapable of giving fair and clear warning." *United States v. Lanier*, 520 U.S. 259, 271 (1997). And "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *Id.* (quoting *Anderson*, 483 U.S. at 640).

The district court recognized that this is a "difficult case," and confronted directly the dispositive question: whether "the officers could reasonably believe probable cause existed to arrest Plaintiff." R. Doc. 81, at 10. After careful review of the record, our panel majority reaches a different conclusion about whether a reasonable officer could have believed that there was probable cause to arrest appellant Bell. But the panel majority and the district court apply a common analytical framework.

The dissent, by contrast, would affirm the judgment without addressing whether a reasonable officer could have believed that there was probable cause to arrest. (And

-21-

by declining to address the first order question whether the officers had probable cause to arrest, the dissent's approach would allow officers qualified immunity to do the same thing again in the future.)  On this view, because there is no decision of the Supreme Court or this court holding that an officer "acting under similar circumstances" violated the Fourth Amendment, the officers have qualified immunity, without an inquiry into whether their actions were objectively legally reasonable.  The dissent declines to address whether the existing constitutional rules were sufficient to give fair and clear warning on these facts, because Bell's appellate briefs did not invoke the language of *Wesby* that this is "an obvious case where a body of relevant case law is not needed."  *Post*, at 27 n.5.

That is not how qualified immunity analysis should work.  When an arrestee argues on a given set of facts that no reasonable officer could have believed that there was probable cause to arrest, the argument brings up for our consideration whether the officer's seizure was objectively legally reasonable.  That question includes whether the existing constitutional rules apply with obvious clarity to the specific conduct in question.  Sometimes a plaintiff can prevail by arguing from general constitutional standards that a right is clearly established on a given set of facts.  *Brosseau v. Hagen*, 543 U.S. 194, 199 (2004) (per curiam).  Bell argued that "fourteen obvious evidentiary reasons should have negated probable cause," asserted that the right in question was clearly established, maintained that it was not objectively reasonable on these facts for officers to conclude that there was probable cause, and employed a rhetorical question—"If all this was objectively reasonable, what would be unreasonable?"—to say, in effect, "it's obvious."  We should not parse Supreme Court opinions as though they were statutes, *see Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979); nor should we read them as though they implemented a code-pleading regime for qualified immunity cases.  We cannot avoid the issue of objective legal reasonableness in this case by requiring the arrestee to use certain magic words in his appellate briefs.

-22-

I join the opinion of the court and concur in the conclusion that "this is an obvious case of insufficient probable cause." *Ante*, at 18. Given the obvious distinctions between the video-recorded suspect and the arrestee, and the implausibility of Officer Munyan's post-hoc assertion that the fleeing juvenile may have sought to disguise himself by disposing of layered shorts and socks while retaining his white t-shirt, any reasonable officer should have known that he lacked probable cause to arrest and detain Bell.[3]

STRAS, Circuit Judge, concurring in part and dissenting in part.

Tyree Bell spent three weeks in custody due to a case of mistaken identity. The district court held that the arresting officers were entitled to qualified immunity. Because there is no clearly established law to support Bell's claims against them, I would affirm across the board.

## I.

After receiving a report of teenagers "playing" with guns in a Kansas City, Missouri neighborhood, officers were sent to the scene. When they arrived, one of the teenagers tossed a gun over a nearby fence and fled on foot. Although Officer Jonathan Munyan ran after him, he got away. The officers issued a be-on-the-lookout

---

[3]In recent decisions, the Supreme Court has added the modifier "rare" when discussing the "obvious case" in which the unlawfulness of an officer's conduct is sufficiently clear to deny qualified immunity without existing precedent that addresses similar circumstances. One hopes that obvious constitutional violations are rare, but it is not evident why rarity would be part of the legal standard; frequency seems to be an empirical question that depends on the conduct of police officers. But accepting that it should be a rare Fourth Amendment case in which qualified immunity is denied without a prior decision involving similar circumstances, this one fits the bill: for me, it is likely the first case in seventeen years to meet the standard.

-23-

advisory for a "[j]uvenile [b]lack male, 17–18, about 5' 10", skinny, blue shorts, white tee shirt, shoulder-length dreads . . . [who] was taking his shoes off."

Just seven minutes after the teenager made a run for it, another officer, Chris Viesselman, spotted Bell walking about a mile away. Although Bell did not match the description perfectly, he was a black male, skinny, roughly the right age, and wearing a white t-shirt. So Viesselman stopped him. While questioning him, Viesselman noticed that he was only "[a] little sweaty" and was not short of breath, despite allegedly covering a mile on foot in around seven minutes.

Munyan, who came over upon learning that Viesselman had apprehended someone, identified Bell immediately from about 30 feet away as the same teenager he had chased just minutes earlier. Only then did Viesselman place Bell under arrest. Meanwhile, Bell continued to insist that he was innocent.

Between them, Munyan and his partner reviewed the patrol car's dash-cam video a total of eight times—four times at the scene and four more times later that day—to make sure that Munyan's eyewitness identification was accurate. According to Munyan, he also spoke to the other two teenagers, one of whom answered "[y]eah, I seen you when you pulled up," in response to the question, "[y]ou know we got him, right?"

Three weeks later, after a juvenile-court judge had ruled that there was probable cause to hold Bell, a detective reviewed the dash-cam video. He concluded that the fleeing suspect and Bell were two different people "because they had on different shorts and different socks." Bell was released not long thereafter.

-24-

## II.

This case is hardly the model of good police work, but the question for us is whether Munyan and his partner were on "notice" that their conduct violated "clearly established law." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quotation marks omitted); *see Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019) (en banc) (laying out the two-step qualified-immunity analysis). If they were not, they are entitled to qualified immunity regardless of whether they violated Bell's rights. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that courts have "sound discretion [to] decid[e] which of the two [requirements] of the qualified immunity analysis should be addressed first"); *Jacobson v. McCormick*, 763 F.3d 914, 917 (8th Cir. 2014) (declining to "decid[e the] potentially difficult question[]" of whether a strip search "was reasonable" and holding that the law was not clearly established). Even assuming a violation occurred, I remain unconvinced that the underlying constitutional question was "beyond debate." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see also Hill v. California,* 401 U.S. 797, 802–04 (1971) (explaining that arresting the wrong person does not violate the Fourth Amendment as long as the mistake was objectively reasonable); *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1265 (8th Cir. 1996) ("The evaluation of evidence to determine if probable cause exists is not an exact science.").

Here are the circumstances that confronted Munyan and his partner. First, they had both seen the suspect personally. Second, when Munyan later saw Bell, he positively identified him. Third, the officers collectively watched the dash-cam video eight times and decided that Bell was the same person who threw the gun and fled. Fourth, Munyan heard one of the teenagers reply affirmatively when he said, "[y]ou know we got him, right?" There was exculpatory evidence, to be sure, but Bell still has to "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Wesby*, 138 S. Ct. at 590 (alteration in original) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam)); *see also*

*Kisela*, 138 S. Ct. at 1152 ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." (quotation marks omitted)).

*Kuehl v. Burtis*, 173 F.3d 646 (8th Cir. 1999), a case relied upon by both Bell and the court, does not do the job. It involved an obstinate cop who did not see the crime occur, yet "made up [his] mind" about the suspect's guilt without speaking to the key witness, truly interviewing the suspect, or examining crucial physical evidence. *Id.* at 648–49; *cf. Johnson v. City of Minneapolis*, 901 F.3d 963, 969, 971 (8th Cir. 2018) (holding that *Kuehl* clearly established the violation because the officer did *not* witness the event and failed to interview an eyewitness).

In this case, by contrast, the officers personally saw the fleeing suspect, reviewed the dash-cam video multiple times, and thought that one of the teenagers had implied that the officers had caught the person who had fled. They may well have placed too little weight on the physical differences between the teenager depicted in the video and Bell, but it does not follow that *Kuehl* gave them "fair notice that [their] conduct was unlawful."[4] *Kisela*, 138 S. Ct. at 1152 (quotation marks omitted).

*Baptiste v. J.C. Penney Co.*, 147 F.3d 1252 (10th Cir. 1998), is not any closer, because the officers there lacked evidence that a crime had even been committed. They were not present at the time, and the surveillance video they watched did not

---

[4]*United States v. Evans*, 851 F.3d 830 (8th Cir. 2017), relied upon by the court to show what is necessary for probable cause, could not have given the officers "fair notice that [their] conduct was unlawful" because it was decided nearly a year after the events in this case happened. *Kisela*, 138 S. Ct. at 1152 (quotation marks omitted); *see also Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004) (per curiam) (stating that cases that "post-date the conduct in question" are "of no use in the clearly established inquiry").

-26-

"suggest" that the person they detained had committed a crime. *Id.* at 1254, 1257. Under those circumstances, the court held that "a reasonable officer" could "not have believed there was probable cause to" make an arrest. *Id.* at 1259.

*Baptiste* would have provided no guidance to these officers, who were eyewitnesses to an actual crime. *See Wesby*, 138 S. Ct. at 589 (holding that the result must be "dictated" by existing law); *see also* Mo. Rev. Stat. § 575.150 (resisting or interfering with arrest). Besides, a single, nonbinding case cannot form the "robust consensus . . . of persuasive authority" needed to clearly establish the law. *al-Kidd*, 563 U.S. at 742 (internal quotation marks omitted).

The bottom line is that neither Bell nor the court "have identified a single precedent . . . finding a Fourth Amendment violation under similar circumstances." *Wesby*, 138 S. Ct. at 591 (internal quotation marks omitted).[5] For this reason, I agree with the district court that Officer Munyan and his partner are entitled to qualified immunity.

---

[5]In his briefs, Bell never argues that this is "an obvious case where a body of relevant case law is not needed." *Wesby*, 138 S. Ct. at 591 (internal quotation marks omitted). So, unlike the court, I would not address this possibility. *See Montin v. Moore*, 846 F.3d 289, 295 (8th Cir. 2017) ("[C]laims not raised in an opening brief are deemed waived . . . ." (quotation marks omitted)). But were I to do so, it would be difficult to conclude that this is one of those "rare" cases in which the officers' conduct was "obvious[ly]" unlawful. *Wesby*, 138 S. Ct. at 590 (quotation marks omitted); *see also id.* at 591 (declaring without further analysis that the circumstances did not present "an obvious case where a body of relevant case law is not needed" (internal quotation marks omitted)).

Appellate Case: 19-1713     Page: 27     Date Filed: 10/28/2020 Entry ID: 4970342